**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

**UNITED STATES OF AMERICA**

     -v.-                                 **18 CR 14 (VM)**

**VINCENT ESPOSITO, *et al.*,**

                      ***Defendants.***
------------------------------------------------------------X

# MEMORANDUM IN SUPPORT OF VINCENT ESPOSITO'S PRETRIAL MOTIONS

LAW OFFICE OF MARC FERNICH
810 Seventh Avenue, Suite 620
New York, NY 10019
(212) 446-2346
maf@fernichlaw.com

LAW OFFICES OF JEFFREY LICHTMAN
11 East 44th Street, Suite 501
New York, NY 10017
(212) 581-1001
jhl@jeffreylichtman.com
einhorn@jeffreylichtman.com

*Attorneys for Defendant Vincent Esposito*

# TABLE OF CONTENTS

STATEMENT ...................................................................................................... 1

POINT I

A RECKLESSLY MISLEADING WARRANT APPLICATION FAILED TO
ESTABLISH CAUSE TO SEARCH ESPOSITO'S HOME, TAINTING ALL FRUITS
...................................................................................................................... 1

  A.   STATEMENT ................................................................................ 1

  B.   THE GOVERNMENT'S TOWNHOUSE PROFFER WAS MANIFESTLY
       DEFICIENT ................................................................................... 3

    1.   Background Allegations ............................................................. 4

    2.   Flimsy Townhouse Showing ..................................................... 7

       a.   Extortion Front ................................................................ 8

       b.   Based at Home ............................................................... 12

  C.   CONCLUSION ............................................................................ 16

POINT II

RECKLESSLY MISLEADING APPLICATIONS ESTABLISHED NO CAUSE OR
NEED TO WIRETAP, TAINTING ALL FRUITS ...................................... 17

  A.   STATEMENT .............................................................................. 17

  B.   THE GOVERNMENT'S MEAGER PROFFER AS TO ANTHONY
       D'ACUNTO ................................................................................. 18

C.   A WAVE OF ADDITIONAL FALSEHOODS AND OTHER STARK INFIRMITIES HOBBLE THE SUBSEQUENT WARRANT APPLICATIONS ............................................................... 25

D.   CONCLUSION ............................................................... 35

POINT III

ALL WIRETAP FRUITS MUST BE SUPPRESSED FOR IMPROPER MINIMIZATION........................................................................... 35

POINT IV

WIRETAP EVIDENCE MUST BE SUPPRESSED, ABSENT SATISFACTORY EXPLANATION, FOR UNTIMELY SEALING ........................................................ 38

POINT V

THE SIXTH AMENDMENT – IF NOT THE FIFTH – COMPELS EARLY *BRADY*/*GIGLIO* DISCLOSURE................................................................. 40

POINT VI

ESPOSITO JOINS ALL APPLICABLE CODEFENDANT MOTIONS AND REQUESTS LEAVE TO FILE FURTHER MOTIONS AS ANY SUBSEQUENT GOVERNMENT DISCLOSURES MAY NECESSITATE........................................... 41

CONCLUSION ........................................................................... 42

## TABLE OF AUTHORITIES

Cases

*Brady v. Md.*, 373 U.S. 83 (1963) ............................................................ 40

*Franks v. Del.*, 438 U.S. 154 (1978) .................................................. 12, 14

*Gallagher v. Green*, No. 12 CV 3840, 2016 WL 3213346 (E.D. Pa. June 10, 2016) ...................................................................................... 6, 11

*Giglio v. U.S.*, 405 U.S. 150 (1972) ...................................................... 40

*In re Coppa*, 267 F.3d 132 (CA2 2001) ................................................. 40

*Ky. v. King*, 563 U.S. 452 (2011) ........................................................... 32

*Lafler v. Cooper*, 566 U.S. 156 (2012) .................................................. 40

*Mo. v. Frye*, 566 U.S. 134 (2012) .......................................................... 40

*Payton v. N.Y.*, 445 U.S. 573 (1980) ...................................................... 15

*U.S. v. Blackmon*, 273 F.3d 1204 (CA9 2001) ............................. 23, 25, 33

*U.S. v. Boles*, 914 F.3d 95 (CA2 2019) .................................................... 5

*U.S. v. Burke*, 718 F. Supp. 1130 (SDNY 1989) ............................. 6, 15, 22

*U.S. v. Cancelmo*, 64 F.3d 804 (CA2 1995) .................................. 6, 15, 21

*U.S. v. Giordano*, 416 U.S. 505 (1974) .................................................. 17

*U.S. v. Gonzalez, Inc.*, 412 F.3d 1102 (CA9 2005) ................................. 25

*U.S. v. Humphrey*, No. 10 CR 25, 2013 WL 8374637 (WDNY Aug. 9, 2013)

.................................................................................................38, 39

*U.S. v. Kaley*, 571 U.S. 320 (2014) ..........................................................2

*U.S. v. Lambus*, 897 F.3d 368 (CA2 2018)...............................................2

*U.S. v. Lopez*, 547 F.3d 364 (CA2 2008)...................................................3

*U.S. v. Lorenzo*, 534 F.3d 153 (CA2 2008) ...................................7, 11, 22

*U.S. v. Payne*, No. CR 07-01215(A) SJO, 2008 WL 11358003 (C.D. Cal.

Oct. 7, 2008) .....................................................................................22

*U.S. v. Rodriguez*, 786 F.2d 472 (CA2 1986) ....................................38, 39

*U.S. v. Rosa*, 626 F.3d 56 (CA2 2010) .....................................................3

*U.S. v. Ruiz*, 536 U.S. 622 (2002)..........................................................40

*U.S. v. Simels*, No. 08-CR-640 (JG), 2009 WL 1924746 (EDNY July 2,

2009)......................................................................................35, 36, 37

*U.S. v. Vasquez*, 605 F.2d 1269 (CA2 1979).............................................40

*U.S. v. Wagner*, 989 F.2d 69 (CA2 1993) ..............................................6, 8

*U.S. v. Wey*, 256 F. Supp. 3d 355  (SDNY 2017)...........................3, 16, 17

*U.S. v. Wong*, 40 F.3d 1347 (CA2 1994) ................................................38

*U.S. v. Zemlyansky*, 945 F. Supp. 2d 438 (SDNY 2013)..........................38

Statutes

18 U.S.C. § 2518(3)(a)-(c) .................................................................. 17

18 U.S.C. § 2518(3)(d) ....................................................................... 23

18 U.S.C. § 2518(5) ....................................................................... 35, 36

18 U.S.C. § 2518(8)(a) ....................................................................... 38

Constitutional Provisions

U.S. Const. amend. IV ......................................................................... 1

**Rules**

Fed. R. Evid. 106................................................................................. 7

**Other Authorities**

Feds Find 150 More Hours of Tapes; Judge Postpones Meldish Murder Trial,
ganglandnews.com (Jan. 31, 2019) ........................................... 41

Fishman & McKenna, *Wiretapping and Eavesdropping*, § 15:7 After-the-Fact
Minimization (Dec. 2018 Update) ............................................. 36

https://en.wikipedia.org/wiki/Ekman_family............................................. 11

https://www.ekmangroup.com................................................................ 11

Sovereign District of NY 'Retrains' All Its Prosecutors on 55-Year-Old Rule of Law,
ganglandnews.com (May 24, 2018) ........................................... 41

Three Years Later, Feds Turn over *Brady* Material in Meldish Murder,
ganglandnews.com (May 31, 2018) ........................................... 41

www.theoldhomesteadsteakhouse.com.................................................... 26

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

**UNITED STATES OF AMERICA**

      **-v.-**                                                    **18 CR 14 (VM)**

**VINCENT ESPOSITO, *et al.*,**

                              ***Defendants.***
-------------------------------------------------------------X

## MEMORANDUM IN SUPPORT OF VINCENT ESPOSITO'S PRETRIAL MOTIONS

### STATEMENT

Vincent Esposito, charged with racketeering and extortion conspiracies, moves this Court for multiple forms of pretrial relief, as follows.

### ARGUMENT

### POINT I

### A RECKLESSLY MISLEADING WARRANT APPLICATION FAILED TO ESTABLISH CAUSE TO SEARCH ESPOSITO'S HOME, TAINTING ALL FRUITS

**A.**   **STATEMENT**

*A man's home is his castle.*

The maxim reflects the privileged status the home enjoys under the Fourth Amendment, ranking first among equals. *See* U.S. Const. amend. IV (banning "unreasonable searches" of "persons, houses, papers, and effects"). And since warrant applications are submitted in secret, without benefit of adversarial testing, the government owes the issuing judge the strictest duty of candor – never greater than

when it would invade the sanctity of the home. *See U.S. v. Lambus*, 897 F.3d 368, 401 (CA2 2018) ("careless government representations" may "impact the integrity of judicial decisions, especially proffers in support of *ex parte* applications that an adversary has no opportunity to dispute").

In Jan. 2018, the government sought a warrant to search a Manhattan townhouse that Esposito owns with his aged mother and two adult sisters, long living there with the octogenarian and one of them. By then a grand jury had returned an indictment – included in a supplemental warrant application filed contemporaneously[1] – charging Esposito with extortion and racketeering conspiracies. Of necessity, the indictment furnished probable cause establishing Esposito's participation in those crimes. *U.S. v. Kaley*, 571 U.S. 320, 328 (2014) (indictment "conclusively determines the existence of probable cause to believe the defendant perpetrated the offense alleged") (citations and internal quotation marks omitted). The warrant application thus had one central office: establishing probable cause to believe that the townhouse contained *evidence* of the charged crimes.

Yet the supporting affidavit prodigiously whiffed on that decisive score, exalting quantity over quality. As regards Esposito, the vast bulk of its 51 pages amount to so much filler, belaboring what the indictment alone ordained: that

---

[1] The initial warrant issued Jan. 9, 2018. During execution the following day, the government discovered a misdescription of the premises and items arguably outside the warrant's scope, including what it termed "a very large quantity of [hidden] cash." Supp. Aff. (Ex. A) 6-8. A Jan. 10 supplemental warrant corrected the error and authorized seizure of the additional items. This motion attacks the initial warrant and seeks to suppress all its fruits, including the cash and other additional items.

probable cause implicated him in the crimes' commission. What little even touched on the *townhouse*, meanwhile, was conspicuously scant, riddled with rash assumptions and breathless exaggerations but otherwise entirely unremarkable. The result? A classic exploratory search – an abhorrent "general rummaging" demanding suppression of all evidence, direct and derivative, obtained in consequence. *U.S. v. Lopez*, 547 F.3d 364, 370-71 (CA2 2008) (citation and internal quotation marks omitted).[2]

## B.    THE GOVERNMENT'S TOWNHOUSE PROFFER WAS MANIFESTLY DEFICIENT

Of the warrant affidavit's 58 numbered paragraphs, fully 35 – over 60% – purported to outline a "widespread racketeering conspiracy" that encompassed "various extortion schemes[] and union corruption involving at least two chapters of the United Food and Commercial Workers' Union." Supp. Aff. (Ex. A) ¶ 10.

---

[2] Preliminarily, the warrant and supporting affidavit – neither attached nor pertinently incorporated in any event – contain no time frame or date range limiting the expansive categories of material agents were authorized to seize. This despite the government's own recognition that Esposito had been "associated" with the townhouse for *21 years or more*. Aff. (Ex. B) ¶ 44. Further, while the warrant purports to incorporate "[a]ll definitions set forth in the affidavit" – including that of the "Union" under suspicion – the latter doesn't accompany the former, allowing agents to seize records relating to *any* union. Warrant Attachment (Ex. B) 2-3 & n.3. These defects alone make the warrant unconstitutionally overbroad, flouting the Fourth Amendment's particularity requirement. *E.g.*, *U.S. v. Wey*, 256 F. Supp. 3d 355, 380-82, 387-88 (SDNY 2017) (collecting cases establishing that (a) "many courts" have found warrants "constitutionally deficient where they imposed too wide a time frame" or none at all and (b) "(f)ailure to limit broad descriptive terms by relevant dates," when "available," renders warrant "overbroad") (citations and internal quotation marks omitted); *U.S. v. Rosa*, 626 F.3d 56, 64 (CA2 2010) (courts may not "rely on unincorporated, unattached supporting documents to cure an otherwise defective search warrant").

1.    **Background Allegations**

As to Esposito, the affidavit accused him of exerting illicit influence and control over UFCW Local 2D in several ways, all through intermediaries.

a.    From 2001-15, Esposito supposedly extracted annual payments – starting at $10,400 and rising to $12,400 – from 2D President Vincent Fyfe, his own nephew turned cooperating witness. Aff. (Ex. B) ¶¶ 11, 13(e)-(j), 15.

b.    Per codefendant Frank Cognetta[3] by way of Fyfe, Esposito and codefendant Steven Arena ostensibly told Cognetta at some unspecified time – presumably around 2014-15 – that they wanted the union to hire codefendant Frank Giovinco to "eventually replace" Fyfe. *Id.* ¶ 15.

c.    In a May 2014 consensual recording, Cognetta told Fyfe that Arena had told him, in substance, to stop organizing "Phoenix," a company that later "merged with another beverage distributor." Cognetta added, as framed in the affidavit, that he "believe[d] the message came from ESPOSITO, through ARENA." From those assertions, the affiant surmised that "ESPOSITO and ARENA were ordering Local 2D to refrain from unionizing Phoenix because they had obtained a financial interest in the merger." *Id.* ¶ 17.

d.    In a Dec. 2014 consensual recording, codefendant Vincent D'Acunto[4] told Fyfe and Cognetta that Arena had told D'Acunto and Cognetta "they

---

[3] Then Secretary-Treasurer, UFCW Local 2D. Aff. (Ex. B), *e.g.*, ¶ 17.

[4] Then Secretary-Treasurer, UFCW Local 1D. *Ibid.* ¶ 13(b). Though you wouldn't know it from the affidavit, the consensuals find D'Acunto repeatedly maligning

needed to hire ARENA's daughter to work at the UFCW." According to D'Acunto, Esposito also told him, "'NO IS NOT AN OPTION.'" *Id.* ¶ 18.[5]

Next, the affidavit recounted that Esposito had been spotted in the company of reputed organized crime figures back in July 2015. *Id.* ¶¶ 30-32. Finally, as discussed in the following subsection, the affidavit alleged that "ESPOSITO and possibly GIOVINCO" were using a "company" named "Triangle Ventures LLC" as a "front" to "collect extortion payments." *Id.* ¶ 46; *see generally id.* ¶¶ 35-42.

Contemporaneous indictment notwithstanding, these accusations barely – if at all – manage to raise a "fair probability" even connecting Esposito to the target crimes. *U.S. v. Boles*, 914 F.3d 95, 102 (CA2 2019) (citations and quotation marks admitted).

---

Cognetta for "mak[ing] shit up" – a striking omission that impugns all the latter's attributions purporting to inculpate Esposito. *E.g.*, 2/19/15 Tr. ("I don't trust him."); 5/26/15 Tr.

[5] That claim is especially suspect. In a series of 2015 Title III applications, the government insisted that wiretaps were partly necessary because Esposito doesn't communicate directly with D'Acunto. *E.g.*, 5/5/15 Aff. (Ex. C) ¶ 6(i) (Fyfe "typically makes [] payments to Target Subject VINCENT D'ACUNTO, who then directs the payments to ESPOSITO. [Fyfe] also believes that he has paid Target Subject ANTHONY D'ACUNTO, who CW-1 knows to be closer to ESPOSITO than VINCENT D'ACUNTO."); *id.* ¶ 26 ("toll records show that VINCENT D'ACUNTO and ESPOSITO, using the 1579 Phone (discussed below), have not been in contact since 2014"); *id.* 42 ("ESPOSITO uses only a small and limited number of intermediaries to communicate with [Fyfe] regarding the extortion payment and Locals 1D and 2D of the UFCW union generally. Indeed, Esposito seems to have created multiple layers between him and [Fyfe]; VINCENT D'ACUNTO interacts with [Fyfe], and then with ANTHONY D'ACUNTO or others, who interact with ESPOSITO."); *id.* 43 (D'Acunto "*no longer appears to even be directly in touch with* ESPOSITO." Rather, VINCENT D'ACUNTO is in touch with ANTHONY D'ACUNTO, who is in touch with ESPOSITO.") (emphasis supplied); *id.* ¶ 44 ("ESPOSITO is particularly surveillance-conscious"). Both contentions seem unlikely to be true; one is probably false.

**First**, they are demonstrably stale, dating from 2014-15 – a three- to four-year hiatus. *See generally U.S. v. Wagner*, 989 F.2d 69 (CA2 1993).

**Second**, they comprise multiple levels of largely conjectural hearsay – core idle chatter – from the mouths of third parties. Esposito never personally appears on any consensual recording or demands money from anyone.

**Third**, it's inherently implausible that Esposito would extort his own nephew – let alone for a relative pittance ($10,000-$12,000 a year) given the huge fortune the government imputed to him. *E.g.*, Supp. Aff. (Ex. A) ¶ 16; Aff. (Ex. B) ¶¶ 41(f), 44(c), 47.

**Fourth**, Fyfe and Cognetta admittedly rebuffed any overture to hire Giovinco (*id.* ¶ 21), belying any suggestion that they feared or were controlled by outsiders.

**Fifth**, the ideas that Esposito was behind any "message" to stop organizing Phoenix and had somehow gained an interest in a future merger amount to raw "guess" or "hunch," a far cry from "probable cause." *Gallagher v. Green*, No. 12 CV 3840, 2016 WL 3213346, at *7, *10 (E.D. Pa. June 10, 2016) (citation omitted); *see, e.g.*, *U.S. v. Cancelmo*, 64 F.3d 804, 808 (CA2 1995) (relying solely on agent's uncorroborated opinion – depending entirely on interpretations of "individuals enforcing the law" – may abdicate judicial role); *U.S. v. Burke*, 718 F. Supp. 1130, 1137 (SDNY 1989) (noting concerns about "agents turning themselves into instant experts on any subject").[6]

---

[6] Indeed, in a July 31, 2014 consensual recording, selectively quoted in the affidavit at ¶ 14, D'Acunto flatly *denies* – despite persistent prodding from Fyfe – that Esposito

**Sixth**, Fyfe and Cognetta admittedly *fired* Arena's daughter from "work at the Union" (Aff. (Ex. B) ¶ 20), further dispelling any suggestion that they feared or were controlled by outsiders – and strongly indicating that personnel decisions were wholly their own.

**Seventh**, it's no surprise that Esposito knows reputed organized crime figures given his patrimony, an accident of birth he needn't apologize for. Merely associating with alleged criminals, even if you know they're breaking the law, doesn't make you a criminal. *U.S. v. Lorenzo*, 534 F.3d 153, 159-60 (CA2 2008).

Yet for all those glaring flaws, the proffered evidence linking Esposito to the charged offenses, slim as it was, dwarfs that tying them to the townhouse – the search warrant's primary object.

## 2.    Flimsy Townhouse Showing

While devoting 35 paragraphs to the underlying crimes, the warrant affidavit spent just seven – spanning two or so throwaway pages – trying to tether them to the townhouse the government wished to search.

Keying that effort was the claim that "Triangle Ventures is a front company *based out [of] the Subject Premises*" – the townhouse – "that is used by ESPOSITO and GIOVINCO to manage extortion or kickback payments, at least from the waste carting or recycling industries." Aff. (Ex. B) ¶ 42(e) (emphasis supplied). That contention, in turn, resolves into two constituent assertions: (i) Triangle is an

---

asked or said anything about "money" or "Phoenix" when the two saw each other the day before. Omitting those exculpatory statements while highlighting other parts of the same conversation smacks of gamesmanship. *Cf.* Fed. R. Evid. 106.

extortion front and (ii) Esposito "*direct[s] payments*" – present tense – to the "purported company" at the premises "address." *Id.* ¶ 46 (emphasis supplied). The affidavit failed to substantiate either one.

### a.  <u>Extortion Front</u>

The extortion front claim rests on a lengthy trio of wiretapped calls – too long to reproduce here – between Esposito and Giovinco, all intercepted Aug. 5, 2015. In sum, the taped conversations, mentioning "containers" and "loads," concern a "small" outstanding "commission" – $2 per ton – to be paid by a "customer" referred to as "Ekman" or "Eichman," associating "Frank Crowley" and "Gary" with that "company." *Id.* ¶¶ 35-39.

Pointing vaguely to the discussion's "nature," the affiant leapt to the conclusion – based on his "training, experience, familiarity with the investigation, and the intercepted calls" – that Esposito and Giovinco "may be involved in ***ongoing*** extortion of Ekman, Ekman's customers, or others, or a kickback scheme." *Id.* ¶37 (emphasis supplied); *see also id.* ¶ 39 ("Based on my training, experience, familiarity with the investigation, and the intercepted calls, I believe that … ESPOSITO and GIOVINCO are discussing obtaining money illegally from vendors at a construction site, either by extortion or fraud."). That supposition flunks even cursory scrutiny.

**First**, the three cited calls crackle again with selectivity and staleness, all dating back some two-and-a-half years, to a single day in Aug. 2015. *See ante* 6; *Wagner*, 989 F.2d 69.

**Second**, the content is entirely unexceptional on its face, appearing nothing more or less than what it seems: a conversation about haggling[7] over *bona fide* "commissions" – brokerage, referral or consulting fees,[8] a common commercial practice – that were legitimately owed and long overdue.[9]

        i.     Notably, the parties speak freely and openly and aren't claimed to use code – highly telling where Esposito is (a) described as "particularly surveillance-conscious,"[10] (b) said to "suspect[]" Fyfe of "cooperating with law enforcement" and (c) alleged to harbor "concerns about drawing additional [investigative] scrutiny." Aff. (Ex. B) ¶ 13(j).

---

[7] Aff. (Ex. B), *e.g.*, 36, 38 ("I says [']Let's keep him as a customer for life. … I'm not looking to be a pig. … Don't be a pig.'").

[8] *Ibid.*, *e.g.,* 30 ("Don't you remember he said to me, over and over, I put you in the system, I said well back in the day with Bobby Ruggeri was in the system, and he had your information in the system, so I says to him why don't you send it over there, as long as it's something…"), 31 ("Tell them to use this company, it's already in the system, cause you had sent, whatever you had already filled out the paperwork for it. … Makes life easier let's just keep it that way then just do it this way I told him, he said 'Oh ok great.'").

[9] *Ibid.*, *e.g.*, 31 ("'This has to be a year ago[,] right?' 'Yeah[,] it's been a while …'"), 36 ("There's some back … invoices…"), 36-37 ("It's got to be a year[']s worth …").

[10] *E.g.*, 5/5/15 Aff. (Ex. C) ¶ 44.

      ii.     Far from extortionate, Esposito seems utterly unfazed by the matter.[11] He calls the amount too "small"[12] and too old[13] to "bother[]" with,[14] counseling Giovinco to simply "ask"[15] for it from a characteristically slow payer.[16] *Id.* ¶¶ 38-39.

      iii.     By spinning these unguarded, anodyne exchanges as something darker, the affiant – consciously or not – advanced an implicit "prejudgment" that Esposito's patrimony renders him incapable of legitimate work. *Cancelmo*, 64 F.3d at 809 (Calabresi, J., concurring). That strange view – distilling to little more than

---

[11] Aff. (Ex. B), *e.g.*, 30 ("If I ask him he'll definitely tell me."), 31 ("I totally forgot about it."), 32 ("I'm not saying it's right, and it's not right, but in the past with him, even with those other things I did, he never just sent it. But if you ask he sends it. So if you let me know what it is he'll send it. You know what I'm saying. I'm not saying it's right, but you'll have to have an order to get it."), 33 ("I'm telling you he will send it. Just let me know who it is I'll get it."), 37 ("Once I asked for it he sent it right away. And that's what'll happen.").

[12] *Ibid.*, *e.g.*, 30 ("Ekman, did he even send you a ten dollar bill or a twenty dollar bill on those loads he was picking up? … A lousy fucking few dollars…") (Giovinco), 31 ("Your [sic] not talking about a lot of money here … but you do three a month over the course of a year, fuck it's a night out, it's a dinner.") (Giovinco), 36 ("It is what it is, it's ah you know two dollars. … At the end of the year it adds up to something."), 37 ("Whenever I did anything with them I would let em go. Not because they didn't have it just because if it was so small that I never even bothered him (unintelligible).").

[13] *Ante* n.9.

[14] Aff. (Ex. B), *e.g.*, 37 ("Whenever I did anything with them I would let em go. Not because they didn't have it just because if it was so small that I never even bothered him (unintelligible).").

[15] *Ante* n.11.

[16] *Ibid.*

another "guess," inkling or "hunch"[17] – sounds in pure determinism and guilt by association. *Cf., e.g.*, *id.* at 808 (maj. op.) (relying solely on agent's uncorroborated opinion – depending entirely on interpretations of "individuals enforcing the law" – may abdicate judicial role); *Burke*, 718 F. Supp. at 1137 (noting concerns about "agents turning themselves into instant experts on any subject"). Whatever their abstract or philosophical merit, those constructs are incompatible with the principles of autonomy and individualized justice animating our criminal law. *Cf.*, *e.g.*, *Lorenzo*, 534 F.3d at 159-60.

**Third**, though quick to flaunt its inspecting "publicly available information" for tactical advantage,[18] the government seemingly eschewed even minimal diligence as to Ekman, the entity at the center of the conversations cited. After all, a simple Google search reveals that Ekman & Co AB is a major international forestry conglomerate based in Sweden. Founded by a prominent Gothenburg industrial family in 1802, it has divisions across the globe specializing in Pulp, Paper and Packaging, Recovered Materials and Bioenergy. One of Sweden's oldest extant companies – boasting $1.7 billion (USD) in annual sales and still owned by the same family[19] – appears an exceedingly unlikely extortion victim or partner.

Musing that "[g]iven the reference to picking up loads, ECHMAN may be involved in the waste carting business" may or may not have been acceptable in mid-

---

[17] *Gallagher*, 2016 WL 3213346, at *7, *10.

[18] *See*, *e.g.*, Aff. (Ex. B) ¶¶ 12, 17, 24, 31.

[19] https://en.wikipedia.org/wiki/Ekman_family; *see also* https://www.ekmangroup.com (both as visited Feb. 23, 2019).

2015, when the government first intercepted the cited calls. 10/1/15 Aff. (Ex. D) ¶ 96. But repeating the same speculative refrain – and failing to discover Ekman's status as a worldwide corporate powerhouse – some two-and-a-half years later is wholly indefensible. That's especially true where the calls themselves allude to "a different division" within "the same company" – a pregnant tell begging follow-up. Aff. (Ex. B) 32. Considering the government's evident lack of diligence, accusing Esposito of extorting Ekman or its customers – apparently without even bothering to contact Frank Crowley or Gary, the Ekman employees identified by name – was at least grossly negligent if not recklessly misleading. *See Franks v. Del.*, 438 U.S. 154 (1978).

### b.  Based at Home

Even assuming probable cause that Triangle was an extortion front (and there wasn't), nothing in the warrant affidavit begins to establish that it justified invading the privacy of Esposito's home – the application's principal brief.

In suggesting that Esposito "*direct[s]*" – present tense – "payments to at least one purported company, Triangle Ventures LLC, at the [premises] address," the affidavit relied chiefly on another musty trilogy, this time involving email correspondence. Aff. (Ex. B) ¶ 46 (emphasis supplied).

The first email, dated Oct. 26, 2015, transmitted an Ekman Group internal communication titled "'Rate increase.'" The communication confirmed that "'Commissions of $2.00 per ton will be paid to Triangle Ventures 67 East 77th St, NY NY 10075" on "two listed accounts," belonging to companies based in Brooklyn and

Jamaica, Queens. An Ekman employee sent the email to Giovinco, who forwarded it to Esposito. *Id.* ¶ 41(a).

The second email, sent to Esposito July 11, 2016 from "another Ekman employee," read: "'Vincent, Total is $558.80. I leave for Europe tonight. Will handle if you still want check when I return.'" Esposito forwarded the email to Giovinco, who replied, "'Bad people Cuz.'" Giovinco emailed the first Ekman employee the following day, writing, "'I thought it was like $2500 or more,'" with a copy to Esposito. *Id.* ¶ 42(c).

The third email, dated July 13, 2017, forwarded to Giovinco from Esposito what the affiant gratuitously dubbed – without a wisp of detail, context or explanation – "purported invoices." *Id.* ¶ 42(d).

These allegations suffer a string of by now familiar faults. **First**, the quoted emails appear facially benign and fully consistent with what they seem: nickel-and-dime negotiations over modest commissions – standard brokerage, referral or consulting fees – legitimately earned and lawfully owed. *Compare* **SUB-SUBPOINT I(B)(2)(a)** *with* Aff. (Ex. B) ¶ 42(b) ("payments [likely] constitute either extortion or tribute payments to ESPOSITO due to his role in the Genovese family, which were secured for ESPOSITO by GIOVINCO"). Casting the correspondence in ominous tones, by the fraught adjective "purported," for example, merely begs the question and assumes a predetermined conclusion – a conclusion in search of supporting evidence. Indeed, it's particularly precipitous given Esposito's documented experience in the "recycling business," chronicled elsewhere in the affidavit. Aff. (Ex. B) ¶ 31.

**Second**, and more fundamentally, the quoted emails precede the warrant affidavit by from six months to 26 plus, again rendering them impermissibly stale. *See* **SUB-SUBPOINTS I(B)(1)-(2)(a)**. At the time of the Jan. 2018 townhouse application, the government already had Esposito's email traffic through at least Sept. 2017 – just a handful of weeks earlier – thanks to search warrants served that month. *See* 9/13/17 Email App (Ex. E). Yet the townhouse affidavit cites no email postdating July 2017, suggesting the government found nothing even arguably incriminating in Esposito's subsequent correspondence. Those facts – only partially disclosed to the issuing judge – make the email staleness especially acute. *See Franks*, 438 U.S. 154.

Adornment aside, the government's factual proffer thus fails to demonstrate that Esposito *ever* "direct[ed]" payments to Triangle at the townhouse – much less that he was "direct[ing]" them there at the time of the Jan. 2018 search warrant application. Aff. ¶ 46. A solitary email from Oct. 2015, confirming insubstantial commission payments of $2 per ton, provides no cause to raid and ransack Esposito's entire home over 26 months afterward.

As for the rest of the government's townhouse showing, it consists exclusively of generic boilerplate. Reverting again to his "training and experience," the affiant averred that racketeers and extortionists "often" stash records, cash and other evidence at home and on "electronic devices" typically found there, "commonly" using "cellphones and computers" as criminal instrumentalities and to manage and launder "illicit proceeds." *Id.* 44, 47. Claiming that mobsters uniquely mix criminal activity

14

with their personal lives and family relationships, the affiant went on to couch evidence of their social "networks" – including photos of "weddings, funerals" and similar functions – as "relevant" and "highly probative." *Id.* ¶ 49. These stock assertions are unconvincing, if not incompetent, on their face.

      i.     In keeping with the author's custom, they reduce to more of the same: bald opinions of a partisan agent holding forth as a roving "expert[] on any subject," *Burke*, 718 F. Supp. at 1137, a tack deserving great skepticism. *Cancelmo*, 64 F.3d at 808.

      ii.     Universally applicable to *every* reputed gangster in *any* organized crime case, they conflate probable cause to arrest with probable cause to search, giving law enforcement free rein to invade the home's sanctity just by linking the target to the mafia. The law is otherwise. *See Payton v. N.Y.*, 445 U.S. 573 (1980).

      iii.    Even if alleged mobsters *generally* retain evidence on their devices long after committing crimes (*see* Aff. (Ex. B) ¶ 52) – by no means an obvious proposition – the supposedly surveillance conscious Esposito reportedly suspected Fyfe of cooperating by 2015, fixating on avoiding additional law enforcement scrutiny.[20] Unsurprisingly, then, the government stopped tapping Esposito's cellphones that Nov. and never sought renewal. Better yet, it appears that Esposito's freshest emails were totally non-inculpatory. *Ante* 14.

Whatever the supposed general practice, there was thus no indication Esposito even had a home computer in Jan. 2018 – let alone that any of his electronics then

---

[20] *E.g.*, 5/5/15 Aff. (Ex. C) ¶ 44; Aff. (Ex. B) ¶ 13(j).

contained evidence of crime. After all, why would Esposito undertake to use his devices illicitly, or to store damning evidence, while simultaneously suspecting Fyfe of cooperating and striving to deflect investigatory attention? To ask the question is to answer it. Try as it might, the government can't have it both ways.

        iv.    Even assuming evidentiary home electronics and probative social photos, they only provided cause to seize devices and pictures – not to toss the townhouse from top to bottom. In that light, the pat device and photo contentions seem a blatant ruse to penetrate the home's threshold – to get a proverbial foot in the door and conduct a wholesale fishing expedition.[21]

## C.   <u>CONCLUSION</u>

The Jan. 2018 warrant application failed to establish probable cause to search Esposito's residence. Because (1) the affiant recklessly misled the issuing judge[22] and (2) the application was so lacking in indicia of cause as to make reliance on it

---

[21] And a fishing expedition, lasting 16 hours, was exactly what ensued, more than a dozen agents indiscriminately seizing scads of items beyond the warrant's scope – yet another ground for suppression. *E.g.*, *Wey*, 256 F. Supp. 3d at 403-05. Among the more flagrant examples: a Rolodex from Esposito's sister Carmella's old job; an "Endangered" pencil from the American Museum of Natural History; a Banana Republic discount postcard; a student record form and application for Carmella; an electric heater manual; a JVC television manual; a health care proxy, living will, power of attorney and Last Will and Testament for Esposito's mother Olympia; a social security brochure; a health care document for Carmella; a Memorial Sloan Kettering pathology report for Olympia; medical records for Esposito; a cremation certificate for Vincent Gigante; a study of growth and rupture risk of ascending aortic aneurysms regarding Esposito; a sweater tag with thread; and a photo of Esposito and Carmella. *See* VEBSW_1-9980, available on request.

[22] *Ante* 12, 14.

unreasonable, the exclusionary rule's good faith exception is unavailable. *E.g.*, *Wey*, 256 F. Supp. 3d at 395. All direct and derivative evidence must be suppressed.[23]

## POINT II

### RECKLESSLY MISLEADING APPLICATIONS ESTABLISHED NO CAUSE OR NEED TO WIRETAP, TAINTING ALL FRUITS

### A.    STATEMENT

An "extraordinary investigative device," wiretapping was intended as a technique of last resort, properly "limit[ed]" to "situations clearly" justifying the drastic privacy invasion it entails. *U.S. v. Giordano*, 416 U.S. 505, 527 (1974). To spy on people's conversations, the government thus must show, among other criteria, probable cause to believe that they will yield evidence of crime and the futility of "normal" (read: less intrusive) "investigative procedures." 18 U.S.C. § 2518(3)(a)-(c). And because eavesdropping applications – like those for conventional search warrants – also proceed in secret, they too demand scrupulous candor with the issuing court given the weighty privacy interests at stake. The applications in this case thumbed their collective nose at those essential truths, making wiretaps a tool of convenience rather than need.

---

[23] Suppression of electronic information is independently mandated because the warrant lacked any meaningful digital search restrictions. *Wey*, 256 F. Supp. 3d at 382-83 (collecting cases). To the contrary, it expressly authorized "a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all [responsive] data." Warrant (Ex. B) 4.

By way of background, the government conducted several months of electronic surveillance in investigating Esposito and his codefendants, as this chart illustrates:

| APPLICATION DATE | TARGET PHONE(S) | SUBSCRIBER/USER |
|---|---|---|
| April 2, 2015 | (646) 372-8701 | Vincent D'Acunto |
| May 5, 2015 | (718) 755-7608 | Anthony D'Acunto |
| June 8, 2015 | (718) 755-7608 | Anthony D'Acunto |
| July 13, 2015 | (917) 655-1579<br>(917) 432-7170<br>(718) 213-8516 | Vincent Esposito<br>Vincent Esposito<br>Steven Arena |
| Oct. 1, 2015 | (917) 432-7170<br>(516) 369-1128 | Vincent Esposito<br>Frank Giovinco |

Esposito's communications were first intercepted over the May 5, 2015 Anthony D'Acunto tap. As we'll see, that tap lacked any plausible showing of cause or necessity. The supporting affidavit also contained materially false statements and omissions made recklessly or with gross negligence, jointly scuttling all resulting evidence, direct and derivative.[24] In addition, the succeeding applications included their own critical misstatements and omissions and suffered a slew of other shortcomings, further contaminating the derivative evidence. Suppression of all wiretap fruits follows inexorably.

## B.   THE GOVERNMENT'S MEAGER PROFFER AS TO ANTHONY D'ACUNTO

Echoing its later filed townhouse counterpart, the affidavit supporting the initial Anthony D'Acunto tap described a scheme whereby Esposito, through Vincent

---

[24] Evidentiary sources derived from the May 5 Anthony D'Acunto tap include the three subsequent taps (June 8, July 13, Oct. 1), a May 29, 2015 GPS warrant for Esposito's cellphones, a Sept. 13, 2017 search warrant for his email accounts and the Jan. 9-10, 2018 search warrants for his home. All those ensuing warrant applications relied significantly on intercepts from the May 5, 2015 Anthony D'Acunto tap.

D'Acunto and other proxies, allegedly exercised "shadow control" over Local 2D by (1) extorting annual payments from Fyfe and (2) attempting to influence personnel and organizing decisions. *See* 5/5/15 Aff. (Ex. C) 19, 42. The affidavit's main mission, however, was establishing that Anthony D'Acunto acted as his cousin's "contact" point and "direct [extortion] intermediary" to Esposito, using his cellphone for "discussions" and "electronic communications" concerning the putative scheme. *Id.* 40-41, 49. And on that pivotal front, the affidavit marshaled precious little by way of backup.

> **Allegation 1:**    Fyfe "believes" he has "also" paid Anthony D'Acunto as well as Vincent D'Acunto, knowing Anthony to be "closer to ESPOSITO." *Id.* 20 & ¶ 26.
> **Comment:**  Vague, equivocal, no payment date(s).
>
> **Allegation 2:**    In a consensually recorded June 5, 2014 conversation, Vincent D'Acunto told Fyfe that Anthony D'Acunto had called and told him to meet Arena at a Brooklyn donut shop. *Id.* ¶ 12.
> **Comment:**  Stale, double or triple hearsay, just passing a message. A claim of mere association without knowing participation in crime. No phone number identified.
>
> **Allegation 3:**    In a consensually recorded Dec. 9, 2014 conversation, Vincent D'Acunto told Fyfe and Cognetta that he had told Anthony D'Acunto, "ARENA should stop coming to the union to talk with him and they should meet elsewhere." *Id.* ¶ 17.
> **Comment:**  Stale, just passing a message. A claim of mere association without knowing participation in crime. No phone use alleged.
>
> **Allegation 4:**    In a consensually recorded Dec. 17, 2014 conversation, Vincent D'Acunto told Fyfe that Anthony D'Acunto had told him "the union needed to hire Arena's daughter" and Fyfe "needed to pay ESPOSITO more on his debt." *Id.* ¶ 18.
> **Comment:**  Stale hearsay. **At least attribution 2 – Fyfe "need[s] to pay ESPOSITO more on his debt" – appears absent from tape**, raising *Franks* concerns. No phone use alleged.

**Allegation 5:**    In a consensually recorded Feb. 18, 2015 conversation, Vincent D'Acunto told Fyfe that he tells Anthony D'Acunto "'ALL THE TIME, TO TELL [ESPOSITO] THAT THIS IS WRONG … THIS IS NO GOOD ANYMORE.'" *Id.* ¶ 21.

**Comment:**  Stale. Esposito's name never actually appears on tape, raising *Franks* concerns. Anthony D'Acunto just passing a message. At most a claim of mere association with knowledge of criminal activity but no participation. No phone use alleged.

**Allegation 6:**    In a call intercepted April 14, 2015 – the day after ostensibly receiving a controlled payment from Fyfe[25] – Vincent D'Acunto told Anthony D'Acunto, "[I] need to see you." Based on his "training" and "experience," the affiant "believe[d]" Vincent was asking Anthony to "meet with him quickly," either to deliver the money "or to discuss the payment and what to do." *Id.* ¶¶ 28-29.

**Comment:**  Call placed to an office "landline," not Anthony D'Acunto's target cellphone. *Id.* ¶ 28. Facially benign conversation among cousins. Agent's self-serving interpretation, based solely on purported temporal proximity, amounts to incompetent guess/hunch. *See* **POINT I**.

**Allegation 7:**    Pen register and toll data show significant recent contact between the Anthony D'Acunto and Esposito cellphones: 10 text messages exchanged the afternoon of April 14, 2015 (within hours of the office landline call), two exchanged the evening of April 21, 19 exchanged April 22 and 20 exchanged April 24. Based again on his "training" and "experience," the affiant "believe[d]" the men "may have been discussing" Fyfe's putative "extortion payments." 5/15/15 Aff. ¶¶ 31, 35, 40, 42.

**Comment:**  Given absence of content, agent's self-serving spin amounts to more incompetent guesswork/hunch. *See id.* 45 (agent concededly can't "confirm" that "payment" actually "discussed"). Frequent phone contact between Anthony D'Acunto and Esposito appears par for the course. The same pen register and toll data show they exchanged 17 calls and 242 texts from March 21 to April 28, 2015. *Id.* 40-41. Fifty-one of 242 total texts – a cherrypicked sliver – scarcely count as suspicious.

**Allegation 8:**    Vincent and Anthony D'Acunto are seen "meeting" outside Anthony's house the night of April 14, as arranged during the office landline call earlier in the day. *Id.* ¶ 32.

---

[25] Though the affidavit dates the controlled payment April 13, the preamble to the corresponding consensual recording appears to place it on April 6, well before the April 14 intercept the government styled as suspicious – another potential *Franks* concern.

**Comment:** Facially neutral family visit. Agents admittedly don't see Vincent hand Anthony "anything." *Id.* Better still, Vincent tells Fyfe three days later that he "'DIDN'T [EVEN] SEE ANYBODY YET'" and has "'NO IDEA'" what to do with the money, exploding Anthony's proffered role as extortion contact point or bagman. *Id.* ¶¶ 33-34.

**Allegation 9:**       In a consensually recorded conversation another four days later, on April 21, Vincent D'Acunto told Fyfe, "'I GOTTA SEE MY COUSIN BECAUSE HE *SUPPOSEDLY* HAS WORD ON WHAT'S GOING ON.'" *Id.* ¶¶ 36-37 (emphasis supplied).

**Comment:** Vague, equivocal, conjectural hearsay. No Anthony D'Acunto phone use alleged. Agents already up on Vincent D'Acunto's phone, poring over pen register and toll records and physically surveilling both D'Acuntos. Thus the affiant surely could – and would – have mustered some tangible evidence to verify Vincent's "suppos[ition]" if any existed.

**Allegation 10:**       The same day, April 21, Anthony D'Acunto texted his cousin: "'IS YOUR OFFICE READY FOR ESPRESSO MACHINE[?]'" Vincent D'Acunto replied: "'NOT YET, I NEED TO SEE YOU LATER[.]'" Repeating his "training" and "experience" refrain, the affiant deduced that the men "may have been discussing meeting regarding" Fyfe's asserted "extortion payments." *Id.* ¶¶ 38-39.

**Comment:** Facially innocuous. Unabashed agent opinion; incompetent guess/hunch. *See* **POINT I**.

**Allegation 11:**       In a call intercepted April 28, Vincent D'Acunto asked Anthony: "'ALL QUIET ON THE WESTERN FRONT?'" Anthony replied: "'YEAH, EVERYTHING'S FINE…I HAD LUNCH FRIDAY …'" Pointing yet again to – wait for it – his "training" and "experience," the affiant somehow divined that "western front" meant "West Side crew of the Genovese Family." Piling inference on speculation, he further equated "lunch Friday" to "lunch with ESPOSITO …, at which they may have discussed the [claimed] extortion payment." 5/15 Aff. (Ex. C) ¶¶ 43-44.

**Comment:** Reifies the pitfall of a partisan "agent" opining on the "true meaning of facially innocent words" – and supplying a purported "code key" that "rests on very little more than a prejudgment" – to encourage "an abdication of the judicial role." *Cancelmo,* 64 F.3d at 808; *id.* at 809 (Calabresi, J., concurring). The agent's "turning" himself into an "instant expert[]" on "any subject" is especially regrettable given the conspicuous lack of physical surveillance, readily available and elsewhere employed, to validate the surmise that Anthony D'Acunto had lunched with Esposito – much less that they'd discussed extortion.

*Burke*, 718 F. Supp. at 1137. Not incidentally, shunning available physical surveillance also confounds any professed need for the electronic variety. *Cf.* Aff. (Ex. C) 46 (allowing that "follow[ing] ANTHONY DA'CUNTO [sic]" to "see if he meets with other Target Subjects w[ould] be of some value").

Overstatement and embellishment aside, these accusations suggest only that Anthony D'Acunto (1) associated with Vincent D'Acunto, Esposito and Arena and (2) served as a conduit for messages among them, perhaps (3) knowing generally that some illegality was allegedly afoot. Nothing indicates, however, that Anthony knew the illegality's nature or scope, let alone intended to join or partake. And it's fundamental that merely associating with suspected lawbreakers, even with knowledge of their purported misdeeds, doesn't make one a conspirator absent willful participation. *E.g.*, *Lorenzo*, 534 F.3d at 159-60. The application thus failed to establish probable cause inculpating Anthony D'Acunto in the target crimes. *Cf., e.g.*, *U.S. v. Payne*, No. CR 07-01215(A) SJO, 2008 WL 11358003, at *4 (C.D. Cal. Oct. 7, 2008) ("In a conspiracy case, a wiretap warrant affidavit must establish that a wiretap is necessary for each and every individual co-conspirator whose phone law enforcement wishes to tap. … [E]stablishing necessity for one conspirator does not establish necessity for another.") (citation omitted).

Equally problematic, the affidavit's perfunctory recitations on the need to tap Anthony's phone reduced to a rush of canned platitudes,[26] globally applicable to

_____

[26] Many of the government's necessity assertions pointed out intrinsic limitations – broadly applicable to any case – in the utility of alternative investigative techniques. Aff. (Ex. C), *e.g.*, 45 ("[Geo]location data alone does not allow investigating agents to know where an interceptee is traveling, how long he will remain at any given location,

practically any instance of concerted criminal activity. *See generally* Aff. (Ex. C) 41-

49.[27] That's especially true given the government's selective and halting attempts at

_____

and with whom he is planning to meet."), 46 (vehicle tracking device "will not provide insight into what is said or … happening at … meetings"), 46 (telephone toll records "provide only limited information. They will not enable law enforcement to identify with certainty the persons involved in committing the Target Offenses or the nature of their involvement. … [They] do not provide real-time evidence of the content of communications…"), 47 (not "desirable" to immunize coparticipants and "compel their [grand jury] testimony. Immunizing them could thwart the public policy that they be held accountable for their crimes" and "undoubtedly would alert the Target Subjects to the pendency of the investigation."), 47-48 (executing a search warrant would "prematurely reveal the [investigation's] existence," provoking "defensive measures that would seriously jeopardize" it); 48 (search warrants not "viable" because "electronic communications, including text messages are only available for short periods of time, because search warrants only provide historical information and not current activity, and because of the delay in receiving returns from … telecommunications carriers"), 48 (arrest and unsuccessful cooperation overture "almost certainly would" reveal investigation's "existence," spurring "defensive measures that would seriously jeopardize [it]"), 49 (financial investigation "would not reveal [enterprise] scope").

If those truisms sufficed to show that "normal investigative procedures have been tried and … failed or reasonably appear … unlikely to succeed … or … too dangerous" (18 U.S.C. § 2518(3)(d)), then wiretaps would be available on demand or merely for the asking. The law is to the contrary. *E.g.*, *U.S. v. Blackmon*, 273 F.3d 1204, 1210-11 (CA9 2001) ("boilerplate assertions" that "merely describe the inherent limitations of normal investigative procedures" are "simply not enough").

[27] Several of the affiant's necessity representations strain the bounds of veracity.

**First**, the author bluntly proclaimed that "members of LCN are particularly wary of outsiders, and would not be likely to divulge information about the Target Offenses to confidential informants with whom they do not have an LCN-based relationship." Aff. (Ex. C) 43; *see also id.* 42 (organization's "guarded nature" makes "attempted introduction of an undercover officer" unlikely to succeed). Tell that to, say, Donnie Brasco aka undercover FBI agent Joseph Pistone.

**Second**, the author maintained that "meetings between [Fyfe] and VINCENT D'ACUNTO occurred at the offices of their mutual employer" – the union – "without prior notice to [Fyfe]. Thus, although able to capture such conversations via a

physical surveillance, a lesser intrusion that was readily available. Together, these dual drawbacks elevated eavesdropping from a last resort to a virtually automatic expedient,[28] subverting the Anthony D'Acunto tap and spoiling all its fruits. *See*

recording device, [Fyfe] did not have sufficient time to advise law enforcement agents of the meetings in a manner that would allow them to conduct surveillance of any such meeting." *Id.* 44; *see also id.* 45 (payment scheme operated through "unscheduled face-to-face meetings"). Yet the same affidavit quotes a consensual recording in which *Fyfe* calls a meeting at the union with Vincent D'Acunto – not vice versa – roughly 14 hours in advance, purportedly to discuss Esposito. *Id.* ¶¶ 22-23.

**Third**, the author suggested that "[w]hile [Fyfe] can record his conversations with VINCENT D'ACUNTO, there is no way to record … conversations between VINCENT D'ACUNTO and ANTHONY D'ACUNTO…" *Id.* 44. In fact, the government had been tapping Vincent's phone for over a month, recording multiple conversations with Anthony and quoting them liberally in the same affidavit.

**Fourth**, the author asserted that physical "surveillance" had been "useful in confirming that VINCENT D'ACUNTO appears to be dealing with ANTHONY D'ACUNTO in respect of th[e extortionate] payment." *Id.* 44-45. Yet the same affidavit concedes that agents surveilling the two meeting outside Anthony's house never saw Vincent "hand[]" him "anything." *Id.* ¶ 32.

**Fifth**, the author declared ominously that "VINCENT D'ACUNTO also appears to use a second cellphone" – besides the one the government had already been tapping for more than a month – "to communicate with ANTHONY D'ACUNTO." *Id.* 49. Notably left out: call records reveal a grand total of *one* contact between that phone and Anthony's from March 21 to April 28, 2015. *Id.* 39-40.

[28] Parts of the affidavit seem to betray a presumptive entitlement to eavesdrop because agents consider it the most effective weapon in their arsenal. Aff. (Ex. C), *e.g.*, 43 ("[i]ntercepting phone calls made by ANTHONY D'ACUNTO … will be far more likely [than other means] to provide [evidentiary] insight"); 45 (GPS data an "[in]adequate substitute for the information that may be obtained through interceptions of electronic communications"), 46 ("Toll records, unlike the interceptions requested herein, do not provide real-time evidence of the content of communications. … It is only through the combination of wire surveillance, physical surveillance and other investigatory tools that the investigating agents expect to identify fully the nature and scope of the organization, including the identities of the individuals … connected to the conspiracy."), 48 ("search warrants are not a viable

*Blackmon*, 273 F.3d at 1211 (government "nulli[fies]" § 2518 "requirements" by "cast[ing] its investigative net so far and so wide as to manufacture necessity in all circumstances").

But wait. It gets worse.

## C.    A WAVE OF ADDITIONAL FALSEHOODS AND OTHER STARK INFIRMITIES HOBBLE THE SUBSEQUENT WARRANT APPLICATIONS

Even assuming cause or need to initially tap Anthony D'Acunto's cellphone, a welter of further misstatements, omissions and other prominent vices – including overt staleness and pronounced lack of cause – stymie the government's ensuing applications for cellphone, GPS and email surveillance.

The misrepresentations at issue are too numerous to fully canvass here. But a representative sample bespeaks a pattern of distortion and embroidery – or at least indifference to accuracy – that clouds the credibility, integrity and reliability of the whole investigative enterprise. And those foibles in turn — the authors' habitual laxity with the facts, intermittent regard for the truth and evident facility in bending

---

alternative to interception of the Target Cellphone"). That has it precisely backward, putting the shoe on the wrong foot. The test is one of need, not efficacy or efficiency, and "the government must overcome the statutory presumption *against* this intrusive investigative method by proving necessity." *U.S. v. Gonzalez, Inc.*, 412 F.3d 1102, 1112 (CA9 2005) (emphasis supplied) (collecting cases), *amended*, 437 F.3d 854 (CA9 2006). That agents *wanted* more information doesn't mean they *needed* to get it by tapping Anthony D'Acunto's phone. *See* Aff. (Ex. C) 46-47 ("The FBI *suspects* that the Target Subjects are *possibly* involved with more co-conspirators than the individuals who have been identified, and that interception of the Target Subjects' wire and electronic communications *may* reveal a broader scope of the Target Subjects' illegal activities, as well as the identities of other co-conspirators.") (emphasis supplied).

it — call for close scrutiny of each assertion in every affidavit presented to the authorizing judges. Here are several select, but by no means exhaustive, examples.

1.    Beginning in a May 29, 2015 application to track Esposito's and Arena's movements, both historical and prospective, via GPS cellphone monitoring, the affiant described Manhattan's Old Homestead steakhouse, a New York City landmark established in 1868,[29] as a restaurant "known to be frequented by members of organized crime." *E.g.*, 5/29/15 Aff. (Ex. F) ¶ 52. Throughout his youth, defense counsel Fernich's father – a self-made, Ivy-educated veterinarian who owned and operated two animal hospitals in Suffolk County, Long Island – routinely took the family to dine at the Old Homestead, usually before or after shows and concerts. The government's characterization would link Dr. Fernich and his family to "organized crime" merely for patronizing a popular eatery.

2.    Starting with the same May 2015 GPS application, the affiant quoted Esposito as telling Anthony D'Acunto, in a May 25 wiretapped call concerning a commercial tenant of his in Asbury Park, NJ, "THAT I MAKE A PERCENT THAT I'M NOT ALLOWED TO HAVE." *E.g.*, *id.* ¶¶ 55-57. From there the agent conjured a "coded" conversation about "collecting a percentage of money from a business." *E.g.*, *id.* ¶ 57. As a *Franks* hearing will show, the tape actually finds Esposito telling D'Acunto, freely, openly and unabashedly, "It's not like I'm asking for something I'm not allowed to have."

---

[29] www.theoldhomesteadsteakhouse.com (as visited March 8, 2019).

3.    The government proffered an exceptionally thin rationale for initially tapping Esposito's 7170 phone in July 2015. It consisted solely of claims that (a) Anthony D'Acunto had invited Esposito, via the 7170 phone, to dinner June 3 at Manhattan's Rao's but Esposito didn't go and (b) from May 28 to July 5 the 7170 phone "was in contact 158 times with a cellular telephone assigned call number 917-662-0661 (the '0661 Phone')." 7/13/15 Aff. (Ex. G) ¶¶ 67-69; *id.* 66-67, 71 (233 "electronic communications" between 7170 and 0661 phones during same period). In a carefully worded passage, the affiant professed to "know" that Gambino associate and Arena nephew Frank Lardi "*use[s]*" – present tense – the 0661 phone. *Id.* 67 (emphasis supplied). He based that supposition on Lardi's having allegedly "*provided* this number to the FBI when … arrested in *2010*," some five years prior – itself a nonsequitur if not an outright fabrication, particularly where Lardi admittedly used a *different* number (and *not* the 0661 phone) when overheard on a recent wiretap in late 2014-early 2015. *Id.* 67-68.

Yet under three months later, in an Oct. 1, 2015 application to resume tapping Esposito's 7170 phone, the *same* affiant imputed present use of the *same* 0661 number to an entirely different individual, Esposito construction colleague Jason Dorn – without even bothering to mention, never mind correct, the earlier misattribution. 10/1/15 Aff. (Ex. D) ¶¶ 88-91. Ascribing the same phone number to different people in separate but related *ex parte* affidavits plays fast and loose with the courts, reeks of manipulation and is simply unconscionable.

27

4.    In the initial July 13, 2015 application to tap Esposito's cellphones, the agent recounted a pair of text messages where Arena asked Anthony D'Acunto to see if "JOE," putative code for Esposito, was "AROUND" for "PIZZA UPTOWN." 7/13/15 (Ex. G) ¶¶ 76-78, 83-85. According to the agent, "geolocation information" and physical surveillance (conducted by, among others, the agent himself) placed Arena "inside Salvo Pizza Bar" on Manhattan's 8th St. "at the time of these communications" – an odd assertion if he was ostensibly asking to have "PIZZA UPTOWN." *Id.* ¶¶ 78, 85.

Yet under three months later, in the Oct. 1, 2015 application to resume tapping Esposito's 7170 phone, the same agent recounting the same text messages now purported that the same "geolocation information" and physical surveillance placed Arena "inside Salvo Pizza Bar" on *78th* St. "at the time of these communications." 10/1/15 Aff. (Ex. D) ¶¶ 74, 81. And again the agent made that change without even bothering to acknowledge the earlier mistake. In ordinary circumstances one might chalk the mistake up to scrivener's error. Not so where the agent purposely referenced geolocation information, and physical surveillance he personally conducted, to (a) pinpoint Arena's exact whereabouts and (b) bolster the credibility of his sinister twist on the allegedly triangulated text messages. Not so given the jarring geographic incongruity — recurring several times in the July 2015 affidavit — between 8th St. and uptown Manhattan. And not so given the studied effort to hide both the initial mistake and the subsequent correction. In those circumstances the mistake is wholly inexcusable.

28

5.     Straining to tar Esposito with the brush of gangsterism, the July 2015 affidavit reported significant wire and electronic communication – calls and text messages – between his 1579 phone and "a cellular telephone assigned call number 917-686-3985." 7/13/15 Aff. (Ex. G) 66-69; *see also* 10/1/15 Aff. (Ex. D) 90, 94-95 (similar). The latter phone, the author alleged, was subscribed to the late Frederico Giovanelli, then a reputed "capo in the Genovese Family." 7/13/15 Aff. (Ex. G) 66-67; 10/1/15 Aff. (Ex. D) 90, 95. In fact, a *Franks* hearing will show that the 3985 number belongs to Dr. *Freddie* Giovanelli, Frederico's son, Esposito's friend and a chiropractor who treats him.

6.     Elsewhere in the July 13, 2015 affidavit, the author couched as "code[]" for "having dropped off [an] extortion payment at ANTHONY D'ACUNTO's house" this intercepted June 18 text message, attributed to Anthony's cousin: "LEFT U A LIST OF WINES AT YOUR HOUSE." 7/13/15 Aff. (Ex. G) ¶¶ 81-82. Yet, amid ongoing GPS monitoring of Esposito's and Arena's cellphones – and despite continuing electronic surveillance of Anthony D'Acunto's – the affidavit offered no concrete indication that Vincent D'Acunto ever left any money at Anthony's home, much less that Anthony passed it on to Esposito, Arena or anyone else. To the contrary, "visual surveillance" the night before the intercepted text message – June 17, 2015 – concededly failed even to track Vincent D'Acunto "to ANTHONY D'ACUNTO's house." *Id.* ¶ 80. Given the startling absence of readily available confirmation, the agent's "extortion code" thesis can only be termed a wishful shot in

29

the dark – the product of a vivid imagination, perhaps excited by watching too many second-rate mafia movies.

7.     The original Esposito cellphone tap expired Aug. 11, 2015 and the government never sought to contemporaneously extend it. 10/1/15 Aff. (Ex. D) 108. And for good reason. By the government's own account, the tap proved a resounding flop – a big nothing burger – yielding "*no readily apparent intercepts about the [alleged Fyfe] extortion scheme*" it chiefly targeted. *Id.* (emphasis supplied). To the contrary, a consensual recording made the tap's final day tended to *exculpate* Esposito, capturing Fyfe and Vincent D'Acunto agreeing that "STEVIE" Arena may well be "DOING IT" – *i.e.*, purportedly "commanding" Fyfe's "payments" – "HIMSELF." *Id.* ¶ 101.

Foiled on that crucial front, and undeterred by its admitted initial failure, the government seemingly regrouped and nonetheless tried to revive the tap some six weeks later – on Oct. 1 – by shifting gears and switching focus, moving the goalposts and casting an even wider net. *Id.*, *e.g.*, 110 (asserting that "[p]rior interceptions of ESPOSITO's phones have revealed that [he] and GIOVINCO have a business relationship relat[ing] to construction work" and "involv[ing] a scheme to extort others, such as subcontractors"). Given the six-week interception lapse and the "[p]rior" tap's admitted failure, the fate of the government's quest to fish for something – anything – to hang on Esposito necessarily hinged on the presence or absence of fresh, post-tap information establishing cause and need to resume

eavesdropping on his calls and texts. And on that dispositive head, the government again fanned mightily.

The only fresh, post-tap information the Oct. 1 affidavit managed were "call" and "electronic communication[]" records, covering the period Aug. 24-Sept. 13, for Esposito's 7170 phone. *Id.* 89-93, 95-96. But as even the government had to confess, "telephone toll records" have "limited" probative value because they "do not provide … evidence of the content of communications." *Id.* 103-04. And even if they were more probative as a class, only 87 of the 5066 wire and electronic communications analyzed for the cited period – just *1.7%* – were with people the government deemed shady. *Id.* 89-93, 95-96.[30] If anything, then, it follows that the toll records tended exculpate rather than inculpate. Blessing the tap's resurrection on such a skimpy showing thus amounted to a pure judicial rubberstamp, premised on the fallacy that Esposito *must* be guilty of *something* because he's Vincent Gigante's son. Visiting a father's putative sins on the son, though, is inimical to the concept of individualized justice.

8.    But you really can't blame a judge for rubberstamping an *ex parte* submission when its sponsor leads the jurist down a garden path. So it was with the Oct. 2015 application, where the government sought to manufacture its own necessity for resumed wiretapping with this rich lament: "Unfortunately, a [controlled] payment from [Fyfe] to VINCENT D'ACUNTO was not made until August 11, 2015, the day that the previous intercepts over" Esposito's phones "concluded." *Id.* 108. The

---

[30] Among those deemed shady were Esposito's own half-brother, Giovinco, Frederico (really Dr. Freddie) Giovanelli, Anthony D'Acunto, Ponte and someone named Rocco Siclari, reputedly a Genovese Family associate. 10/1/15 Aff. (Ex. D) 89-93, 95-96.

pregnant use of the passive voice can't mask the reality that the government alone controlled the frequency and timing of staged payments from its cooperating witness. *Cf. Ky. v. King*, 563 U.S. 452, 462 (2011) ("exigent circumstances rule justifies" warrantless search to prevent evidence destruction only where "police d[o] not create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment").

Having floated the government's own neglect to bootstrap renewed wiretapping, the affiant went on to pledge:

> *[T]he FBI intends to have [Fyfe] make another payment to VINCENT D'ACUNTO during the course of any future wire intercepts* over the [7170 phone], which will hopefully generate conversations regarding the extortion scheme. Such interceptions will allow the agents to determine if ESPOSITO is the final recipient of the payments, if he is [sic] passes all or part of the payments to other individuals associated with the Genovese Family.

*Id.* (emphasis supplied). *Never, ever happened*, at least according to the progress reports filed with the issuing judge during the renewed tap's life. *See* progress reports dated 10/13/15, 10/16/15, 10/23/15 (collectively Ex. H). A *Franks* hearing is essential to determine why not, and thus whether the affiant's contrary promise was deliberate, reckless or simply inadvertent.

9.    Impossible as it sounds, the cause proffered for searching Esposito's email accounts almost two years later was even slighter, to the point of abject nonexistence. Filed Sept. 2017, the warrant application cited no suspected criminal activity attributable to Esposito after Oct. 2015, no suspected criminal activity by *anyone* after May 2016 and no email traffic involving Esposito – sterile

and content-barren though it had been – after late 2015. 9/13/17 Aff. (Ex. E) ¶¶ 50-
51; *id.* 45-48. Once again, endorsing a search upon the feeble justifications and
blanket generalizations[31] comprising the Sept. 2017 affidavit can only be ascribed to
judicial rubberstamping based on Esposito's lineage – or, more likely, material
misrepresentations by the author.

        10.     To that end, the government continued to assert – despite several
years to investigate – that the FBI to date "has been unable to determine whether
ESPOSITO has legitimate involvement in real estate and construction in New York
City." *Id.* ¶ 29. The affiant's hedging was perhaps understandable back in July 2015,
when agents first intercepted the Esposito-Giovinco conversation prompting the
quoted statement. *See* 10/1/15 Aff. (Ex. D) ¶¶ 92-93. But copying the statement
verbatim more than two years later – while conducting no apparent investigation
meanwhile – is intolerable if not disgraceful. *Cf. Blackmon*, 231 F.3d at 1208-09
(suppressing wiretap-derived evidence where supporting application, "nearly a

---

[31] 9/13/17 Aff. (Ex. E), *e.g.*, ¶¶ 60 (email use a "common and indispensable part of
operating any modern business or labor union," so "likely that the Target Subjects
used their email accounts in connection with the Subject Offenses"), 61 (email
accounts "expected to contain … communications that demonstrate (through their
content and frequency) the personal networks of the Target Subjects, including the
identities of those with whom the Target Subjects maintain particularly close
relationships"), 62 ("email accounts commonly contain information identifying their
bank and other financial accounts, such as emails generated when an account is first
established, and emails providing updates concerning financial transactions
involving the relevant account"), 63 ("Those who engage in criminal activities such as
the Subject Offenses also often conduct internet and website searches and research
related to their criminal activities, such as using map programs such as Google maps
to plan meetings related to their crimes and searching for victim information and
news coverage about the crimes they have committed to monitor law enforcement
investigations into their crimes.").

carbon copy of a previous application for a different suspect, contain[ed] material misstatements and omissions regarding … necessity").

11.    In the Sept. 2017 email affidavit, the author purported to identify as Esposito the "he" in this ostensibly extortion-related remark by Vincent D'Acunto, consensually recorded by Fyfe March 5, 2015: "'HE TEXTED ME THAT HE WANTED TO COME BY LAST NIGHT! … HE DIDN'T CALL ME OR ANYTHING.'" 9/13/17 Aff. (Ex. E) ¶ 60. Yet over two years earlier, in the initial May 2015 eavesdropping affidavit for Anthony D'Acunto's cellphone, the same author unmistakably identified the same "he" in the same quoted remark – shortly after its passing – as codefendant Frank Cognetta. 5/5/15 Aff. (Ex. C) ¶ 24. Naturally the affiant didn't bother alerting the issuing judge to the whopping discrepancy or point to any changed circumstance explaining it. Another galling disgrace.

12.    In still another carefully worded passage, the email affiant presumed to "know" – from (what else?) his "training and experience" – that "members of groups that engage in organized criminal activities such as the Subject Offenses often communicate with each other via *electronic messages* in furtherance of their illegal activities." 9/13/17 Aff. (Ex. E) ¶ 60 (emphasis supplied). That comes as news to anyone – or at least anyone who's a defense lawyer – that's ever worked a so-called "organized crim[e]" case. Especially where the target's described as secretive, "insular," suspicious and "particularly surveillance-conscious." *E.g.*, 5/5/15 Aff. (Ex. C) ¶ 13(j), 44. And especially where the only evidence cited for the affiant's fancy is the same misattributed *text message* (again, not the *electronic mail* the government

34

wished to search) discussed in the preceding paragraph – another sleight of hand, this one semantic (lumping text messages and email together into "electronic messages"), that's too cute by half.

## D.    <u>CONCLUSION</u>

Lacking any semblance of cause or necessity, all wiretaps and fruits beginning with the May 2015 Anthony D'Acunto tap must be suppressed upon a *Franks* hearing. If ever a case demanded such a hearing, then surely this one – with its mountain of integral misstatements and omissions that are too chronic to be coincidental – ranks as Exhibit A.

### <u>POINT III</u>

### <u>ALL WIRETAP FRUITS MUST BE SUPPRESSED<br>FOR IMPROPER MINIMIZATION</u>

Beyond the absence of cause or need, and apart from the reckless falsehoods and omissions, the wiretaps founder for a separate but equally fundamental reason: the government's unlawful resort to systematic after-the-fact minimization.

Title III requires agents[32] conducting electronic surveillance to "minimize the interception of communications" extraneous to the crimes under investigation. 18 U.S.C. § 2518(5). Interception occurs upon a communication's "acquisition," *id.* § 2510(4) – when its "content" is "acquired by electronic recording." *Simels*, 2009 WL

---

[32] *See U.S. v. Simels*, No. 08-CR-640 (JG), 2009 WL 1924746, at *5 & n.5 (EDNY July 2, 2009) (Gleeson, J.) (minimization requirement a "direct regulation of the conduct of the monitoring agents," not merely a "directive to the court that issues the order").

1924746, at *3.[33] "[B]arring unusual circumstances" lacking here,[34] "contemporaneous" minimization – monitoring conversations in real time and minimizing non-pertinent ones on the spot – is the Second Circuit "norm." Fishman & McKenna, *Wiretapping and Eavesdropping*, § 15:7 After-the-Fact Minimization n.1 (Dec. 2018 Update) (collecting cases). After all, "an agent cannot minimize the *interception* of communications that should not be intercepted by intercepting all communications and sorting them out later." *Simels*, 2009 WL 1924746, at *3.

Yet "intercepting all communications and sorting them out later" is precisely how the government seems to have opted to proceed in this case – at least during non-business hours. To that end, each wiretap affidavit states, in substance:

> It is anticipated that the monitoring location will not be staffed at all times, but will be staffed at regular hours, at which time intercepted communications will be monitored, examined, and minimized … (including those intercepted at hours when the location was not staffed). However, even

---

[33] In contrast, the written minimization instructions to the agents monitoring the pending wiretaps assert: "The law makes no distinction between 'intercepting,' 'listening to,' 'overhearing,' or 'monitoring' (hereinafter 'intercepting') a communication. … *If a communication is monitored but not recorded, it has still been intercepted for purposes of the Order*." *E.g.*, 5/5/15 Wiretap Monitoring and Minimization Instructions (Ex. I) ¶ A4. Those propositions are inaccurate and incomplete. As § 2510(4) and *Simels* make clear, communications are intercepted the moment they're acquired or recorded, whether or not agents monitor, overhear or listen to them. And if a communication has been *recorded* but not *monitored*, it too has been intercepted for Title III purposes. How could the monitoring agents hope to properly minimize when the attorneys guiding them evidently misconstrued and misadvised them on settled law? *Cf.*, *e.g.*, 10/16/15 progress report (Ex. H) at 2-3 nn. 3-4 (again appearing to conflate "intercepted" and "monitored"). The question answers itself: they couldn't.

[34] Specifically, "minimization may be accomplished as soon as practicable" after intercepting coded or foreign language communications when an expert in the foreign language or code isn't immediately available. 18 U.S.C. § 2518(5).

36

> when unmanned, the monitoring location will be kept
> secured with access limited to only authorized monitoring
> personnel and their supervising agents.

5/5/15 Aff. (Ex. C) 11.

Though the listening post was "unmanned" and "[un]staffed" outside "regular hours," it thus appears that night and weekend communications were continuously "intercepted" with nobody present to monitor them, minimization delayed until agents returned to work their normal shifts. The progress reports seem to confirm this understanding, typically noting that the term "'intercepted calls' includes, for purposes of this report, … calls made at times monitoring was not occurring, such as during certain portions of the night." *E.g.*, 5/18/15 Report (Ex. H) at 2 n.1.

This is not some small technicality or accidental interception of a few stray non-pertinent calls. It was a carefully conceived plan – aired before each issuing judge in advance – to postpone after-hours minimization for reasons of convenience, economy and resource conservation. "The specially tailored provision was not foisted on the government; it was proposed by the government and apparently adopted as proposed by the authorizing court[s]." *Simels*, 2009 WL 1924746, at *9.

Discovery reveals the interception of countless unmonitored nighttime and weekend communications during the investigation.[35] And "[a]utomatically recording everything," even when "followed by a post-interception minimization protocol,

---

[35] Esposito was overheard on the May and June 2015 Anthony D'Acunto cellphone taps along with the July and Oct. 2015 taps of his own cellphones. Our discovery review indicates that those taps intercepted some 10,634 wire and electronic communications on weeknights and weekends. By "weeknights" we mean 5:01 pm-8:59 am.

virtually guarantee[s] the interception of communications the government should not have seized." *Id.* at *9. Because it represents an overriding structural defect in the wiretaps' acquisition and execution, this pervasive violation of the well-established contemporaneous minimization rule requires blanket suppression of all resulting evidence, direct and derivative. *Id.* at *14 ("when the surveillance, viewed as a whole, violates the minimization requirement of 18 U.S.C. § 2518(5), every communication conducted during that surveillance was obtained unlawfully, and should be suppressed.") (citation omitted).

Here, as in *Simels*, the Court faces not "discrete calls that were improperly minimized," but "an entire method of wiretapping" that systematically violated Title III if not the Fourth Amendment. *U.S. v. Zemlyansky*, 945 F. Supp. 2d 438, 482 (SDNY 2013). The same outcome must ensue.

## POINT IV

### WIRETAP EVIDENCE MUST BE SUPPRESSED, ABSENT SATISFACTORY EXPLANATION, FOR UNTIMELY SEALING

To ensure integrity and accuracy, and to avoid possible tampering, Title III recordings must be sealed immediately upon expiry of the order authorizing interception. *U.S. v. Rodriguez*, 786 F.2d 472, 477 (CA2 1986); 18 U.S.C. § 2518(8)(a). Sealing within one or two days generally counts as "immediate," but "longer delays" require a "satisfactory" explanation. *U.S. v. Wong*, 40 F.3d 1347, 1375 (CA2 1994) (citations and internal quotation marks omitted). Suppression "*must* be granted unless the government's explanation for the delay in presentation is satisfactory." *U.S. v. Humphrey*, No. 10 CR 25, 2013 WL 8374637, at *5 (WDNY Aug. 9, 2013)

(emphasis supplied), *adopted*, 2014 WL 1836602, at *2-*3 (WDNY May 8, 2014). Even if there's "no evidence that the tapes have been tampered with or that the delay caused the defendant any other prejudice," that "does not relieve the government of its burden to present a satisfactory explanation." *Id.* (citing *Rodriguez*, 786 F.2d at 477).

Discovery in this case indicates delays of four and 17 days in sealing recordings from the first Anthony D'Acunto cellphone tap, three days in sealing recordings from the Esposito/Arena cellphone taps and five days in sealing recordings from the Esposito/Giovinco cellphone taps. *See* 6/9/15, 6/22/15, 8/14/15, 11/6/15 Sealing Applications & Orders (Ex. J). "[A]t the time the [tapes] were presented for sealing,"[36] the government attempted to explain only the 17-day delay attending what it called "a limited set of electronic interceptions" from the first Anthony D'Acunto cellphone tap. 6/22/15 Sealing App. (Ex. J) ¶ 1. As to those interceptions, the government summarily claimed, without elaboration, that they were "mistakenly" omitted from the initial sealing application – itself untimely. *Id.*

Barring satisfactory explanation now, this apparent pattern of delay requires suppression of the interceptions from all three taps. *E.g.*, *Humphrey,* 2013 WL 8374637, at *6-*9 (suppression the "only appropriate remedy" where, despite "repeated mantra" that tapes "could not have been tampered with" and lack of concrete "prejudice" showing, government "offer[ed] no explanation" for 11- and 12-

---

[36] *Humphrey*, 2013 WL 8374637, at *7.

day sealing delays); *U.S. v. Vasquez*, 605 F.2d 1269, 1280 n.25 (CA2 1979) (claim that issuing judge unavailable for several days deemed irrelevant once caselaw held that factor an invalid reason for delayed presentation).

## POINT     V

### THE SIXTH AMENDMENT – IF NOT THE FIFTH – COMPELS EARLY *BRADY/GIGLIO* DISCLOSURE

The disclosure obligations imposed by *Brady v. Md.*, 373 U.S. 83 (1963), *Giglio v. U.S.*, 405 U.S. 150 (1972), and subsequent cases stem from the Fifth Amendment's due process guarantee. And in our circuit, the government need only turn over constitutionally required exculpatory and impeachment information in time for defendants to use it effectively at trial – not immediately on demand or any sooner. *In re Coppa*, 267 F.3d 132 (CA2 2001); *cf. U.S. v. Ruiz*, 536 U.S. 622, 632-33 (2002) (due process "does not require the [g]overnment to disclose material impeachment evidence prior to entering a plea agreement").

In the years since *Coppa* and *Ruiz*, however, the Supreme Court has held that the Sixth Amendment right to effective assistance of counsel extends to plea bargaining, *Lafler v. Cooper*, 566 U.S. 156 (2012); *Mo. v. Frye*, 566 U.S. 134 (2012) – the culmination of "90% or more of federal criminal cases." *Ruiz*, 536 U.S. at 632; *see Frye*, 536 U.S. at 144 (plea bargaining "is not some adjunct to the criminal justice system; it *is* the criminal justice system") (citations and internal quotes omitted).

It is self-evident that counsel cannot mount an effective trial defense without timely *Brady/Giglio* disclosure. By the same token, how can *any* defense lawyer plea bargain effectively, in the sense *Lafler* and *Frye* contemplate, without knowing the

relative strengths and weaknesses of the prosecution's case that *Brady*/*Giglio* disclosure helps bring to light? The question answers itself. And when it comes to "the negotiation of a plea" – "almost always the critical point for a defendant" – *Brady*/*Giglio* disclosure is useless unless made well before trial. *Id.* at 1407.

Immediate production of all exculpatory and impeachment information in the government's possession, custody or control is therefore imperative – and independently mandated by the *Sixth* Amendment's Assistance of Counsel Clause – to preserve the eventuality of effective plea bargaining. The Court should order it accordingly.[37]

## POINT    VI

### ESPOSITO JOINS ALL APPLICABLE CODEFENDANT MOTIONS AND REQUESTS LEAVE TO FILE FURTHER MOTIONS AS ANY SUBSEQUENT GOVERNMENT DISCLOSURES MAY NECESSITATE

In particular, and without limitation, Esposito joins any severance motions filed by Cognetta and D'Acunto, adding that antagonistic defenses further favor separating his trial from theirs. To the extent the consensual and wiretap recordings find Cognetta and D'Acunto making out-of-court statements tending to inculpate

---

[37] The requested relief is especially appropriate given the extensive withholding of *Brady* material recently ascribed to the Southern District U.S Attorney's Office, prompting trial adjournments, judicial rebukes and officewide disclosure retraining. *E.g.*, Feds Find 150 More Hours of Tapes; Judge Postpones Meldish Murder Trial, ganglandnews.com (Jan. 31, 2019); Three Years Later, Feds Turn over *Brady* Material in Meldish Murder, ganglandnews.com (May 31, 2018); Sovereign District of NY 'Retrains' All Its Prosecutors on 55-Year-Old Rule of Law, ganglandnews.com (May 24, 2018).

Esposito, we plan to vigorously attack the declarants' credibility under Fed. R. Evid.

806.

## <u>CONCLUSION</u>

This Court should grant Esposito's motions in full.

Dated:       New York, NY
             March 11, 2019

Respectfully submitted,

LAW OFFICE OF MARC FERNICH
By: _____
810 Seventh Avenue, Suite 620
New York, NY 10019
(212) 446-2346
maf@fernichlaw.com

LAW OFFICES OF JEFFREY LICHTMAN
Jeffrey Lichtman
Jeffrey Einhorn
11 East 44th Street, Suite 501
New York, NY 10017
(212) 581-1001
jhl@jeffreylichtman.com
einhorn@jeffreylichtman.com

*Attorneys for Defendant Vincent Esposito*

42