USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: September 9, 2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
UNITED STATES OF AMERICA          :
                                  :        18 CR 14 (VM)
     - against -                  :
                                  :        **DECISION AND ORDER**
STEVEN ARENA,                     :
                                  :
                Defendant.        :
------------------------------------X

**VICTOR MARRERO, United States District Judge.**

The Court sentenced defendant Steven Arena ("Arena") to 366 days' imprisonment followed by 3 years' supervised release. (See Dkt. Minute Entry dated 11/15/2019.) Arena is serving his sentence in FMC Devens. By letter dated September 2, 2020, Arena requests that he be released pursuant to 18 U.S.C. Section 3582(c)(1)(A)(i) ("Section 3582") or otherwise released to home confinement. (See "Motion," attached.[1])

The Court will deny the Motion. First, the Motion seeks a transfer to home confinement. This remedy is committed by statute to the discretion of the Bureau of Prisons and the Court lacks authority to order such a transfer. United States v. Bido, No. 14 CR 212, 2020 WL 2765689, at *1 (S.D.N.Y. May 28, 2020).

---

[1] Because the Motion attached various medical records as exhibits, those exhibits will be filed under seal.

Second, the Motion -- which the Court notes is Arena's seventh such motion -- fails on the merits.[2] Construed as a motion for reconsideration of the Court's prior orders denying compassionate release pursuant to 18 U.S.C. Section 3582(c)(1)(A), the Motion contains no overlooked matters or legal authority. Reconsideration of a previous order is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." United States v. Rutigliano, No. 11 CR 1091, 2016 WL 2727317, at *2 (S.D.N.Y. Apr. 26, 2016) (quoting In re Health Mgmt. Sys. Inc. Sec. Litig., 113 F. Supp. 2d 613, 614 (S.D.N.Y. 2000)). To succeed, the request for reconsideration must "set[] forth concisely the matters or controlling decisions which [the movant] believes the Court has overlooked." Local Crim. R. 49.1.

Nothing Arena presents in this seventh motion constitutes overlooked matters or controlling decisions. While it is certainly true that "what we know now is that this pandemic is fluid," that is as true today as it was several months ago. (Motion at 2.) Nor is Court persuaded by the testimony of Warden Spaulding in an unrelated case; while

---

[2] The procedural history is set forth in the Court's Orders dated June 23, 2020, August 3, 2020, and August 18, 2020. (See Dkt. Nos. 376, 393, and 395.)

the Warden may have conceded that he was "lucky" that "COVID had not ravaged [Devens]," the facility where Arena is housed, Arena does not present any information to suggest that the situation at Devens has changed. (Motion at 2.) In fact, he agrees that "FMC Devens is best equipped to handle his medical conditions." (Motion at 3.) His citation to the overall number of cases within the entire BOP system does not persuade otherwise. Nor does Arena contend that he is not receiving adequate medical care for the many health issues Arena faces, such as the recent development of a hernia, for which he states that he will undergo surgery. In short, nothing in Arena's Motion persuades the Court that it should reconsider its prior orders denying compassionate release.

Accordingly, it is hereby

**ORDERED** that the defendant's motion for compassionate release or transfer to home confinement (attached) is **DENIED.**

**SO ORDERED.**

Dated:  New York, New York
        9 September 2020

_____
                    Victor Marrero
                    U.S.D.J.

## KEAHON, FLEISCHER & FERRANTE

ATTORNEYS AT LAW
1393 VETERANS MEMORIAL HIGHWAY · SUITE 312 NORTH
HAUPPAUGE, NY  11788
WWW.KEAHONLAW.COM

William J. Keahon
Craig J. Fleischer
Joseph J. Ferrante

TELEPHONE: (631) 361-5360
TELECOPIER: (631) 361-5365
Keahonpc@hotmail.com

September 2, 2020

**Filed Under Seal**
The Honorable Victor Marrero
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     *United States v. Steven Arena*, S2 18 Cr. 14 (VM)

Dear Judge Marrero,

Because the facts underpinning your denial decisions have materially changed, Mr. Steven Arena respectfully renews his emergency motion to the Court for an order directing the remainder of his sentence to be served in home confinement and that he be immediately released based on "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i). Additionally, we have submitted new CDC guideline information, new facts that were never considered and an independent declaration from Larry DiFabrizio, MD, the director of the Pulmonary Faculty at the Respiratory Institute at the Mount Sinai Respiratory Institute who has treated Mr. Arena for half a decade.

The Court denied Arena's compassionate release because he is at FMC Devens, was receiving adequate medical care, and did not present extraordinary and compelling reasons for release.[1]  Further, the order mentioned that Devens had "taken multiple precautions in light of COVID-19, including isolating affected individuals, requiring inmates to wear masks, and deploying screening measures."  Id.  Also, the court referred to the denial letter provided by Warden Spaulding at Devens dated April 6, 2020.  See, Exhibit A ("Devens Denial").  There, Warden Spaulding wrote, "your medical conditions are treatable, and FMC Devens is able to manage your medical needs at this time."  Id.  Roughly 40 days after

---

[1] See, Order, dated May 21, 2020, ECF # 370.

writing that, Warden Spaulding gave sworn testimony before the Honorable D.J. Wolf in the U.S. District Court of Massachusetts.  The warden was being questioned about why an inmate named Robert Pena was being denied release.  He was asked:

THE COURT:          Yeah. Who do you consider to be -- how
                    would you describe an at-risk inmate?

W. SPAULDING:       So an at-risk inmate would be -- I
                    would follow the CDC guidelines and some of the criteria that
                    are written there, we are following to include anybody over the
                    age of 65, if they have pulmonary issues, cardiac issues, heart
                    conditions, I think I said, a BMI above 40.

See, Transcript of Warden Spaulding, May 13, 2020, Page 39. (attached as a PDF file).

In his "honest and candid" testimony from May 13, 2020, Warden Spaulding told the court that he was mistaken about his authority to release inmates, that he did not have the time or resources to contact trace his staff, that Devens[2] was "lucky" that COVID had not ravaged their facility, that had he known he had the authority he would have released inmate Pena.  Id.  Judge Wolf did in fact release inmate Pena from Devens.[3]  United States of America v. Robert M. Pena, Cr-No.16-10236-MLW (May 29, 2020).  Pena was 70 years old and obese.  Per CDC guidelines that did make him more susceptible.  However, he pales in comparison to the danger Mr. Arena is in.  Based on CDC guidance, Arena's combination is literally off the charts and results in a 5X increase of complications and death if he contracts the virus. See, Exhibit B ("CDC Illustration").

To begin with, what we know now is that this pandemic is fluid and the idea that we could "control it" or truly understand it is an elusive concept.[4]  Yesterday, the CDC released a report stating that "ninety-four percent of Americans who died from COVID-19 had other 'types of health conditions and contributing causes' in addition to the virus, according to a new CDC report. See, https://www.cdc.gov/nchs/nvss/vsrr/covid_weekly/index.htm.

---

[2] At the time of this writing there have been at least 60 positive COVID diagnoses and recoveries at Devens. Numbers obtained from www.bop.gov/coronavirus.

[3] "With regard to Pena, there are significant risks that staff at the FMC Devens Camp will become infected, that the infection will spread to inmates, and that, if Pena becomes infected, he will by virtue of his age alone face a significant risk of being hospitalized and also a risk of dying."  See, United States v. Robert Pena, United States District of Massachusetts, Criminal Case #16-10236-MLW.

[4] BOP Director Michael Carvajal has dismissed scrutiny of the bureau as "misinformation."  During a June Senate Judiciary Committee hearing on covid-19 best practices for prisons and jails, Carvajal testified that the bureau was well-prepared and that the Centers for Disease Control and Prevention had praised the bureau after evaluating unspecified facilities in the early months of the pandemic. As of June 1, Carvajal said 1,650 federal inmates and 171 bureau staff had tested positive.  Less than 12 weeks later, those numbers grew to 11,953 prisoners and 1,436 staff, with more than 120 combined deaths, according to UCLA's Covid-19 Behind Bars Data Project.

The types of health conditions, or "co-morbidities" have constantly changed and given higher severity levels.  Mr. Arena's age (63) and underlying health conditions, respiratory conditions, heart issues, diabetes and diabetes are at the top.  When the court stated that FMC Devens is best equipped to handle his medical conditions it was correct. Compared to other locations it is certainly where someone would want to be if they had serious health conditions.  That is why Arena asked the court to recommend Devens at sentencing.  Caring for his health was paramount before COVID-19 ever happened. However, "handling" underlying medical conditions is one thing, contracting COVID-19 is another.  As Professor Prins wrote in his declaration to the court in Massachusetts, "even if a prisoner is infected and symptomatic, there are still many families that would prefer to take on the risk of having the individual self-isolate in their home rather than having their family members die in prison."  See, Exhibit C ("Prins Declaration").

## I.     Arena's Illnesses Place Him at the Highest Risk of Contracting Covid-19 and Having severe complications.[5]

After being designated by the BOP, Mr. Arena, 63, self-surrendered at FMC Devens on December 23, 2019.   Before arriving, he was diagnosed with Chronic Obstructive Pulmonary Disease, Heart Disease, Hypertension, and several other debilitating conditions. Since arriving he has further deteriorated.  On July 17th, after nearly 5 weeks of abdominal pain, Mr. Arena was shackled inside a bus and taken to Massachusetts Hospital for CAT scans.  They opined that he had intestinal blockage and tried to treat him with a standing enema.  Notwithstanding the failure of that procedure, he was sent back to Devens and placed in quarantine.  The following day he was in extreme pain.  On July 19th he was given another CAT scan and they found a ruptured intestine.  From there he was rushed to Saint Elizabeth's hospital for surgery.  Tragedy was averted and he was sent back into quarantine. He now has a colostomy bag attached to him that is painful and requires cleaning and replacing daily.

Just last week, without knowing the exact cause, Mr. Arena was diagnosed with a large parastomal hernia which will require another surgery and another trip out of the facility and another quarantine.

Mr. Arena went into the facility weighing 173 pounds.  He has withered down to 128 pounds.

All in addition to his other severe medical issues.

---

[5] The government has already conceded that Mr. Arena suffers from multiple conditions that place him at a high risk should he contract COVID-19.

### II.    Mr. Arena is in the Highest Risk Category for Contracting COVID and Having Severe Complications and will Likely Die from it.[6]

- COPD[7]

  o Chronic Obstructive Pulmonary Disease (COPD) is a chronic inflammatory lung disease that causes obstructed airflow from the lungs. People with COPD are at increased risk of developing heart disease, lung cancer, and a variety of other conditions. Emphysema and chronic bronchitis are the two most common conditions that contribute to COPD.

  o People with chronic obstructive pulmonary disease (COPD) are among the most vulnerable to COVID-19 infections, being even more likely to develop severe illnesses or to be admitted to intensive care units (ICU) than those with diseases like high blood pressure or diabetes, an analysis of several published studies found.  The research also shows that shortness of breath (dyspnea) is the only COVID-19 symptom significantly associated with disease severity and ICU admission.

- Obstructive Sleep Apnea on continuous positive airway pressure

- Type II Diabetes[8]

  o Having type 2 diabetes increases your risk of severe illness from COVID-19. Based on what we know at this time, having type 1 or gestational diabetes may increase your risk of severe illness from COVID-19.[9]

- Hypertension[10]

  o The CDC added hypertension to this list after Mr. Arena's first motion for release.

- Heart Disease with Four Stents in Place

  o Having any of the following serious heart conditions increases your risk of severe illness from COVID-19:
  o Heart failure
  o Coronary artery disease

---

[6] See, Exhibit D, ("Letter and Declaration/CV of Larry DiFabrizio, MD").
[7] People who are at higher risk for severe illness at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html;
[8] Id.
[9] Id.
[10] Id.

      o  Cardiomyopathies
      o  Pulmonary hypertension
      o  Having other cardiovascular or cerebrovascular disease, such as hypertension (high blood pressure) or stroke, may increase your risk of severe illness from COVID-19.[11]

- Irritable Bowel Syndrome

- Diaphragm Paralysis with Diaphragmic pacemaker in place

      o  Diaphragm Paralysis which is the functions of the lungs.   Bilateral diaphragmatic paralysis is a rare cause of respiratory failure that is poorly recognized and underdiagnosed. Bilateral diaphragm paralysis is a rare cause of acute respiratory failure and is often related to direct phrenic nerve injury, as well as a variety of myopathies and neuropathies. However, the cause of bilateral diaphragm paralysis goes unidentified in over two-thirds of cases.

- Rapid Weight Loss

      o  Arena entered FMC Devens at 173 pounds.  He now weighs 128 pounds.

- Compromised Immune System from recent surgical intervention for chronic large bowel obstruction with perforation of the sigmoid.  Emergency exploratory laparotomy and Hartmann's "Ileostomy."

- Colostomy Bag Attachment.

    * Mr. Arena has not one, not two, not three, not four, but FIVE comorbidities listed by the CDC.[12]  Age, COPD, diabetes, hypertension, and heart disease.  Based on CDC guidance, this combination results in a 5X increase of complications and death if the disease is contracted.  See, Exhibit "B".

### III.    Procedural History and COVID-19

    When Mr. Arena asked this honorable court to release him on March 18, 2020, the pandemic was in its infancy stage.   According the records provided by the BOP, in that week in March there was one inmate positive and two positive staff members.  On April 3, 2020, when Arena renewed his motion, there were 91 inmates infected, 7 deaths and 50 staff positives.  On April 6, 2020, when Arena's petition to Warden S. Spaulding was denied, there were 196 infected inmates, 8 deaths and 63 staff positives.  That same day, Arena's attorney sent a letter to the court saying he was in fact granted release by the warden, but that

---

[11] Id.
[12] People who are at higher risk for severe illness at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html;

was simply a mistake and a misunderstanding between client and attorney.  On May 14th Arena reapplied.  He had exhausted his remedies pursuant to the court's direction.  The government opposed on May 19th and the court denied the request on May 21st.  As of that date, COVID-19 figures in the BOP skyrocketed, 1735 inmates positive, 2767 inmates recovered, 59 dead, 191 staff positives and 392 recovered, the total was 5144.  See, Exhibit E, Graphs and Charts of COVID spread in the BOP.

A month later, on or about June 18, 2020, Arena filed a pro se letter to the court renewing his request for release.   Mr. Arena was desperate.  He knew the CDC kept adding co-morbidities to their list and each one created more fear as they were his exact medical conditions.  The court denied him again on June 23rd, saying that he failed to set forth any legal or factual information that was overlooked.  He did not relay to the court that his medical conditions were all listed in the "high risk for complications category" by the CDC and had no access to the Devens information mentioned in this motion.

By June 23, 2020, the BOP numbers climbed higher, 1349 inmates positive, 4975 inmates recovered, 87 inmate deaths, 163 staff positive, 528 staff recovered for a total of 7103.  On July 24, 2020, Arena's attorney sent another "emergency letter" asking for his compassionate release.  The government opposed on July 28th stating that the letter was false and Mr. Arena was not in pain.   They cited to the medical records provided by FMC Devens that stated Mr. Arena claimed to have no pain, however, two sentences prior, he was quoted saying "I don't wish this on my worst enemy."  See, Exhibit F, (Page from Medical Records). Nonetheless, the court denied the request again.  The court pointed out that release to home confinement is best made with the BOP and that Mr. Arena had undergone surgery.  Finally, on August 3, 2020, Arena's attorney sent a letter asking for the same relief and that was denied on August 18, 2020.  The court made clear that to return with another motion, Arena must show that things had been overlooked in prior decisions. See, ECF #395.

By the time that denial was delivered on August 18, 2020, the BOP COVID numbers had gone off the charts, over 10,000 total BOP cases and 111 inmates had died.  Those numbers continue to rise with no end in sight and the BOP is beginning to deal with the same nightmare we all fear, a second wave and the possibility of re-infection after "recovery."  See, Exhibit G, ("Inmate Death at FMC Carswell, August 26, 2020, BOP Release")(As of August 24, 2020, BOP numbers grew to 11,953 prisoners and 1,436 staff, with more than 120 combined deaths, according to UCLA's Covid-19 Behind Bars Data Project). https://www.washingtonpost.com/nation/2020/08/24/prisoners-guards-agree-about-federal-coronavirus-response-we-do-not-feel-safe/.

## **Argument**

Under 18 U.S.C. § 3582(c)(1)(A)(i), a sentencing court may" reduce [a] term of imprisonment . . . after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable, if it finds that" (a) "extraordinary and compelling reasons warrant such a reduction," and (b) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." As described below, a reduction in Arena's sentence is

warranted based on the COVID-19 pandemic and the inability of Arena—who faces increased risk—to take appropriate measures to protect himself given the conditions at FMC Devens.

**IV.    Extraordinary and compelling reasons warrant a reduction of Arena's sentence, and a reduction is consistent with the Sentencing Commissions' <u>applicable policy statements</u>.**

Congress did not define the term "extraordinary and compelling reasons" in § 3582(c)(1)(A)(i), and while the Sentencing Commission has listed several specific examples of "extraordinary and compelling reasons," it also included a catch-all provision for circumstances the Commission might not anticipate—such as, for example, a global pandemic to which a person is particularly vulnerable.  Indeed, it is difficult to imagine more "extraordinary and compelling reasons" than the ones Arena presents. Notably, our local districts and numerous other courts across the country have already reduced sentences in light of COVID-19, including some in cases involving defendants less vulnerable than Arena.  <u>See</u>, Exhibit H, String Cites from the SDNY & EDNY.

Mr. Arena was sentenced to 366 days of incarceration and has served more than eight months to date.  Under a provision of the First Step Act, 34 U.S.C. §60541, he could have already been released on August 22, 2020, or his two-thirds date, but he was not.  In any event, when taking good time and halfway house time into account, Arena's release date should be roughly 30 days from now (September 30, 2022).  And yet, each day is a ticking time bomb for someone in his position.  Arena has been a model prisoner.  To be clear, Arena is not requesting that his liberty be restored, merely that he be confined to his home (rather than a prison facility) where he is far less likely to contract a fatal disease and he can be treated by Dr. DiFarbrizio for his surgical follow-ups.

**V.    <u>Reentry Plan If Released</u>.**

If Mr. Arena is released based on his debilitating medical conditions, he will reside with his wife, Margaret Arena, his daughter, Maria Arena, and his four grandchildren.  All have been living with severe sadness and extreme anxiety for his condition.  The address is 1863 71'st Street, Brooklyn, New York 11204.  It is a three-floor home with a separate third floor area for Mr. Arena to self-isolate and recover from his recent surgeries.  There is no mortgage on the property, and the Arenas have sufficient financial assets, including a pension and medical insurance to help cover the cost of his medical treatment. He will be cared for by his primary care physician, Larry DiFabrizio, at Mount Sinai Medical Center.

**Conclusion**

Recently, Chief Judge McMahon was presented with a similar renewal motion and granted it saying that the "the specter of COVID has altered the calculus."  See, United States v. Ganeene Goode, Case No. 14-Cr.810-07 (CM)(August 10, 2020).  We believe the same reasoning should be used here.

There is no dispute that Arena committed a serious offense and deserved (and still deserves) serious punishment.  At the same time, the world looks different now than it does when Arena was sentenced in November of 2019.[13]  Under 18 U.S.C. § 3582(c)(1)(A)(i), when an defendant presents "extraordinary and compelling reasons," as Arena has here, the Court must consider the relevant sentencing factors in 18 U.S.C. § 3553(a) to determine if a sentence reduction is warranted. Arena is not a threat to the community, nor does he present any likelihood of flight.  Given the circumstances, an equivalent sentence of home confinement is sufficient, but not greater than necessary, to achieve the purposes of sentencing.

Respectfully submitted,

/s/ Joseph Ferrante

Joseph Ferrante
1393 Veterans Hwy, Suite 312N
Hauppauge, New York  11788
(617) 278-3532
Joefesq@gmail.com

Dated: September 2, 2020

---

[13] As of September 2, 2020, COVID-19 has infected 25.7 million people worldwide and killed 857,333.  The United States accounts for 6 million of those infections and 184,564 deaths.  See, New York Times, Coronavirus Latest Maps and Case Count, Updated September 2, 2020.

```
1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3    UNITED STATES OF AMERICA,          )
                          Plaintiff,    )
4                                       )
     vs.                                )   No. 16-CR-10236-MLW
5                                       )
     ROBERT M. PENA,                    )
6                         Defendant.    )

7

8

9

10

11               BEFORE THE HONORABLE MARK L. WOLF
                 UNITED STATES DISTRICT COURT JUDGE
12                    REDACTED MOTION HEARING

13

14

15           John Joseph Moakley United States Courthouse
                          One Courthouse Way
16                   Boston, Massachusetts 02210

17

18                          May 13, 2020
                            11:45 a.m.

19

20

21

22               Kathleen Mullen Silva, RPR, CRR
                       Official Court Reporter
23         John Joseph Moakley United States Courthouse
                   One Courthouse Way, Room 7209
24                   Boston, Massachusetts 02210
                 E-mail: kathysilva@verizon.net
25
             Mechanical Steno - Computer-Aided Transcript
```

```
 1    APPEARANCES:

 2

 3            United States Attorney's Office

 4            AUSA Brian M. LaMacchia

 5            John Joseph Moakley U.S. Courthouse

 6            Boston, Massachusetts 02210

 7            617.748.3126

 8            for Plaintiff

 9

10            Scott Katz Law

11            Scott A. Katz, Esq.

12            1600 Providence Highway

13            Walpole, Massachusetts 02081

14            617.545.4488

15            for Defendant

16

17    Also Present:  Stephanie Scannell, Esq.

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            THE COURT:  Do we have a court reporter?
 3            THE CLERK:  We do, Your Honor.  It's Kathy Silva
 4    today.
 5            THE COURT:  And do we have all the participants to our
 6    knowledge, including the warden and Ms. Bourke?
 7            THE CLERK:  We are waiting for the defendant and
 8    Ms. Bourke and the warden.  I will find out if the people in
 9    the waiting room with these unknown numbers are possibly the
10    warden.
11            THE COURT:  I'm going to ask everybody except the
12    lawyers to turn their pictures off.  So they can watch us, but
13    it's distracting to see them.  Let's see.  There's -- oh,
14    that's just Ms. Silva.  Okay.  And it will be necessary to
15    prepare the transcript of this on an expedited basis.
16            THE CLERK:  Is the full number 978-796-1000 either
17    Ms. Bourke or the warden?
18            Do we have the warden and Ms. Bourke on the line?
19            THE COURT:  Why don't I ask the attorneys to identify
20    themselves for the record, please, starting with the defendant.
21            MR. KATZ:  Thank you, Your Honor.  Good morning, Scott
22    Katz on behalf of Robert Pena.
23            MR. LaMACCHIA:  Good morning, Your Honor, Brian
24    LaMacchia on behalf of the United States.
25            THE COURT:  You've got an echo there.  Is there
```

```
 1    something you can do about that?
 2            MR. LaMACCHIA:  Still now?  I'm not sure that there's
 3    anything I can do about it.
 4            THE COURT:  That's better.
 5            Is Mr. Pena on the line?
 6            THE CLERK:  It doesn't appear that Mr. Pena is on the
 7    line.
 8            THE COURT:  Mr. LaMacchia, have you talked to Devens
 9    about this hearing?
10            MR. LaMACCHIA:  Yes.  They're aware of it.  I know
11    that the folks at Devens were in contact with the clerk's
12    office about getting numbers and stuff like that yesterday.  So
13    I anticipate them to be on.
14            THE COURT:  Do you have a telephone number for them?
15            MR. LaMACCHIA:  Yeah.  If I can get off for one
16    second, if you don't mind, I can try them and see what the
17    story is.
18            THE COURT:  Well, that's fine, because we've got an
19    11:45 hearing and otherwise I'm going to order them to be into
20    court this afternoon.
21            MR. LaMACCHIA:  Okay.  Yeah.  Let me -- if you just
22    give me a second, Your Honor, I'll call them.  Okay?
23            THE CLERK:  Your Honor, the warden is in the waiting
24    room.
25            THE COURT:  Okay.
```

```
 1              THE CLERK:  Would the person with the phone number
 2    978-796-1000 identify themselves, please.
 3              WARDEN SPAULDING:  Warden Spaulding is here.
 4              THE CLERK:  Thank you.  I will move you to the waiting
 5    room.
 6              THE COURT:  Mr. LaMacchia, have you been able to track
 7    down the defendant?
 8              MR. LaMACCHIA:  No.  I sent a message to my contact at
 9    BOP, but I wasn't able to get in contact.
10              THE COURT:  Well, here, the warden is on.  Could you
11    bring him into this, please, Ms. Loret.
12              THE CLERK:  Yes, Your Honor.
13              THE COURT:  Mr. Spaulding, are you able to hear me?
14              WARDEN SPAULDING:  Yes, sir.
15              THE COURT:  We're waiting for the defendant, Mr. Pena,
16    and then Ms. Bourke is supposed to be accessible, but not
17    participate until whatever questions are put to you are put to
18    you.  Do you know where Mr. Pena is?
19              MR. PENA:  We've been here waiting for ten minutes.
20              THE COURT:  Is Mr. Pena with you?
21              MR. PENA:  Well, this is Mr. Pena.  I'm with a
22    Mr. Larkin, but we've been waiting.
23              THE COURT:  And is Mr. Spaulding there?
24              THE DEFENDANT:  Not with us.
25              WARDEN SPAULDING:  I'm in my office.
```

1            THE COURT:  Would Mr. Fick take his picture down,

2      please.  I asked everybody to --

3            THE CLERK:  Your Honor, I think the issue is that

4      Mr. Pena and the warden are using the same phone number.

5            THE COURT:  Well, only one will speak at a time.  And

6      is Ms. Bourke accessible when we need her, Mr. Spaulding?

7            WARDEN SPAULDING:  Yes, sir.  She's next door.  You

8      didn't want me to have any interaction with her.  So she's next

9      door.

10            THE COURT:  Excellent.

11            WARDEN SPAULDING:  So I have staff that can bring her

12      in if you have a question.

13            THE COURT:  Thank you very much.

14            We're here pursuant to my May 7, 11 and 12 orders

15      concerning the continuation of the May 6 hearing on Mr. Pena's

16      motion for an order that he serve the remainder of his 32-month

17      sentence in home confinement, pursuant to 18 United States Code

18      Section 3582(c)(1)(A)(1).

19            I ordered the warden, Mr. Spaulding, and his colleague

20      Amber Bourke to be available to testify, but to be sequestered.

21      The warden is on the line now, and I'm told that Ms. Bourke is

22      next door.

23            I'm conducting this hearing by video conference with

24      regard to the lawyers and the public.  The defendant, Robert

25      Pena, and the Bureau of Prisons personnel are on the telephone

 1    because I understand that it's not possible to do video with

 2    the camp at Devens.  We're doing this by video and audio

 3    because most criminal proceedings have been deferred because

 4    the chief judge of the United States District Court has

 5    determined that in-court proceedings generally cannot be

 6    conducted without jeopardizing public health and safety.  I

 7    find this a compelling reason to conduct this hearing by video

 8    and telephone, because the defendant's, Mr. Pena, liberty is at

 9    stake.  And I understand that Mr. Pena continues to consent to

10    this procedure after having spoken to his attorney.

11             Is that right, Mr. Katz?

12             MR. KATZ:  Yes, Your Honor.

13             THE COURT:  And Mr. Pena, do you consent to proceeding

14    by video and audio?

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  I may not have asked this last time.

17    Mr. LaMacchia, has the victim, Ginnie Mae, been informed of

18    this proceeding?

19             MR. LaMACCHIA:  Yes.  I understand that -- I was

20    unsure whether Paul St. Laurent from Ginnie Mae was going to be

21    able to make it, but they were aware, and they communicated to

22    me their thoughts and I can share that with the court if you

23    like.

24             THE COURT:  Thank you.  And if there is somebody --

25    let me ask.  Is there anybody from Ginnie Mae on this call,

1    either by video or audio?

2           Apparently not.

3           If somebody joins and at some appropriate point wants

4    to be heard, I'll permit that, and I'll look forward to hearing

5    from Mr. LaMacchia what I should consider from Ginnie Mae's

6    perspective, in any event.

7           As I said, there's public access to this by Zoom.  I

8    can see there are many members of the public, some members of

9    the public who are observing these proceedings.

10           Since we adjourned on May 6, I received a number of

11    submissions.  I have the joint report that I ordered be filed,

12    which was filed yesterday, Docket 196.  I have another memo

13    from the government filed May 11, that's number 189, and

14    certain exhibits, which are 196.  I have Ms. Bourke's

15    declaration, Docket No. 189-1.  I have the defendant's response

16    to the government's submissions, Docket 199.  I have, among

17    other things, the defendant's Bureau of Prisons medical

18    records, 194, I believe.  And I have certain Bureau of Prisons

19    policies that have been referenced, and in some instances sent

20    to me, in addition to everything that I had last week.

21           But is there anything else that I should have received

22    and read since May 6?

23           MR. KATZ:  I do not think so, Your Honor.

24           MR. LaMACCHIA:  No, Your Honor.  There is one

25    correction I would like to make to the government's --

1          THE COURT:  Hold on just one second.

2          MR. LaMACCHIA:  Sure.

3          THE COURT:  You should identify yourself when you're

4    speaking.

5          MR. LaMACCHIA:  Sure.  This is Brian LaMacchia on

6    behalf of the government.

7          I just want to make one correction that has come to

8    light after further review of Ms. Bourke's declaration that I

9    think the government's brief, this is the May 11 response, at

10   page 2 did have an incorrect statement in there that I just

11   want to clarify for the court in case there's any confusion.

12         In that the government indicated that Devens

13   determined that Mr. Pena's home confinement would present a

14   greater risk of infection compared to Devens, and that was

15   based on my misunderstanding of paragraph 26 of the

16   May 11, 2020, Amber Bourke declaration that was submitted, and

17   that paragraph had dealt with infection rates in and around

18   Mr. Pena's home community.

19         You know, as the government understands now, after

20   having had more time to review that more carefully and also

21   clarifying that statement with Devens, it's my understanding

22   that Devens has not yet made that determination about

23   Mr. Pena's home environment.  The court can discuss this with

24   the warden and Ms. Bourke and ask them as well, but as the

25   government understands it, Devens has to consider that

1    information per the AG and BOP guidelines, but has not yet done

2    that specifically with respect to Mr. Pena's home environment

3    because he did not meet the criteria as far as how long he has

4    served.  And so while -- to the extent that he may come up for

5    home confinement in the future and may be eligible for that, I

6    think what you will hear from the warden and Ms. Bourke is that

7    they would consider that to some extent and you can ask them

8    about how much, but they haven't made that determination as of

9    yet.  So I apologize for that misunderstanding.  We're moving

10   very quickly obviously and filing a lot of things to be able to

11   address this issue with the court under some challenging

12   circumstances, but I hope that's clear now for the court.

13            THE COURT:  Okay.  And that actually relates to

14   questions I have.

15            What I propose, I think in the interests of efficiency

16   and fairness and hopefully effectiveness, I have some

17   preliminary questions for the warden.  And then I propose to

18   let Mr. Katz and then you to question him, and then to follow

19   up with any remaining questions I have.

20            Anybody want to be heard on that procedure?

21            MR. KATZ:  I think that's fine.

22            MR. LaMACCHIA:  Your Honor, this is Brian LaMacchia.

23   I have no problem with that.  I think you can ask whatever

24   questions you want of the warden and Ms. Bourke and satisfy

25   yourself with respect to their determinations.  You know, I

1    think what -- one thing that might be helpful, because there's

2    a little bit of a point of maybe ambiguity in the last hearing

3    that this may be my fault, but also just, you know, I want

4    to -- and it may be helpful to sort of discuss, at least at the

5    outset, the framework that BOP is operating under with respect

6    to compassionate release decisions versus home confinement,

7    because I think there's different criteria, and I think it may

8    help streamline things if Your Honor -- I'm happy to talk about

9    that now, but I think it may help streamline some of the

10   questioning to make this a more efficient proceeding.

11           THE COURT:  Well, I understand that the Bureau of

12   Prisons has the sole authority to decide whether or not to

13   permit Mr. Pena, in this case, to serve the remainder of his

14   prison in home confinement.  The Bureau of Prisons, it is my

15   understanding, decided not to do that.  Well, that hasn't been

16   done.

17           Then there's the second vehicle, the statute that I've

18   cited, which is generally considered compassionate release.

19   However, in this case, Mr. Pena's not seeking a reduction in

20   his sentence.  He's essentially -- well, I think it would be a

21   reduction in sentence.  But he proposes to serve what would

22   otherwise be the remainder of his time in custody in home

23   confinement.  So I have that distinction in mind, and then

24   there are certain statutory factors to be considered.

25           MR. LaMACCHIA:  I think that framework is correct.

1    The only thing I would add is that I think it's helpful to

2    clarify the different guidance, and the warden can tell you

3    this, and Ms. Bourke can tell you this, but the different

4    guidance that they're considering with respect to each.

5              So in this case, it sounds like Mr. Pena, along with

6    other inmates, was considered for home confinement, and that

7    was pursuant to various AG memos, the March 26, April 3 one,

8    and other BOP guidance, and that relates specifically to home

9    confinement.

10             And then he also separately submitted a compassionate

11   release request to the warden, and that's the handwritten

12   denial form that Your Honor was looking at during the last

13   hearing, and is attached to the government's initial

14   opposition.  I think it's April 28, 2020, is the date.

15             THE COURT:  Actually, it's April 20.  Isn't it?

16             MR. LaMACCHIA:  I'm sorry.  22, I believe.

17             THE COURT:  I don't think so.

18             Docket 175-1.

19             MR. LaMACCHIA:  Yes.  So I think the decision was

20   the 20th and Mr. Pena was informed on the 22nd.

21             THE COURT:  I see.

22             MR. LaMACCHIA:  The distinction I want to make, and I

23   think it's helpful just to guide our discussion, is that for

24   that compassionate release determination, which the Bureau of

25   Prisons also calls a reduction in sentence, or RIS for short,

1    the guidelines that are animating that, and that BOP is

2    following, is found in the BOP program statement 5050.50.  And

3    that's something we submitted yesterday in our filing, which is

4    Docket No. 197, Exhibit E.  It's not that much different when

5    you look at it compared to what's in the Sentencing Guidelines

6    Application Note 1 in 1B1.13.  Essentially it has to be a

7    serious medical condition or debilitating condition related to

8    age or in the case of a 70-year-old, someone who has served

9    quite a while, more than Mr. Pena, or there's also a provision

10   for incapacitation or death of a family member.

11             THE COURT:  I'm sorry.  Go ahead.

12             I see.  So -- and this is not to my -- well, this

13   hasn't been, I think, expressed before.  So the Attorney

14   General's March 26 and April 3 memoranda are being interpreted

15   as applying to home confinement only and not to motions under

16   the statute for reductions in sentence?

17             MR. LaMACCHIA:  That's correct, Your Honor.  That

18   guidance goes to, and I think the warden can give you his view,

19   of course, but I think that guidance goes to the BOP's

20   determination under maybe various statutes, one of which is 18

21   U.S.C. 3621.

22             THE COURT:  Well --

23             MR. LaMACCHIA:  The other thing I would point out,

24   Your Honor --

25             THE COURT:  Hold on just one second.

```
 1            MR. LaMACCHIA:  Sure.

 2            THE COURT:  Okay.  Go ahead.

 3            MR. LaMACCHIA:  The other thing I would just point out

 4  is if you look at the reasons for the April 20 denial of

 5  Mr. Pena's compassionate release reduction in sentence, it says

 6  in there in the middle of the second paragraph that -- it

 7  references those BOP program statement reasons in program

 8  statement 50 --

 9            THE COURT:  Hold on a second.  Let me get it out of my

10  file.  This is the compassionate release notification.  Go

11  ahead.

12            MR. LaMACCHIA:  So you'll see there in the second

13  paragraph, it talks about how BOP program statement

14  number 5050.5 compassionate release/reduction in sentence

15  procedures for implementation of 18 U.S.C. 3582(c)(1)(A)

16  provides guidance on the types of circumstances that present

17  extraordinary and compelling reasons, and then goes on to

18  describe those reasons there.

19            THE COURT:  I'm sorry.  Can you say that again?

20            MR. LaMACCHIA:  I'm sorry about that.  Yeah.

21            So that statement in there, it references BOP program

22  statement 5050.50, and then goes on to list out the reasons in

23  that program statement.  And I think the warden can tell you

24  about what he was considering when he made that decision, but

25  they're the things I talked about before, terminal medical
```

1    condition, debilitative medical condition, new law elderly

2    inmate, someone who, my understanding, is 70 years or older and

3    served an extensive period of time beyond what Mr. Pena served.

4         So my point is, I think when you talk to the warden,

5    and you can obviously talk to him and ask him, but I think he's

6    going to say that for the compassionate release decision he's

7    looking at the program statement.  For home confinement

8    decisions, he's looking at the AG's memo from March 26 and

9    April 3, as well as BOP guidance.

10        THE COURT:  Well, let's see.  Mr. Spaulding, are you

11   there?

12        WARDEN SPAULDING:  Yes, Your Honor.

13        THE COURT:  Do you swear that the testimony you're

14   about to give will be the truth, the whole truth and nothing

15   but the truth so help you God?

16        WARDEN SPAULDING:  I do.

17               STEPHEN SPAULDING, Sworn.

18        THE COURT:  Would you state your full name for the

19   record, please.

20        WARDEN SPAULDING:  Rear Admiral Stephen Spaulding,

21   Warden FMC Devens.

22        THE COURT:  And --

23        MR. KATZ:  Excuse me, Your Honor.  I hate to

24   interrupt.  But I mean, I'm happy to wait for my turn to ask

25   these questions, but I do think it may inform Your Honor along

1    the same lines on the questions that you're going to ask.

2            THE COURT:  Okay.  Do you want to say something?

3            MR. KATZ:  Very briefly.  It's really just two points

4    in response to some of the things that the government raised.

5            One is that on the BOP regulation 5050.50, I

6    understand the government to be saying that that is essentially

7    implementing the application statement in the Sentencing

8    Guidelines.  The Sentencing Guidelines, however, include a sort

9    of a catchall provision, and that's what we're talking about

10   here.  I don't see anywhere in 5050.50 it talks about the

11   catchall provision as opposed to just specific medical -- you

12   know, medical conditions, specific family conditions, or other

13   specific circumstances.  By the same token, I don't see

14   consideration of that catchall provision in the warden's

15   decision.  So I just wanted to raise that for Your Honor to

16   consider in talking to the warden.

17           The other point was on the government's statement

18   about -- I guess its misstatement in its memorandum, I

19   appreciate the government's attempt to clarify.  To be honest,

20   I'm actually a little bit more confused, because I think the

21   government was essentially suggesting it was misreading

22   Ms. Bourke 's declaration and suggesting that, you know, sort

23   of reading too much that she didn't say that Mr. Pena was in

24   greater risk of infection at home.  But as I read her

25   declaration, page 9, paragraph 26, after she cites the number

1    of infections in Falmouth, Barnstable County, she writes,

2    quote, "Accordingly, granting defendant home confinement

3    placement may increase his risk of contracting COVID-19 in

4    contradiction with the Attorney General's guidance."  So, I

5    mean, I guess, you know, I hear the government saying now they

6    haven't made a determination.  I mean, it sounds to me like

7    they did.  I just raise it as I think the government raised the

8    issue to clarify things, and at least for me I'm more confused.

9         THE COURT:  Well, this actually goes to a point --

10   actually, this gets to something that I wanted to understand

11   better, but thank you for pointing that out.  Thank you both.

12   That's actually a helpful overview.

13        Okay.  Would the witness please state his name again.

14        WARDEN SPAULDING:  Rear Admiral Stephen Spaulding,

15   Warden FMC Devens.

16        THE COURT:  Okay.  And Mr. Spaulding, you heard me

17   review the documents that have been submitted to me since

18   May 6.  Do you have those documents?

19        WARDEN SPAULDING:  Yes, sir.

20        THE COURT:  And do you have all of them?

21        WARDEN SPAULDING:  I have a majority of them, I

22   believe.

23        THE COURT:  Do you have Ms. Bourke's declaration?

24        WARDEN SPAULDING:  Yes, sir.

25        THE COURT:  Okay.  And do you have my May 7 order?

```
 1                WARDEN SPAULDING:  I do.

 2                THE COURT:  How long have you been employed by the

 3     Bureau of Prisons?

 4                WARDEN SPAULDING:  2002, May 2002.

 5                THE COURT:  When did you first become a warden of some

 6     facility?

 7                WARDEN SPAULDING:  February of 2014.

 8                THE COURT:  And what facility was that?

 9                WARDEN SPAULDING:  FCI Allenwood, Allenwood,

10     Pennsylvania.

11                THE COURT:  What was your next position in the Bureau

12     of Prisons?

13                WARDEN SPAULDING:  Warden at FMC Devens in

14     January of 2018.

15                THE COURT:  And did you deal with any compassionate

16     release motions before the First Step Act, which was in, I

17     think, December 2018?

18                WARDEN SPAULDING:  I do not have a lot of experience

19     with motions.  I get a lot of requests from inmates.

20                THE COURT:  Well, that's actually a better question.

21                WARDEN SPAULDING:  Okay.  So to answer your question,

22     yes.

23                THE COURT:  Did you receive requests prior to the

24     First Step Act, which removed the requirement that the Bureau

25     of Prisons file a motion?
```

```
 1                WARDEN SPAULDING:  Yes.
 2                THE COURT:  And did you ever grant any of those
 3      requests?
 4                WARDEN SPAULDING:  Yes.
 5                THE COURT:  And did the Bureau of Prisons file
 6      motions?
 7                WARDEN SPAULDING:  Against my decision?
 8                THE COURT:  Oh, I'm sorry.  I said -- I'm sorry.  I
 9      said did you ever grant a request?  Did you recommend that the
10      Bureau of Prisons --
11                WARDEN SPAULDING:  Yes.
12                THE COURT:  -- file a motion seeking a reduction of
13      sentence for compassionate reasons, it's often called?
14                WARDEN SPAULDING:  Yes, sir.
15                THE COURT:  And did the Bureau of Prisons file the
16      motions?
17                WARDEN SPAULDING:  Yes, sir.
18                THE COURT:  And did the judge grant any of those
19      motions?
20                WARDEN SPAULDING:  Yes, sir.
21                THE COURT:  Okay.  All right.  I was told that you've
22      been away from Devens for at least a period of time since I
23      issued my May 7 order, which memorialized what I said orally on
24      May 6.  Where were you?
25                WARDEN SPAULDING:  I've been selected as the warden at
```

 1   USP Lewisburg.  We had a tornado at FCI Estill, and we received
 2   953 inmates in two days.  So I was there facilitating that
 3   situation.
 4            THE COURT:  And did you receive my May 7 order while
 5   you were away?
 6            WARDEN SPAULDING:  Yes, sir.
 7            THE COURT:  Did you read it?
 8            WARDEN SPAULDING:  Yes, sir.
 9            THE COURT:  And what did you do as a result of seeing
10   the order?
11            WARDEN SPAULDING:  I contacted my attorney, and she
12   and I had discussions about it just to make sure that I was on
13   point with hopefully this conversation that I was going to have
14   today with you.
15            THE COURT:  Who is the attorney to whom you are
16   referring?
17            WARDEN SPAULDING:  Stephanie Scannell.
18            THE COURT:  Does she work for the Bureau of Prisons?
19            WARDEN SPAULDING:  Yes, sir.
20            MR. LaMACCHIA:  I'm sorry, Your Honor.  I don't mean
21   to interrupt, but I just wanted -- you might want to ask, I
22   know that the warden may have been accompanied by one or more
23   people where he is right now.  Just so you're clear about the
24   circumstances under which he's testifying, given that it's
25   virtual.  So I think Ms. Scannell might be there with him.  You

1  can ask him.  And there was a possibility that he was going to

2  have another person present who might be able to answer some

3  more specific questions, to the extent you had them, about the

4  particular camp in case he didn't know the answer.  So I just

5  wanted to make that clear for the record.

6          THE COURT:  Is there somebody in the room with you,

7  Mr. Spaulding?

8          WARDEN SPAULDING:  Yes, sir.

9          THE COURT:  Who?

10          WARDEN SPAULDING:  Ms. Scannell is in the room and

11  Ms. Hunton, the unit manager for the camp.

12          THE COURT:  Okay.  And if you want an opportunity to

13  confer with Ms. Scannell, I'll probably permit you to do that.

14          So you read my order, is that correct, and you spoke

15  to Ms. Scannell, right?

16          WARDEN SPAULDING:  Yes, sir.

17          THE COURT:  Then what did you do in response to the

18  order?

19          WARDEN SPAULDING:  I re-reviewed Mr. Pena's request

20  for home confinement.  I got up to speed with Ms. Hunton with

21  those requests.  I reviewed his medical record.  I reviewed his

22  compassionate release request, and I also reread the AG's memo,

23  as well as our assistant director of reentry services, who put

24  out guidance for home confinement.

25          THE COURT:  You said the AG memo singular.  Did you

1      read one or more than one?

2              WARDEN SPAULDING:  I'm sorry.  I read two.  The March

3      one and the April.

4              THE COURT:  And then you said you read something else

5      from the Bureau of Prisons.  What was that?

6              WARDEN SPAULDING:  So it's guidance that was sent down

7      to all the wardens and unit team for us to be able to determine

8      home confinement for inmates that are eligible for home

9      confinement, some of the things you have been talking about

10     today in terms of the justifications for consideration to

11     review and approve and send up through central office the

12     request for home confinement.

13             THE COURT:  Okay.  And Mr. LaMacchia, is that one of

14     the documents you submitted to me?

15             MR. LaMACCHIA:  I believe it could be Exhibit C to my

16     notice of materials from yesterday.  It's a May 8 Bureau of

17     Prisons guidance on home confinement.

18             THE COURT:  Is that from Mr. Hurwitz?

19             MR. LaMACCHIA:  I believe that could be it.  I don't

20     know.  You'll have to ask the warden.  But I believe that could

21     be it.  He should have this filing, or at least I sent it to

22     Ms. Scannell.

23             THE COURT:  Just a minute.  Exhibit C?

24             MR. LaMACCHIA:  I believe so, yes.

25             THE COURT:  The memo from Hugh Hurwitz.

```
 1              And Mr. Spaulding, did you say you re-reveiwed both
 2    the request to transfer Mr. Pena to home confinement and the --
 3    his request for a motion for reduction of sentence?
 4              WARDEN SPAULDING:  No, I -- yes.  I re-reviewed the
 5    home confinement request, as well as the compassionate release.
 6              THE COURT:  And putting aside Ms. Scannell or
 7    Mr. LaMacchia, did you speak with anybody else as part of those
 8    reviews?
 9              WARDEN SPAULDING:  No, sir.
10              THE COURT:  Did you speak to Ms. Bourke?
11              WARDEN SPAULDING:  No, sir.
12              THE COURT:  Did you communicate to anybody the
13    reasons -- well, did you, again, deny the transfer to home
14    confinement and the request for a motion for reduction in
15    sentence?
16              WARDEN SPAULDING:  So the motion for reduction in
17    sentence was done -- let me get the dates, sir.
18              THE COURT:  Back in April, last month?
19              WARDEN SPAULDING:  Right.  So that was -- the
20    reduction in sentence was the one in April.  So there wasn't a
21    new one for that, that I'm aware of.
22              And then the home confinement one, the May 8 memo, we
23    re-reviewed Mr. Pena for that, and he still does not meet the
24    criteria for home confinement.
25              THE COURT:  All right.  You have my May 7 order.  It's
```

 1    Docket No. 186, you told me, right?

 2              WARDEN SPAULDING:  Yes, sir.  Yes, sir.

 3              THE COURT:  Do you see it says in paragraph 2 that if

 4    the parties haven't resolved the matter, you shall by May 11 --

 5    and I know when it came in because I wanted to keep this on

 6    track, and I'm doing hearings in a range of cases every day.  I

 7    said I'd accept Ms. Bourke's declaration and speak to you

 8    today, but do you see in 1A I directed you to file a

 9    declaration stating "Whether in view of developments following

10    denial of Pena's request for compassionate release, and in view

11    of the Attorney General's memoranda to the director of the

12    Bureau of Prisons dated March 26 and April 3, 2020, the warden

13    has decided to transfer Pena to home confinement, or whether

14    the warden has decided to file a motion requesting the court

15    reduce Pena's sentence to time served and modify the conditions

16    of Pena's supervised release to include home confinement for

17    the amount of time that Pena would otherwise have served in

18    custody."

19              Do you see that?

20              WARDEN SPAULDING:  Yes, sir.

21              THE COURT:  And did you understand that to mean that I

22    continued the last hearing to give you a chance to make both of

23    those decisions again in the current circumstances?

24              WARDEN SPAULDING:  Yes, sir.  So when I was down in

25    Lewisburg, I directed Ms. Scannell, my attorney, to get with

1   Amber -- I'm sorry -- the last name Bourke, Amber Bourke, to do

2   a declaration for me.

3          THE COURT:  Well, you just told me, I believe, a

4   moment ago that you didn't consider a second time whether a

5   motion should be filed for reduction of sentence, and what I

6   understood from what you said is you didn't do that because

7   there hadn't been another request by Mr. Pena.  Am I right or

8   wrong in understanding that you did not a second time consider

9   whether to file a motion for reduction of sentence based on

10  current circumstances?

11         WARDEN SPAULDING:  Right.  And the circumstances

12  haven't changed in terms of Mr. Pena's medical status, nor

13  having the situation at the camp with COVID-19 or any of those

14  things don't warrant a change to make a declaration to require

15  a situation where I would reduce his sentence for time served.

16         THE COURT:  You mean a motion?

17         WARDEN SPAULDING:  Motion.  My bad.  Yes, sir.

18         THE COURT:  And is it your understanding that the

19  Attorney General's memos, March 26 and April 3, apply only to

20  exercising your authority concerning home confinement and not

21  to request for motions for reduction in sentence?

22         WARDEN SPAULDING:  So the guidance that I'm getting,

23  that I've gotten with the AG's memo to include, and what I am

24  obligated to follow is the guidance that I get from the

25  assistant director of reentry services of how to adequately

1    look at each inmate that meets the criteria for consideration

2    of home confinement.

3           So the AG memo gave a broad spectrum of what we're

4    supposed to do, and our assistant director of reentry services

5    gave us explicit instructions of how to implement his order.

6    So that's what we've been doing.

7           I'm sorry.  Go ahead.

8           THE COURT:  Is there anything in the AG's memo that

9    says an inmate has to have served 50 percent of his sentence or

10   25 percent of his sentence and be within 18 months of the end

11   of the sentence to be considered on the merits for release?

12          WARDEN SPAULDING:  No, sir.

13          THE COURT:  Do you have any guidance that tells you

14   that you can't consider the reasons for and the criteria in the

15   Attorney General's memos in deciding whether to file motions

16   for release?

17          WARDEN SPAULDING:  So since the AG's memo in March,

18   and then again in April, we have had multiple -- now I'm going

19   off memory -- but we've had at least six changes to how we're

20   going to view inmates for home confinement.  When I say

21   "changes," I mean the memos, like the one that you have that I

22   keep referring to, that is an additional one, the most up-to-

23   date one that we just received May 8.

24          Prior to that we had other requirements -- many of

25   them have stayed the same, but consistently we've had -- 50

1    percent has been the marker that our central office wants us to

2    follow, and then the new thing was the 18-month and 24-month to

3    go on the sentence with 18 months.  I could read it, but I want

4    to be clear.  Oh, there it is.  Serve 50 percent or more of

5    their sentence or have 18 months or less remaining on their

6    sentence and have served 25 percent or more of their sentence.

7            So there's some other criteria in there as well, but

8    in terms of dealing with Mr. Pena, you know, he has not met the

9    50 percent yet.  So because of that, he is not eligible for

10   home confinement.  And he hasn't met the 18-month 25 percent.

11           THE COURT:  Do you know when he'll meet that?

12           WARDEN SPAULDING:  Give me just about 30 seconds, and

13   I can figure that out.  Hold on one second.  It looks like July

14   of 2020.

15           THE COURT:  Yeah.  That's what the defendant said when

16   I did the calculation with my law clerk.  We had late June.

17   But okay.  July.  So we're talking within the next two months.

18           WARDEN SPAULDING:  Yes, sir.  And what would happen is

19   at that time, when he meets that criteria, then we would review

20   him again, and if he meets the criteria, we would submit him

21   for home confinement.

22           THE COURT:  And then -- just one second.  Usually I

23   can have a transcript in front of me, but I don't now.  So he'd

24   be eligible, in your view, in July 2020 to be considered for

25   home confinement, right?

1          WARDEN SPAULDING:  So just to be clear, sir, in July

2    we would submit him for consideration for home confinement, and

3    that's when central office would review the documentation and

4    to double-check to make sure that we are accurate in our

5    request based on the criteria, and then they would approve the

6    home confinement request.  I just want to be clear, I am not

7    the approving official for home confinement.  I am one step of

8    a few steps to get him to home confinement.

9          THE COURT:  If he meets the criteria for home

10   confinement under the Attorney General's directions, you can't

11   approve him for it?

12         WARDEN SPAULDING:  I am the recommending official, and

13   then it is submitted up through my command to the regional and

14   central office for the final approval.

15         THE COURT:  And this relates to something

16   Mr. LaMacchia clarified for me.  So the process concerning

17   motions for reduction in sentence is different than the

18   standards and procedures; is that right?

19         WARDEN SPAULDING:  Yes, sir.

20         THE COURT:  And is it your understanding that they're

21   governed by the Bureau of Prisons Program Statement 5050.50?

22         WARDEN SPAULDING:  Reduction in sentences,

23   compassionate releases, yes, sir, 5050.50.

24         THE COURT:  And that document is dated January 17,

25   2019 in the version that I have.

1          Has that been revised since the pandemic hit?

2          WARDEN SPAULDING:  No, sir.

3          I can elaborate on that a little, if you'd like.

4          THE COURT:  I'm trying to ponder what's a proper

5   question for you, but sure.  This is very helpful.  You know,

6   do you have an understanding as to why not?

7          WARDEN SPAULDING:  When we -- when I get a

8   compassionate release request from an inmate or an attorney

9   supporting the inmate or family, they -- I look at it, and I

10  determine what criteria do they currently -- are they currently

11  dealing with right now.  So do they have a prognosis of

12  terminal illness, cancer, tumors?  Are they in a family

13  situation where they have a loved one that requires -- that

14  cannot work that has -- they need complete care, maybe ADL

15  assistance.  They have some kind of situation where they can't

16  care for themselves, and it's been well documented by the

17  request and verified by social workers to determine that there

18  is, in fact, nobody else available to care for a loved one.

19          And then getting back to the inmate, we look at the

20  prognosis, how much -- their age, how much time they've served

21  on their sentence.  So all of these factors we look at to

22  determine if they meet the criteria for me to forward my

23  request for compassionate release.  Then if it's approved by

24  the central office, then it's sent to the judge of that

25  defendant -- I'm sorry -- yeah, the defendant for approval to

1    reduce their sentence or authorize a compassionate release.

2         THE COURT:  And are those the criteria that you used

3    before the First Step Act, and, prior to the First Step Act, it

4    was required that the Bureau of Prisons file a motion before

5    the judge could consider compassionate release?

6         WARDEN SPAULDING:  That's my understanding, sir.  I

7    don't think it's changed too much from prior to the First Step

8    Act to current.  I think some of it now is pushed where we

9    review all inmates that are at a certain age, and then also

10   apply the medical criteria in terms of are they -- do they have

11   medical issues and things of that nature that would rise to the

12   level of a compassionate release motion.

13        THE COURT:  Well, the law has changed in a way that's

14   material for the purposes of this hearing -- well, two ways.

15   And one we've mentioned, and that is that an inmate can file

16   the motion himself in certain circumstances.  But it adds

17   something to the criteria.  This is what Mr. Katz, Mr. Pena's

18   lawyer, was referring to, a section that says that the judge

19   can order release for extraordinary and compelling reasons,

20   which is also in the guidelines.  And the guidelines haven't

21   been amended since the First Step Act, Mr. LaMacchia, to comply

22   with the statute because the Sentencing Commission doesn't have

23   a quorum.  This is really a potentially significant

24   misunderstanding, but I'll discuss this with the lawyer.

25        Let me ask you this:  So am I right in understanding

 1   that you felt because, you know, Mr. Pena -- you know,

 2   essentially you made the decision with regard to the request

 3   for reduction in sentence based on the same criteria that you

 4   would have before the pandemic; is that right?

 5           WARDEN SPAULDING:  Yes, sir.

 6           THE COURT:  And you didn't consider, for the purpose

 7   of that motion, whether the COVID-19 pandemic constituted

 8   extraordinary and compelling circumstances that would justify

 9   release?

10           WARDEN SPAULDING:  No, sir.

11           THE COURT:  I'm pausing to make a note.

12           Okay.  I think you said you read Ms. Bourke's

13   declaration, her affidavit.  Is that right?

14           WARDEN SPAULDING:  Yes, sir, I have it with me.

15           THE COURT:  And do you agree with the statements in

16   it?

17           WARDEN SPAULDING:  I have it here.

18           THE COURT:  You read it.  Do you agree with what it

19   says?

20           WARDEN SPAULDING:  Yes, sir.

21           THE COURT:  And does it require any corrections from

22   your perspective?

23           WARDEN SPAULDING:  No, sir.  She's my technical

24   expert.

25           THE COURT:  And do you think it leaves out anything

 1  that might be important?

 2          WARDEN SPAULDING:  I can't really speak to that

 3  because if it's in reference to a question that wasn't asked,

 4  I'm not -- as I read it, it pretty much sums up the -- not only

 5  the institution, but also how we do what we do and also related

 6  to the First Step Act.  So I feel pretty confident in what I

 7  read that it's very accurate, and I don't think anything was

 8  left out.

 9          THE COURT:  Am I -- okay.  So with regard to the

10  reduction in sentence, I think you just told me this, you

11  denied that request in April because the guidance -- the

12  requirements set forth in CFR Section 5050.50 weren't met,

13  correct?

14          WARDEN SPAULDING:  Yes, sir.

15          THE COURT:  All right.  I do have a number of other

16  questions, but I have a feeling Mr. Katz and Mr. LaMacchia will

17  cover many of them.  So I think I'll let Mr. Katz go, and then

18  Mr. LaMacchia, and then we'll see if any of mine are left, or

19  if I have more.

20          Mr. Katz.

21          MR. KATZ:  Sure.  Thank you, Your Honor.

22          So I'm just going to start by following up on a couple

23  of the questions that Judge Wolf asked.  Okay?

24          One is I believe Judge Wolf was asking you questions

25  about whether or not you had reconsidered decision on home

1   confinement and compassionate release.  Do you remember those

2   questions?

3           WARDEN SPAULDING:  Yes.

4           MR. KATZ:  And I thought I heard you say that your

5   decisions haven't changed because circumstances haven't

6   changed.  Is that correct?

7           WARDEN SPAULDING:  Based upon his medical history,

8   based upon his criteria for home confinement considerations,

9   those things have not changed.

10          MR. KATZ:  And I thought you said that the conditions

11  at FMC Devens also haven't changed.  Is that right?

12          WARDEN SPAULDING:  The conditions at FPC Devens has

13  not changed.

14          THE COURT:  I'm sorry.  Say that again.  At what?

15          WARDEN SPAULDING:  The camp conditions have not

16  changed.

17          THE COURT:  Okay.

18          MR. KATZ:  Now, my understanding is yesterday FMC

19  Devens reported two new COVID-19 infections, one with an inmate

20  and one with staff.  Is that right?

21          WARDEN SPAULDING:  Correct.

22          MR. KATZ:  So the number -- how many current active

23  cases does FMC Devens have?

24          (Pause.)

25          Warden, this is not data that you have ready at your

1    fingertips?

2            THE COURT:  Mr. Spaulding, this is Judge Wolf.  Are

3    you still there?

4            WARDEN SPAULDING:  Sorry about that.  I had it on

5    mute.

6            So we've had two active cases on the restrictive

7    housing unit for the mentally ill, and the staff member that

8    worked on that unit tested positive.  So I don't have -- I

9    continue to test inmates to determine how many positives I have

10   inside the institution.  Currently right now we have zero at

11   the camp.

12           MR. KATZ:  That you know of?

13           WARDEN SPAULDING:  That I know of.

14           MR. KATZ:  I'm sorry.  There were two active cases in

15   the restricted housing unit?

16           WARDEN SPAULDING:  There's two -- at this institution

17   there's two restricted housing units.  There's the general

18   population restricted housing unit, and there is a secure

19   mental health unit restricted housing unit.  Those are the ones

20   that are severely mentally ill that cannot be in open

21   population or cannot have a celly, a roommate.

22           MR. KATZ:  So where are the infections then?  There's

23   one in each?  I'm sorry.  I just didn't --

24           WARDEN SPAULDING:  So the staff member's at home,

25   quarantining at home, and then the inmates were on that unit,

1    in the restricted housing unit for the secure mental health

2    unit.

3            MR. KATZ:  So both inmates are in that unit and

4    there's a staff member at home?

5            WARDEN SPAULDING:  Yes.

6            Just to be clear, because these are our first

7    positives, we have begun testing inmates inside the institution

8    to identify any other positive inmates that we might have.

9            MR. KATZ:  Now, one of the advantages of doing this,

10   you know, from home is that I can look at the Internet at the

11   same time, and as I'm looking at the Bureau of Prisons website,

12   it's reporting that there's two members, two staff members who

13   have tested positive, and one inmate.  You said it was two

14   inmates and one staff.

15           WARDEN SPAULDING:  So they update that website every

16   day at 3:00.

17           MR. KATZ:  Okay.

18           WARDEN SPAULDING:  So that was as of yesterday.  So

19   that staff member that you're talking about should have -- it

20   should have fallen off because she's back to work.  She tested

21   positive out in the community, and she never came to work until

22   she was tested, and then she was cleared to come back to work.

23   So she never was in the institution with COVID.

24           MR. KATZ:  So let me -- I just want to make sure that

25   I have the numbers clear.  Tell me if this is right.  There's

1    two active inmate cases.  One active staff member case, one

2    inmate who has died, and one staff member who has recovered.

3    Is that correct?

4          WARDEN SPAULDING:  Yeah, that sounds right.  But to be

5    clear on the death, that inmate had terminal cancer, who had

6    surgery, went out to the hospital, contacted COVID, came back

7    to our inpatient, requested hospice because of the surgery of

8    his cancer tumor, and chose to have comfort measures only.

9    However, he did have COVID.  So the central office asked us to

10   document that as a positive COVID death.

11         MR. KATZ:  Now, do you remember Judge Wolf was also

12   asking you questions about -- what I've been calling sort of

13   the 50/25 rule, that to be considered for home confinement,

14   inmates have to have served 50 percent of their sentence or 25

15   percent of their sentence with less than 18 months remaining?

16         WARDEN SPAULDING:  Yes, sir.

17         MR. KATZ:  Now, you mentioned that there have been at

18   least six changes to how inmates have been considered for home

19   confinement, and I thought I heard you say that it has always

20   been the case, or I think you used the words consistently been

21   the case that at least 50 percent of a sentence needed to have

22   been served, and then the 25 percent rule was added later.  Is

23   that right?

24         WARDEN SPAULDING:  Yes, sir, that sounds right.  And

25   don't -- when I said "six," I'm going off memory here.  I can

1    get you the exact number, but I can pretty much attest that

2    it's been definitely more than five changes.  It could be even

3    more than that, but what has been inconsistent is the 50

4    percent rule.

5          MR. KATZ:  Okay.  So are you aware of any inmates from

6    FMC Devens either in the camp or at the medical facility who

7    have been put on home confinement that have not satisfied those

8    standards?

9          WARDEN SPAULDING:  Without doing some research, I can

10   get you that, but I can't definitively say off the top of my

11   head to be able to answer that question.

12         MR. KATZ:  Well, is it fair to say then it's possible

13   in some cases those standards are not being followed?

14         WARDEN SPAULDING:  Yes.  I would agree that there's

15   probably one or two that didn't -- that maybe did not, but I

16   don't -- I wouldn't know unless I researched that.

17         MR. KATZ:  And is it your understanding that that's

18   true not just at the FMC Devens but across the Bureau of

19   Prisons?

20         WARDEN SPAULDING:  I'm sorry.  I can't speak to other

21   institutions that I don't work at.  So I don't know what comes

22   across the warden's desk in terms of justifications for home

23   confinement.  I just go with what I currently have in front of

24   me in terms of my inmates that I manage.  There are exceptions.

25   In the April 22 home confinement criteria that my assistant

1    director of reentry services sent out, and if you like I can
2    read that to you.
3            THE COURT:  Actually, let me interject here a moment.
4    This is Judge Wolf.  You mentioned chain of command before.
5    Now that you're in the Department of Justice, who's at the top
6    of your chain of command?
7            WARDEN SPAULDING:  The director of the Bureau of
8    Prisons.
9            THE COURT:  Who's above him or her?
10           WARDEN SPAULDING:  The Attorney General.
11           THE COURT:  Right.  And if you got an order from the
12   Attorney General and an inconsistent order from the Bureau of
13   Prisons, what would you do?  Which would you feel obliged to
14   follow?
15           WARDEN SPAULDING:  Right.  So that's where our
16   assistant directors receive that direction from the Attorney
17   General and from -- and then our director, and develop criteria
18   that would meet the needs of releasing inmates to home
19   confinement.  So we follow that criteria.
20           THE COURT:  Well, do you remember that the Attorney
21   General wrote the April 3 memo, "Now that I've exercised my
22   authority under the CARES Act, your review should include all
23   at-risk inmates, not only those who were previously eligible
24   for transfer"?
25           WARDEN SPAULDING:  Yes, sir.

1          THE COURT:  And you don't think -- you don't think

2    that that was the Attorney General communicating to the Bureau

3    of Prisons that it shouldn't use the 50/25 rule anymore?  It

4    should evaluate all at-risk prisoners?

5          WARDEN SPAULDING:  Right.

6          THE COURT:  Yeah.  Who do you consider to be -- how

7    would you describe an at-risk inmate?

8          WARDEN SPAULDING:  So an at-risk inmate would be -- I

9    would follow the CDC guidelines and some of the criteria that

10   are written there, we are following to include anybody over the

11   age of 65, if they have pulmonary issues, cardiac issues, heart

12   conditions, I think I said, a BMI above 40.

13         THE COURT:  Right.  Pause on that one.

14         WARDEN SPAULDING:  Okay.

15         THE COURT:  What was Mr. Pena's BMI?  What's "BMI"

16   stand for?

17         WARDEN SPAULDING:  Body mass index.

18         THE COURT:  What was Mr. Pena's body mass index when

19   he came into the Bureau of Prisons in October 2019?

20         WARDEN SPAULDING:  So I know, going off memory, he was

21   290, and then he's lost 50 pounds, and his BMI now currently is

22   in the low 30s, I think 31 percent.

23         THE COURT:  Actually, this is significant.  And this

24   is helpful, because I've been looking for this.  Why do you say

25   he lost 50 pounds and his BMI is in the low 30s?

1          WARDEN SPAULDING:  Because I was looking at his BEMR

2     records prior to this, and --

3          THE COURT:  I'm sorry.  Looking at what?

4          WARDEN SPAULDING:  The Bureau Electronic Medical

5     Records, his medical records.  During his arrival at Devens, he

6     was 290 pounds.  He's had bilateral hip replacements, and in

7     some of the documentations he was reporting that he's been

8     losing weight.  He's been running -- I'm sorry, not running --

9     walking the track as many as 18 times, and those kinds of

10    things have contributed to a really significant weight loss

11    that he should be proud of.

12         THE COURT:  Well, here, let's pause.  Mr. LaMacchia,

13    are those the records that you gave me under seal yesterday?

14         MR. LaMACCHIA:  That's my understanding, Your Honor.

15         THE COURT:  Because last week I was told, but I

16    didn't -- I've looked at these records, but I haven't read all

17    of them.  I was told that Mr. Pena now weighed over 300 pounds.

18    Did you tell me that last week, Mr. Katz?

19         MR. KATZ:  The declaration -- can you hear me?

20         THE COURT:  Yes.

21         MR. KATZ:  The declaration Mr. Pena filed, I believe

22    he said he was 297 pounds.

23         THE COURT:  Two hundred what?

24         MR. KATZ:  I believe he said he was 297 pounds upon

25    arrival.  The last time he weighed himself, he was 307 pounds.

1    I did see in the medical records that the government submitted

2    yesterday suggesting that Mr. Pena's -- I think it was 243

3    pounds.  I did briefly discuss it with him yesterday.  He

4    doesn't remember being weighed, but at the same time -- but at

5    the time that they weighed him, he has no reason to dispute

6    that that number is wrong.  I think he's --

7            THE COURT:  You mean he has no reason to dispute that

8    it's right?

9            MR. KATZ:  I'm sorry.  I misspoke.  He doesn't doubt

10   that 243 was correct at the time.  He certainly was aware that

11   he lost weight.  I think he was honestly surprised that it was

12   that much.  You know, again, I mean, I appreciate the -- you

13   know, the concerns that the issue raises.

14           THE COURT:  Why didn't you tell me that earlier?

15           MR. KATZ:  I'm sorry.  Say it again.

16           THE COURT:  Why didn't you tell me earlier that when

17   you told me last week he was over 300 pounds, you now know that

18   was wrong?

19           MR. KATZ:  I apologize, Your Honor.  I should have.

20   To be honest, I was waiting for obesity to come up in the

21   hearing.  I know it was an issue Your Honor was interested in

22   and certainly was going to address it.

23           THE COURT:  Well, it's a significant issue because if

24   you're over 300 pounds, it appears, from what I understand,

25   that his BMI would be, you know, like 39 something, almost 40.

1    And 40 is considered by the CDC severe obesity, and then given

2    his age, which still is a significant factor, but his age plus

3    obesity, you would argue would put him in a high risk category,

4    you know, just the type of person the Attorney General wanted

5    the Bureau of Prisons, if other criteria were met, to be

6    released.  But if it's just age, the analysis may be different.

7         MR. KATZ:  I appreciate that, Your Honor.  I guess

8    what I would suggest is, even at his current weight -- first of

9    all, that number is from March.  I don't know what his current

10   weight is.  We're two months later now.  Even at that weight,

11   he's still considered obese.  He's not bordering severely

12   obese.

13        THE COURT:  All right.  But why don't you continue

14   with your questions.  We'll come back.

15        MR. KATZ:  Thank you, Your Honor.

16        THE COURT:  But I'm trying to get accurate information

17   so I can make a properly informed decision.  Go ahead.

18        MR. KATZ:  Thank you, Your Honor.

19        Warden, do you remember Judge Wolf was asking you some

20   questions about the criteria you considered in assessing

21   Mr. Pena's compassionate release request?

22        WARDEN SPAULDING:  Yes, sir.

23        MR. KATZ:  And I understood you to say that you did

24   not consider the current pandemic in evaluating that request.

25   Is that correct?

1          WARDEN SPAULDING:  That's correct.

2          MR. KATZ:  So is that true for all inmates who submit

3    a compassionate release request at FMC Devens?

4          WARDEN SPAULDING:  Yes, sir.

5          MR. KATZ:  Do you know whether or not that's -- has

6    the Bureau of Prisons or the Department of Justice offered any

7    guidance on that?

8          WARDEN SPAULDING:  They said to not use COVID-19 as a

9    sole determination of reduction in sentence or compassionate

10   release.

11         MR. KATZ:  Okay.  But so it can be considered?  It

12   just can't be the sole determination?

13         WARDEN SPAULDING:  I don't consider COVID-19 as part

14   of the criteria for reduction of sentence or compassionate

15   release based on the 5050.50 program statement.

16         MR. KATZ:  And, again, is that based on guidance

17   you've been given from the Department of Justice or the Bureau

18   of Prisons, or is that just your reading of what 5050.50

19   requires?

20         WARDEN SPAULDING:  No, sir.  It's based on guidance

21   from central office.

22         MR. KATZ:  Is there a particular document that

23   contains that guidance?

24         WARDEN SPAULDING:  One second.

25         I don't have it with me.  I'd have to research that.

1          THE COURT:  All right.  Mr. LaMacchia, why don't you

2     get that for us, please.

3          MR. LaMACCHIA:  I will, Your Honor.

4          THE COURT:  As soon as possible.

5          MR. LaMACCHIA:  Okay.

6          MR. KATZ:  Now, you testified earlier that there's

7     been a couple of new inmate cases.  Is that correct?

8          WARDEN SPAULDING:  Yes, sir.

9          MR. KATZ:  And what actions has FMC Devens taken in

10    response to these new cases?

11         WARDEN SPAULDING:  Well, we've started modifying our

12    operation back when the convention center had those positive

13    cases in the first week of March.  So around the middle of

14    March, we've modified our operation to basically quarantine the

15    housing units to themselves.  We've modified all schedules.

16    We've canceled pretty much every outside medical trip.  If

17    anybody looks sick, we quarantine them, and we test them.  If

18    they test positive, then we isolate them in a single cell, and

19    staff are protected with PPE and inmates are not permitted to

20    have contact with that inmate and they're behind a locked door.

21         We actively screen every single inmate in the

22    institution and the camp seven days a week.  We started masking

23    inmates and staff in the middle of March.  And we town hall and

24    communicate with inmates on a regular basis to ensure that they

25    know that there's transparencies with what we're doing here at

1   Devens.

2           We do grab-and-go for dinners, and now we're feeding

3   on the unit.  We do medical appointments on the units.  We do

4   -- all programming has been canceled, and we try to create as

5   much social distancing as we can within the units, as best we

6   can with the current population that we have.

7           MR. KATZ:  I'm going to circle back to some of the

8   things you said, but, first of all, you said that a lot of

9   these actions were taken, you know, starting months ago; is

10  that correct?

11          WARDEN SPAULDING:  Yes.

12          MR. KATZ:  So even despite all those actions, just

13  yesterday you had three new cases at FMC Devens; is that

14  correct?

15          WARDEN SPAULDING:  Yes.

16          MR. KATZ:  My original question was more geared toward

17  what actions have you taken in response to the new cases?  Is

18  there a lockdown or anything like that going on as a result of

19  new cases?

20          WARDEN SPAULDING:  Yes.  I have enhanced the modified

21  operation to a complete lockdown, yes.  But not at the camp.

22          MR. KATZ:  All right.  So, I mean, could you describe,

23  I guess, in a little more detail what that entails?

24          WARDEN SPAULDING:  Yes.  So inmates are -- so inmates

25  are assigned to their cells.  They are locked in their cells,

1    and they are brought their food, and we have setting up laundry

2    and commissary schedules, and we have begun testing the inmate

3    population for all of the inmates that we have identified using

4    our infectious disease coordinator and team to identify the

5    inmates that were in close proximity to the positive cases to

6    ensure that -- we hope that we can capture any inmate that

7    tests positive so that we can move them off the unit and

8    isolate them so that we can watch them closely and provide

9    medical care if they need it.

10           MR. KATZ:  But you said you have not imposed a

11   lockdown at the camp?

12           WARDEN SPAULDING:  That's correct.  The camp inmates

13   do not have contact with the inmates on the inside.  And so we

14   have no active cases of COVID at the camp at this time, and

15   that's why I kept it normal operations with some modified

16   scheduling, as we've had --

17           THE COURT:  Let me ask a question here.  Are you the

18   warden of both the camp and the medical facility?

19           WARDEN SPAULDING:  Yes, sir.

20           THE COURT:  And do you spend time at both locations?

21           WARDEN SPAULDING:  I spend -- I do rounds in both

22   locations, yes.

23           THE COURT:  And is there -- are there any other staff

24   members that spend sometime in the medical facility and some

25   time at the camp?

1          WARDEN SPAULDING:  The unit team are assigned to the

2     camp, and I have a unit officer -- a camp officer that I have

3     requested through the custody roster, the captain, to try to

4     keep those staff assigned to the camp and not bringing them

5     inside.

6          THE COURT:  But from time to time do staff members go

7     from the camp to the medical facility or the medical facility

8     to the camp, at least up until a couple days ago?

9          WARDEN SPAULDING:  No, sir.  I asked the captain to

10    modify the roster back in March to try to keep as many officers

11    assigned to the camp and not bring them inside.

12         Now, if there's overtime things and people that call

13    out sick, then there is -- I cannot definitively say with a

14    hundred percent accuracy to you today that my correctional

15    officers that were inside did not go outside and work.

16    However, every staff member is screened prior to their shift.

17         THE COURT:  Are any staff members at the camp tested?

18         WARDEN SPAULDING:  None of the staff at the camp have

19    been tested, no.

20         THE COURT:  I'm sorry.  No staff member at the camp

21    have been tested?  Is that what you said?

22         WARDEN SPAULDING:  Yes, sir.

23         THE COURT:  So when you say they're screened, what is

24    the screening?

25         WARDEN SPAULDING:  You know what, sir, let me circle

```
 1   back.  I believe ████████████ was tested, and he was

 2   negative.

 3            THE COURT:  Okay.  Why was that person tested?

 4            WARDEN SPAULDING:  He had a fever.  He had flu-like

 5   symptoms.  So err on the side of caution.  We captured that in

 6   a staff screening, and so █████████████████████████████

 7   ████  We captured that fever during the active screening

 8   process, which happens in the front lobby off the FMC.  And

 9   then before they go to their work assignments, they check in

10   there.  We actively screen them, ask them questions related to

11   COVID, as well as take their temperature.  That's where ██████

12   ████████████ had a fever, and said he had some flu-like

13   symptoms.  So we sent him home, and err on the side of caution,

14   we asked him to go get tested, and he did, and he was negative.

15            THE COURT:  When you say you ask them some questions

16   in addition to taking their temperature, what questions are

17   they asked?

18            WARDEN SPAULDING:  I can tell you -- just give me one

19   second.  I'll give you exactly what these questions are.

20            Okay.  So we check their temperature.  We ask them if

21   they're short of breath.  Do they have a cough?  If they do

22   have a cough, is it dry?  Is it congested?  Is it sputum

23   production?  Is it a new onset or chronic cough?  Do you have

24   nasal congestion?  Do you have a history of seasonal allergies?

25   Have you traveled in the past 14 days out of the geographical
```

1    area?  Have you been in close contact with anybody with a

2    diagnosis of COVID-19 illness within the past 14 days?  And

3    have you been deployed to an institution or some other location

4    based upon your job where there was active COVID cases in the

5    institution or wherever they were deployed to?  And then we

6    check their temperature.

7              THE COURT:  Okay.  Hold on just one second.  I'm

8    looking.  All right.

9              Is it your understanding that some people infected

10   with the virus are asymptomatic and, therefore, may not have a

11   fever or cough, for example?

12             WARDEN SPAULDING:  Yes, sir.

13             THE COURT:  But am I right in understanding that

14   you're not doing any testing at the camp to see if there's

15   somebody who's infected but asymptomatic?

16             WARDEN SPAULDING:  That's correct, sir.

17             THE COURT:  Have you considered that that could be

18   dangerous, particularly to high-risk people at the camp?

19             WARDEN SPAULDING:  Yes, sir.

20             THE COURT:  Is there a reason you don't do the

21   testing?

22             WARDEN SPAULDING:  Yes, sir.  It's resources.  The

23   Bureau of Prisons, specifically the medical centers around the

24   country, we are getting tests now.  They come once a week.

25   We've just started receiving them.  Last week we got a

1    hundred -- I think we got 90.  Today, I got 120.  Tomorrow, I'm

2    getting 250.  Then each week thereafter I get an initial 250.

3    So because I have the positive cases inside the institution and

4    the most medically compromised inmates within the FMC, within

5    the confines of the prison, those are my priority right now.

6            THE COURT:  All right.  Mr. Katz, you can keep going,

7    although at some point I'm going to want you to -- well, keep

8    going.

9            MR. KATZ:  Thank you, Your Honor.

10           I thought I heard you say -- I just want to be

11   clear -- that it's certainly possible that staff could go back

12   and forth between the medical building and the camp; is that

13   right?

14           WARDEN SPAULDING:  Yes, sir.

15           MR. KATZ:  And, in fact, the staff who are assigned to

16   the camp report to the medical building every morning, is that

17   right, and whenever they're reporting for work, I guess?

18           WARDEN SPAULDING:  They report to the front lobby,

19   yes.

20           MR. KATZ:  And they report there, because that's where

21   they get screened, among other things, correct?

22           WARDEN SPAULDING:  They get screened in the front

23   lobby.

24           MR. KATZ:  Okay.  And inmates as well also go to --

25   inmates from the camp also go to the main building, correct?

1          WARDEN SPAULDING:  The inmates that work in the

2    administrative building go into the front lobby to be screened,

3    and our staff at the 4:00 count go out to the camp and do

4    temperatures at the 4:00 count.

5          MR. KATZ:  So the inmates who work at the building go

6    to the lobby to get screened in the same location where staff

7    who have come from outside the camp to be screened are coming;

8    is that right?

9          WARDEN SPAULDING:  Not at the same time, but yes.

10          MR. KATZ:  But they do go to the main building to

11    report for work during the day?

12          WARDEN SPAULDING:  Yes.

13          MR. KATZ:  And during their duties in the main

14    building, inmates from the camp would come into contact with

15    staff who work in the main building?

16          WARDEN SPAULDING:  So when you say -- yes.  They come

17    in contact, but I would argue that the social distancing is a

18    priority here inside the admin. building.  So their

19    responsibilities are to clean the bathrooms and the trash.

20    That's pretty much all they do.  Mop and sweep and things like

21    that.  But they're not supervised by staff.  They have -- they

22    know what their responsibilities are.  Each inmate goes through

23    an orientation before they get their job, and they're told what

24    to do, and then they pretty much do it independently.  Then

25    they report back to the camp upon completion of their

1    assignments.

2         MR. KATZ:  So you said the inmates who were screened

3    at the main buildings are not screened at the same time as

4    staff who are screened at the main building.  Is that right?

5         WARDEN SPAULDING:  That's right.

6         MR. KATZ:  What about the staff at the camp?  Are they

7    also screened separately from the staff who work in the main

8    building?

9         WARDEN SPAULDING:  It depends on their start time.  So

10   primarily our main shift for unit team is 7:30 to 4:00.  So

11   they would come in during that time to be screened.  So to

12   answer your question, yes, it's possible that we would have

13   people getting screened.  We create social distancing within

14   the screening site.  So they would come in, stand in line, wait

15   for the provider to ask them to come up next for their

16   temperature and to ask those questions.

17        MR. KATZ:  And when staff are waiting to be screened,

18   are they wearing masks?

19        WARDEN SPAULDING:  Some are, some are not.  Some

20   receive their mask when they get there.

21        MR. KATZ:  Now, you said one of the questions that was

22   asked during screenings had to do with staff who may work at

23   other facilities.

24        WARDEN SPAULDING:  So we have a public health service

25   core that work here.  We have -- I think we're at 32 officers

1    that are nurses, pharmacists, PAs, dentists, social workers.

2    They are public health service officers, and there are times

3    when we deploy them to hot zones like other institutions.  But

4    before they return to FMC Devens, they are quarantined for 14

5    days.

6              MR. KATZ:  Now, you said that there was -- ███████

7    ███████ got tested, and his test came back negative.  When

8    was he tested?

9              WARDEN SPAULDING:  About a month ago, maybe three

10   weeks ago.

11             MR. KATZ:  Now, earlier you talked about some of the

12   measures that have been taken since March.  You talked about

13   quarantining units, grab-and-go dinners, things like that.  Do

14   you remember those statements?

15             WARDEN SPAULDING:  Yes, sir.

16             MR. KATZ:  Now, the measures that you were describing,

17   those apply just to the medical facility or to the camp as

18   well?

19             WARDEN SPAULDING:  To the medical facility.  The camp

20   is -- they eat in their dining hall.  We do -- we have them --

21   we split them in half.

22             MR. KATZ:  So roughly speaking, about 50 people eating

23   together at a time?

24             WARDEN SPAULDING:  That's about right.

25             MR. KATZ:  Forty-five, 50 people?

1          WARDEN SPAULDING:  I think so.  I think the camp

2     population right now is around 90.  I think -- let me be clear.

3     How do we separate?

4          So we split the sides of the camp.  One side would go

5     first.  They'll eat.  And when they're done, then we do the

6     second side.

7          MR. KATZ:  Now, earlier I heard you use the term

8     "social distancing."  Is that term you're familiar with?

9          WARDEN SPAULDING:  Yes.

10          MR. KATZ:  What's your understanding of what social

11     distancing means?

12          WARDEN SPAULDING:  Well, there's multiple definitions.

13     If you're out in the community, it's easier to socially

14     distance in the community.  But at a prison setting, you do the

15     best you can with trying to create as much social distancing as

16     possible.  So the expectation is through multiple town halls

17     and the information we've provided, they do the best they can

18     with trying to separate themselves at least at six feet.

19          MR. KATZ:  So it sounds like you would agree that

20     social distancing is difficult in the penal setting; is that

21     right?

22          WARDEN SPAULDING:  Yes, sir.

23          MR. KATZ:  Would you agree in a setting like the camp,

24     social distancing is impossible?

25          WARDEN SPAULDING:  I wouldn't say it's a hundred

1    percent impossible.  I'd say that we do the best we can with

2    some of the things to create as much space as possible.  So I

3    would say that we try.  I wouldn't say that it's ideal and

4    rises to the level of community standards because of the space.

5              MR. KATZ:  Well, I mean, could you describe the

6    sleeping conditions in the camp at FMC Devens?

7              WARDEN SPAULDING:  So there are cubicles.  There are

8    two main cubicles.

9              MR. KATZ:  And how are they arranged?

10             WARDEN SPAULDING:  There's cubicles.  So there's a

11   berthing area, or common area where they sleep.  And there's

12   four hallways -- five hallways within this open space, and

13   these hallways are created by the cubicles, where these

14   locations are of the cubicles.  So I would say that cubicles

15   are side by side down the hallway and then to the right.  And

16   then everything above the cubicle is open area, if that makes

17   sense.

18             MR. KATZ:  I think it does, but I'll try and ask some

19   questions to clarify it.

20             So when you say "in open space," essentially the

21   inmates in the camp are all sleeping in one room together?

22             WARDEN SPAULDING:  Yeah, one big berthing area, yup.

23             MR. KATZ:  And the cubicles, you said they don't go to

24   the ceiling.  How high do they go?

25             WARDEN SPAULDING:  I'd say probably six and a half,

 1   seven feet.

 2           MR. KATZ:  And how high is the ceiling?

 3           WARDEN SPAULDING:  Probably 30 to 40 feet.

 4           MR. KATZ:  Now, when an inmate lays his head down and

 5   goes to sleep, how far away is that inmate sleeping from other

 6   inmates?

 7           WARDEN SPAULDING:  They were instructed to, based on

 8   CDC guidelines for correctional services, the best approach for

 9   open units like that is to do head-to-toe for the top bunk

10   gentlemen.  They're in a lower bunk and an upper bunk.  So the

11   upper bunk guys are head-to-toe from the cubicle next to them,

12   if that makes sense.

13           THE COURT:  I'm not sure I understand that.  So for

14   many people, although maybe not Mr. Pena, there are two people

15   in a cubicle, correct?

16           WARDEN SPAULDING:  Yes, sir.

17           THE COURT:  And then -- and they're in bunk beds,

18   correct?

19           WARDEN SPAULDING:  Yes, sir.

20           THE COURT:  Do I understand it's recommended that one

21   have his head above the toes of the other?

22           WARDEN SPAULDING:  So to be -- so when you read the

23   CDC guidelines, they primarily are asking us to -- the top

24   bunks are the ones that are the most problematic.  The bottom

25   -- let me back up.

1            So the cubicle area, you have two inmates that are

2      separated by the actual bunk bed itself.  But on the top bunk,

3      if you and I are living in the camp together, and we're both in

4      the top bunk next to each other, my cubicle is next to your

5      cubicle, then the CDC recommends that your head is on one side

6      of the mattress away from me on the top bunk.  So we are foot-

7      to-head, if you will, on the top bunk.

8                  THE COURT:  Thank you.  That's helpful.

9                  But the cubicles have no ceilings; is that right?

10                 WARDEN SPAULDING:  Yes, sir.

11                 THE COURT:  Okay.  Mr. Katz, do you have much more?

12                 MR. KATZ:  To be honest, I actually do have quite a

13     bit more, Your Honor.  I mean, I've covered some of it sort of

14     out of order.

15                 THE COURT:  Okay.  Let me do this, because the

16     warden's got a lot of responsibilities:  I have some questions.

17     Mr. LaMacchia will have some questions.  If I take about a

18     30-minute break so people can eat lunch, or if you wanted it to

19     be a little longer, Mr. Spaulding, so you could do some other

20     things, I could make it 45 minutes or something.  And then, you

21     know, I'd like to complete your testimony.  It may not be

22     necessary to hear from Ms. Bourke.  But this is very helpful.

23     I know you've got a class action lawsuit.  I think some of the

24     lawyers in that class action are listening in.  So this record

25     may be important not just to this case, but I'm going to take a

1    lunch break.

2           Mr. Spaulding, would you like 30 minutes or 45 minutes

3    or more?

4           WARDEN SPAULDING:  Sir, I'm available to you, sir.  So

5    30 minutes is fine.

6           THE COURT:  You are.  All right, because now it's

7    1:30.  Let's see.  We also have a court reporter, who's working

8    hard under challenging conditions.  We'll resume at 2:15, about

9    45 minutes.  Okay?

10          WARDEN SPAULDING:  Sir, do you want me to call in --

11          THE COURT:  What's that?

12          WARDEN SPAULDING:  I'll just call in like I did?

13          THE COURT:  Ms. Loret, is that correct?

14          THE CLERK:  Yes.  And we will just identify you when

15   you call in, yes, because you're using the same phone number as

16   Mr. Pena and Ms. Bourke, but you will just have to identify

17   yourself when you call in.

18          THE COURT:  Let me ask you this, Mr. Katz:  Did

19   Mr. Pena file something that addresses his weight?

20          MR. KATZ:  He filed -- his original -- yes.  The

21   initial declaration that attached to our motion -- I'll find

22   you the document number in a moment.

23          THE COURT:  Hold on a second.  So here's his motion.

24          MR. KATZ:  Number 171.

25          THE COURT:  Yeah.  I have 171, and I have 171-2.  For

1    some reason I don't have 171-1, which is probably his

2    declaration.

3           MR. KATZ:  It is.

4           THE COURT:  I'll ask my law clerk to email it to me,

5    please.

6           MR. LaMACCHIA:  He filed another declaration at

7    document number 184 that addressed the same issue.

8           THE COURT:  171-1 and 184?

9           MR. LaMACCHIA:  Correct.

10          THE COURT:  Just one second.

11          MR. KATZ:  Your Honor, I refiled the declaration when

12   I received the signed copy from Mr. Pena.

13          THE COURT:  Well, oddly I'm not laying my hands on it.

14   I'm sure I have it in one of my files.

15          Okay.  But if my law clerk who has primary

16   responsibility for this case would email me the two

17   declarations, I will look at them over the break.  All right.

18          Court is in recess to 2:15.

19          And do we use the same link, Ms. Loret?

20          THE CLERK:  Yes.  You don't even have to sign out,

21   Your Honor.  You can just stop your video and mute it, if you'd

22   like.

23          THE COURT:  I may want to use my computer for other

24   reasons.  So I can click on the same thing?

25          THE CLERK:  Yes, it's the same link.

```
 1              THE COURT:  All right.  Thank you all very much.
 2              MR. LaMACCHIA:  Thank you.
 3    (A recess was taken 1:30 p.m. to 2:17 p.m.)
 4              THE COURT:  Good afternoon.  I think Mr. LaMacchia is
 5    on there somewhere, but I don't see him.
 6              MR. KATZ:  Before we resume -- I apologize, I meant to
 7    ask this before the lunch break -- would it be possible for me
 8    to confer with Mr. Pena for a few moments?
 9              THE COURT:  You can do that right now.
10              MR. KATZ:  Thank you.
11              THE COURT:  I would have had you do it earlier.
12              MR. KATZ:  I apologize.
13              THE COURT:  It's okay.  Ms. Loret, will you put them
14    in a breakout room.
15              MR. KATZ:  Thank you very much.
16              THE CLERK:  Just look for the invite to join the
17    breakout room.
18              THE COURT:  Do we have the warden on the line?
19              THE CLERK:  We do.  We have the warden.  And
20    Ms. Bourke has not called in yet.
21              THE COURT:  Mr. Katz, be as efficient as possible,
22    please.
23              MR. KATZ:  I will do that, Your Honor.  Thank you.
24              MS. SCANNELL:  Your Honor.
25              THE COURT:  I'm sorry.  Who's asking?
```

1          MS. SCANNELL:  Yes.  This is Stephanie Scannell.  I'm

2     one of the staff attorneys with the BOP.  Two things, Your

3     Honor.  I sent Ms. Bourke back down to her office, but if we

4     need her I can get her back.

5          THE COURT:  Thank you.

6          MS. SCANNELL:  The other thing I was going to ask is

7     with respect to the discussion about ███████████████████████

8     ████████████ and his medical status, I was wondering if Your

9     Honor could direct Mr. Pena not to divulge that information to

10    anyone else, especially other inmates.  It's personal medical

11    information of a staff member, and I just don't think that's

12    appropriate for Mr. Pena to discuss with anyone, especially

13    given ███████████ didn't give his consent for it.

14         THE COURT:  Is he the staff member who tested

15    positive?

16         MS. SCANNELL:  He is -- no, he tested negative.

17         THE COURT:  I don't feel comfortable discussing this

18    without Mr. Katz.  So --

19         MS. SCANNELL:  Okay.

20         THE COURT:  He's conferring with his client.

21         THE CLERK:  Mr. Katz is still on.  He has not -- oh,

22    now he's gone.  He just joined the breakout room.  I can bring

23    him back, if you want.

24         THE COURT:  No.

25         (Mr. Katz and defendant in breakout room.)

```
 1                THE COURT:  I'm going to ask -- I just sent my law

 2       clerk a message.  I'm going to call her up right now.  I have

 3       to ask her a question.  Meg, can you use your phone?

 4                LAW CLERK:  Yes.  But I'll have to drop out of the

 5       Zoom call to do that.

 6                THE COURT:  All right.

 7                (Pause.)

 8                THE COURT:  Let's see.  I see Mr. Katz is back.

 9                THE CLERK:  One moment.  Your Honor, I believe

10       Mr. Pena may be calling back.

11                THE COURT:  All right.  Is this Mr. Pena on the line?

12                THE DEFENDANT:  Yes.

13                THE COURT:  Okay.  Let's see.  Mr. Spaulding, are you

14       there?

15                WARDEN SPAULDING:  Yes, sir.

16                THE COURT:  And do you understand you're still under

17       oath?

18                WARDEN SPAULDING:  Yes, sir.

19                THE COURT:  All right.  Mr. Katz, you may proceed.

20                MR. KATZ:  Thank you, Your Honor.

21                Mr. Spaulding, earlier we were talking about social

22       distancing.  I take it from your references to the CDC's

23       advice, you're familiar with the CDC's advice on social

24       distancing.

25                WARDEN SPAULDING:  Yes, sir.
```

1           MR. KATZ:  So you're aware that the CDC has described

2   social distancing as the cornerstone of reducing transmission

3   of diseases like COVID-19?

4           WARDEN SPAULDING:  Yes, sir.

5           MR. KATZ:  And that limiting face-to-face contact with

6   others is the best way to reduce the spread of coronavirus?

7           WARDEN SPAULDING:  Yes, sir.

8           THE COURT:  And you agree that social distancing is

9   important for everyone, including people that don't have

10  symptoms?

11          WARDEN SPAULDING:  Yes, sir.

12          MR. KATZ:  And would you agree that reducing the

13  population at FMC Devens makes everyone safer?

14          WARDEN SPAULDING:  Yes, sir.

15          MR. KATZ:  That includes inmates?

16          WARDEN SPAULDING:  Yes, sir.

17          MR. KATZ:  That includes staff?

18          WARDEN SPAULDING:  It includes staff.  So I can't drop

19  below a staffing level for a prison.

20          MR. KATZ:  I'm sorry.  Would you agree reducing the

21  inmate population makes it safer for the staff that continues

22  to work there?

23          WARDEN SPAULDING:  Yes.

24          MR. KATZ:  And presumably also makes the community

25  safer as well?

1          WARDEN SPAULDING:  It makes the community safer as

2     well?  I suppose.  I'm not clear on how you're asking that

3     question.

4          MR. KATZ:  Well, I guess what I'm getting at is if the

5     staff that's coming to Devens every day and returning to the

6     community every day has less exposure to fewer inmates at FMC

7     Devens, that makes not just the staff safer, but the community

8     that they're returning to safer as well.  Would you agree with

9     that?

10         WARDEN SPAULDING:  Yeah.  I guess so, yes.

11         MR. KATZ:  So you agree at FMC Devens everyone would

12    be safer if the population were reduced to create greater

13    social distancing?

14         WARDEN SPAULDING:  Yes.

15         MR. KATZ:  I want to move on to some questions about

16    compassionate release and home confinement and sort of the

17    relationship between them.

18         You said earlier that you don't consider the

19    coronavirus pandemic as part of considering requests for

20    compassionate release; is that correct?

21         WARDEN SPAULDING:  Correct.

22         MR. KATZ:  Okay.  Now, do you have -- you have

23    Ms. Bourke's declaration in front of you?

24         WARDEN SPAULDING:  In a second I will.

25         MR. KATZ:  Okay.

1        WARDEN SPAULDING:  Yes.

2        MR. KATZ:  In paragraph 24, which is on page 8 --

3        WARDEN SPAULDING:  Page 8.  Okay.  I'm on page 8.

4        MR. KATZ:  Paragraph labeled number 24?

5        WARDEN SPAULDING:  Well, numbered, and 24 I think is

6   on page -- it's on page 7.

7        MR. KATZ:  Oh, I apologize.

8        WARDEN SPAULDING:  "Twelve inmates at FPC," that one?

9        MR. KATZ:  Correct.  It says, "Twelve inmates at FPC

10  have been approved for compassionate release or early home

11  confinement placement since March 1, 2020."  Do you know the

12  breakdown of how many were compassionate release and how many

13  were home confinement?

14       WARDEN SPAULDING:  One second.  One compassionate

15  release and the rest were home confinement.

16       MR. KATZ:  So the compassionate release motion that

17  was made, that was one that you approved?

18       WARDEN SPAULDING:  It's the one I recommended.

19       MR. KATZ:  One that you recommended.  Thank you.  One

20  that you recommended and was ultimately approved.

21       WARDEN SPAULDING:  But let me verify, please.

22       MR. KATZ:  Certainly.

23       WARDEN SPAULDING:  Can we move forward and then come

24  back to that question as I have my unit manager research that.

25  Is that okay?

 1              MR. KATZ:  Sure.  I mean -- sure, that's fine.

 2         On home confinement, how many times has Mr. Pena been

 3    evaluated for home confinement as opposed to compassionate

 4    release?

 5              WARDEN SPAULDING:  I just sent my unit manager out of

 6    the room to get your other answer.

 7              THE COURT:  Well, hold on just one second.  This is a

 8    real problem when I can't see you.  If you don't know the

 9    answer and want to ask somebody else, please tell me so the

10    record will reflect it.  Okay?

11              WARDEN SPAULDING:  You got it.  Yes, sir.

12         So I don't have the answer in front of me right now.

13    I have to get that answer from my unit manager.

14              MR. KATZ:  I'm sorry.  The question about

15    compassionate release or the question about how many times

16    Mr. Pena has been evaluated for home confinement?

17              WARDEN SPAULDING:  Both questions.

18              MR. KATZ:  Both questions.

19              THE COURT:  Well, evaluated or considered?  In other

20    words, with regard to home confinement, the instructions you

21    now have, if I understand correctly, are that a prisoner has to

22    be -- have served half his sentence, or 25 percent of his

23    sentence and within 18 months of the end of it, to be eligible

24    for evaluation under the Attorney General's criteria for

25    release to home confinement.  Do I understand that right?

1          WARDEN SPAULDING:  Yes, sir.

2          THE COURT:  All right.  So am I correct in

3     understanding that because Mr. Pena hasn't served half his

4     sentence, and -- he hasn't served 25 percent of his sentence,

5     you as the warden and the people who work for you -- well, you

6     as the warden have not considered whether you would release him

7     under the criteria in the March 26 and April 3 Attorney

8     General's memo.  Is that correct?

9          WARDEN SPAULDING:  That's correct.

10         MR. KATZ:  Earlier I thought you had said that there

11    were instances where individuals had been placed on home

12    confinement even though without meeting those criteria.  So I

13    guess what I'm getting at is I'm trying to understand how would

14    that review get triggered if they don't meet the criteria?

15         WARDEN SPAULDING:  Central office sends down advice --

16    or not advice -- a recommendation to review a specific inmate.

17    We do that.  They don't meet the criteria or they do meet the

18    criteria, and if they ask for us to send it up anyway, then I'm

19    required to do that.

20         THE COURT:  Have you ever done that?

21         WARDEN SPAULDING:  I have done that.

22         THE COURT:  You've been asked by the central office

23    about a specific inmate who didn't meet the 50 or 25 percent

24    criteria?

25         WARDEN SPAULDING:  Yes, sir.

1          THE COURT:  Is that common or uncommon?

2          WARDEN SPAULDING:  It is uncommon until COVID-19 and

3    the Attorney General's memo and the guidance that has come out

4    since with the assistant director.  I would say that now I am

5    getting those -- I wouldn't say frequently, but I'm getting

6    more than I've ever seen before.  When I say that, I mean as

7    many as three to five in the last two to three months.

8          THE COURT:  Are there some common characteristics to

9    those?

10          WARDEN SPAULDING:  The criteria might have changed

11    where you have -- the level of violence might have happened 30

12    years ago, and they took that into consideration, and they

13    asked us to -- because that was one of the criteria, that is,

14    to have a history of violence.  And when they reviewed it at

15    the central office level, they deemed that inmate not to be a

16    threat, and to send it up anyway for them to review, and either

17    to approve or disapprove?

18          THE COURT:  But were those inmates who hadn't served

19    half their sentences or weren't within 18 months of the end of

20    their sentence?

21          WARDEN SPAULDING:  Yes, sir.

22          THE COURT:  Are you aware that the media reports that

23    there's been one such prominent example today?

24          WARDEN SPAULDING:  No, sir.  No, I haven't seen

25    anything yet.

```
1              THE COURT:  Nobody's told you that the Bureau of
2    Prisons released Paul Manafort today, although he hadn't served
3    half his sentence or 25 -- had far more than 18 months left?
4              WARDEN SPAULDING:  I did not hear about that.
5              THE COURT:  I just learned about it over lunch.  It's
6    in the media.  I'm sorry.
7              Anyway, Mr. Katz, you can resume.
8              MR. KATZ:  Sure.
9              On the cases that sort of we hear about the central
10   office from that don't meet the 50/25 rule, what's your
11   understanding about how those cases would be brought to your
12   attention?
13             WARDEN SPAULDING:  I don't know how they -- maybe they
14   run rosters and identify past history or criteria that they're
15   willing to revisit or to somehow consider waivable.  I don't
16   have any kind of documentation to support how they do this.  I
17   just know that we get notified via an email from central office
18   through our regional office to re-review or to review a
19   specific inmate, and then send up the home confinement request,
20   and whether they approve it or disapprove it, that's -- the
21   only way I know is when the inmate gets a date for placement
22   into home confinement.
23             MR. KATZ:  I want to be clear.  So when I say 50/25
24   rule, you understand what I'm talking about, correct?
25             WARDEN SPAULDING:  I do understand.
```

1            MR. KATZ:  And you're saying that you get requests to
2    review a case from the central office for specific inmates who
3    have not met that requirement, correct?
4            WARDEN SPAULDING:  Yes.
5            MR. KATZ:  And you don't know what motivates the
6    central office to generate those requests to you; is that
7    correct?
8            WARDEN SPAULDING:  That's correct.
9            MR. KATZ:  Now, earlier you said that coronavirus was
10   not a consideration for compassionate release.  Do you remember
11   that?
12           WARDEN SPAULDING:  Yes.
13           MR. KATZ:  Is compassionate release a factor
14   considered in making home confinement decisions?
15           WARDEN SPAULDING:  Yes.
16           MR. KATZ:  But besides, I guess, the exceptions that
17   you hear about from the central office, is the 50/25 rule
18   considered a prerequisite for considering someone for home
19   confinement based on coronavirus?
20           WARDEN SPAULDING:  Repeat the question, please.
21           MR. KATZ:  I apologize.  As a general matter, is it
22   your understanding that you are not to consider someone for
23   home confinement because of coronavirus unless they've already
24   met the 50/25 rule?
25           WARDEN SPAULDING:  So the criteria that I currently

1   use from the May 8 criteria sent down from central office is

2   what I use to consider and recommend home confinement to the

3   central office.  So if they decide that they want to use --

4   follow through that criteria or have some other reason to

5   consider something else that's not based on Mr. Hurwitz's memo

6   to all the wardens, then I'm not privy to that information.  I

7   just follow the guidelines that were presented to me by the

8   memo dated May 8.

9         MR. KATZ:  You said earlier that prior to the May 8

10  memo, there were several previous memos?

11        WARDEN SPAULDING:  Yes.

12        MR. KATZ:  And I think you said, correct me if I'm

13  wrong, I think you said that the 50 percent rule was always

14  part of that policy, and the 25 percent and 18-month rule was

15  something that got added?

16        WARDEN SPAULDING:  Yes.

17        MR. KATZ:  What else changed from memo one to the May

18  8 memo?

19        WARDEN SPAULDING:  So originally, and for most of the

20  memos up until the last May 8 memo, if an inmate received an

21  incident report or an infraction while in prison for twelve

22  months -- in other words, if he received an infraction for

23  twelve months -- it's on his record for twelve months, then he

24  is excluded from home confinement, they changed that on May 8

25  to if they've had an incident report or an infraction that is

1    considered minor, which we code those as incident reports that
2    are 300 is a minor infraction and 400 is less than a 300
3    infraction.  So any inmate that had an infraction of 300 series
4    incident report or 400 series incident report, those now can be
5    considered for home confinement.  So that was changed.
6         I believe there was another one.  Past history of
7    violence was changed sometime in the last couple memos where
8    they looked at the level of violence and how long ago that
9    occurred.
10        And what about the low and the mid, that was still
11   there, right?  Okay.
12        That's what I have so far.
13        MR. KATZ:  So it sounds like the changes you are
14   describing were all directed at lowering the standards for
15   releasing people to home confinement.
16        WARDEN SPAULDING:  Correct.
17        MR. KATZ:  Were there any changes made from memo one
18   to the May 8 memo that made it more difficult for a person to
19   be placed on home confinement?
20        WARDEN SPAULDING:  No, sir.
21        MR. KATZ:  Okay.  Judge, can I request that the
22   government produce all of the memos, not just the May 8 memo.
23   I mean, that's last Friday.  I don't know what Mr. Pena was
24   actually evaluated under.  I think it would be helpful for us
25   to have the full gamut of what, you know -- what's been

1     governing.

2             MR. LaMACCHIA:  Your Honor, the issue here is

3     compassionate release and whether he meets the standards under

4     3582.  I understand why the court and Mr. Katz want to explore

5     the reasons why the warden made his home confinement decision,

6     but that's -- you know, that's not necessarily the issue before

7     the court.

8             THE COURT:  Well, it relates to something I said to

9     you last week.  You're arguing for deference to the warden's

10    decisions.  But -- look, this is helpful.

11            MR. LaMACCHIA:  I guess my point is --

12            THE COURT:  Let me say this:  I'm not ruling on

13    whether you need to turn them over, but this is not relevant.

14    You're arguing there should be deference to the decisions, and

15    no decision has been made on the merits.  There's no decision

16    from me or any of my colleagues to defer to.

17            So let's put aside the request for the production of

18    documents, but the whole issue is not even irrelevant.  It was

19    part of your argument.

20            MR. LaMACCHIA:  That's not what I'm suggesting, Your

21    Honor.  I'm just suggesting that based on the testimony we have

22    so far, maybe a few more questions, we can get a sense of how

23    the warden made his decision with respect to Mr. Pena, which is

24    the issue.

25            THE COURT:  Well, I know how he made his decision.

1    He's following orders, what he regards as orders, and he saw

2    that he wasn't -- hadn't served half his sentence, and he

3    hadn't served 25 percent of his sentence.  So he didn't

4    consider him, under the criteria that the Attorney General

5    instructed all should be used to be evaluate all, at least

6    at-risk, prisoners.  These are questions --

7            MR. LaMACCHIA:  I understand your point.  I guess my

8    point is be that as it may, I don't think we need to produce

9    every --

10           THE COURT:  All right.  And I don't want to take the

11   warden's time or my time right now on requests for documents.

12   Look, people are leaking this -- go ahead.

13           MR. KATZ:  Fair enough.

14           THE COURT:  And it shouldn't be leaked.  Either it's

15   discoverable or not discoverable.  I think if you reflect on

16   it, Mr. LaMacchia, and talk to the Bureau of Prisons, there

17   probably won't be an objection.  You've produced some of these,

18   and, I don't know, what would be wrong with producing the rest,

19   but I don't want to spend another minute on this right now.

20           Go ahead.

21           MR. KATZ:  Thank you, Your Honor.

22           Warden Spaulding, was there ever a time when inmates

23   at FMC Devens were placed on a list for home confinement, and

24   there were changes made to the list?

25           WARDEN SPAULDING:  When you talk about a list, I'm not

1    clear on what you're asking.  We get a list from central office

2    of inmates that meet criteria for consideration for home

3    confinement based upon their determination of the computer

4    research that they're doing.  We get that list, and then we

5    review each inmate based on the criteria that we've talked

6    about.  And to answer your -- just to finish up -- I know I had

7    two questions you needed answered.  One of them was was he

8    considered throughout his time as these changes came about with

9    these additional criteria?  And I got clarification on that.

10   So each inmate that meets the criteria from the first memo to

11   the current memo that we're using were re-evaluated,

12   redetermined if they met the new criteria.  So that answers

13   your question about Mr. Pena, was he re-reviewed, and the

14   answer is yes, he was re-reviewed.  We do get lists.  We run

15   our own lists based on the criteria that comes out, and then we

16   review those inmates for home confinement.

17            THE COURT:  Just so I understand this, because I'm

18   your ultimate audience.  He was reviewed, but as long as the 50

19   percent/25 percent rule didn't change, neither you, nor any of

20   your colleagues, evaluated whether he met the criteria in the

21   March 26 Attorney General's memo, which on April 3 the Attorney

22   General said should be used to evaluate all at-risk inmates.

23   Do I understand that right?

24            WARDEN SPAULDING:  Yes, sir.

25            THE COURT:  And Mr. Katz, I want you to focus your

1    questions on things that are relevant to Mr. Pena.  How much

2    more do you think you have?

3              MR. KATZ:  I mean, honestly, Judge, it's difficult

4    because I guess you know my view is -- I mean, I have a lot of

5    questions about testing, because I view all of the conditions

6    at the camp relevant to Mr. Pena.  I mean, this is what we are

7    litigating.

8              THE COURT:  They are relevant.  But he's answered --

9    look, I'm your audience.  You want to persuade me.  I

10   understand that the staff is not being tested, that people can

11   be asymptomatic.  They could be infected.  Mr. Pena's 71 years

12   old.  The statistics -- or 70.  I honed in -- I mean, I'm

13   helping you.  I'm helping all of you to know what my state of

14   mind is.

15             I asked you to get me the statistics on the people who

16   were dying in Massachusetts and nationally.  And in

17   Massachusetts about three out of four are 70 or older.  If a

18   staff member who's infected -- and you can ask him, but I don't

19   think they're doing any tracking, at least with regard to

20   asymptomatic people -- you know, if a staff member is infected

21   and comes into the facility, and an inmate gets infected,

22   unless something is done very quickly to totally isolate that

23   inmate, there's a high risk that it will spread.  And Mr. Pena,

24   you know, will be at risk of getting it.  Then you've got your

25   figures on what percentage of people who were over 65, you

 1   know, get hospitalized and what percentage die.  I get that.

 2            MR. KATZ:  I will try to streamline my questions.

 3            THE COURT:  Yeah.  Well, you need to because I want to

 4   give Mr. LaMacchia a chance, and then I have some more

 5   questions.

 6            MR. KATZ:  Sure.

 7            THE COURT:  Go ahead.

 8            MR. KATZ:  Warden Spaulding, is it fair to say that

 9   BOP's duty is to carry out the sentence that was imposed by the

10   sentencing judge?

11            WARDEN SPAULDING:  Yes.

12            MR. KATZ:  And would you agree that that's why the

13   Bureau of Prisons requires a certain portion to be served

14   before considering inmates for home confinement?

15            WARDEN SPAULDING:  Yes.

16            MR. KATZ:  So if a sentencing judge said that home

17   confinement would not undercut the sentence that the judge

18   imposed, would that affect your view as to how the Bureau of

19   Prisons is carrying out its mission?

20            WARDEN SPAULDING:  I say this delicately, because I

21   don't want to upset anybody on the phone.  But my understanding

22   is Your Honor cannot order the Bureau of Prisons to place an

23   inmate on home confinement.  He has, or she has the ability to

24   deal with a reduction in sentence which, again, answers the

25   second question that you asked me earlier, which was the one

1    inmate of the eleven that we released from the camp, we denied

2    his reduction in sentence based on the program statement

3    5050.50, and now with the First Step Act those go to the judge,

4    and that judge made the decision to order him time served, and

5    released him from prison.

6            THE COURT:  So there's been one person in the camp

7    that a judge has ordered released, although the Bureau of

8    Prisons didn't request it?

9            WARDEN SPAULDING:  Well, we didn't -- yes, correct.

10           THE COURT:  All right.  And look, you're being very

11   respectful, and there is a distinction.  I have authority to

12   order a reduction in sentence under the statute.  I don't have

13   the authority to order home confinement.  But Mr. Katz was

14   asking -- I know why he asked you the question.  He was asking

15   a different question.  Did anybody give you a transcript of

16   last week's hearing?

17           WARDEN SPAULDING:  No, sir.

18           THE COURT:  Okay.  Did anybody -- unless somebody

19   thinks this is attorney/client privilege, you can object -- but

20   did anybody tell you that I said last week that in my view it

21   would not be unreasonable for the Bureau of Prisons, based on

22   what I knew then, to put Mr. -- to let Mr. Pena serve the rest

23   of his sentence on home confinement?

24           WARDEN SPAULDING:  No, sir.

25           THE COURT:  And that's, I think, what Mr. Katz is

1  getting at.

2          MR. KATZ:  I'll move on.

3          Now, you've read Amber Bourke's declaration?

4          WARDEN SPAULDING:  Yes, sir.

5          MR. KATZ:  Now, there was a little confusion over this

6  issue earlier, but in her declaration, paragraph 26, she cites

7  the number of cases of COVID-19 in Falmouth and in Barnstable

8  County.  And then states, "Accordingly, granting defendant home

9  confinement placement may increase his risk of contracting

10  COVID-19 in contradiction with the Attorney General's

11  guidance."  Do you see that?

12          WARDEN SPAULDING:  Yes, sir.

13          MR. KATZ:  Do you now take the position that Mr. Pena

14  is safer in FMC Devens than he would be at his home?

15          WARDEN SPAULDING:  Sir, I can't predict that.

16  Currently -- I don't know his home setting, how many times his

17  wife goes out, who she interacts with.  So there's a risk, I

18  think, in both areas.

19          I just know that currently, right now, as I knock on

20  wood, we don't have any positive cases at the camp, and we've

21  limited movement from just about everybody, to include the

22  housing unit officers.  So I can speak to the camp.  I feel

23  relatively certain that we're doing everything we possibly can

24  to keep every inmate in that housing unit safe.

25          MR. KATZ:  Well, let me ask this way:  Are the numbers

1   of the cases in Falmouth and Barnstable County relevant in

2   determining where Mr. Pena is safest?

3          WARDEN SPAULDING:  Yes.

4          MR. KATZ:  Can you tell me why?

5          WARDEN SPAULDING:  The more cases you have in the

6   community, the more chances you have of contracting the virus.

7          MR. KATZ:  How many staff members work at FMC Devens?

8          WARDEN SPAULDING:  Inside we have -- I have a total of

9   475 staff.  Now, obviously they don't -- it's a 24-hour/7-day

10  operation.  So they all come in and out and work different

11  shifts and work different work assignments throughout the

12  prison, as well as the camp.

13         MR. KATZ:  Do you know where those folks live?

14         THE COURT:  Yeah.  Obviously they live within

15  commuting distance of FMC Devens.

16         MR. KATZ:  And do you know the number of COVID-19

17  infections and rates of infections in the towns where they

18  live?

19         WARDEN SPAULDING:  I do not know all of them, no.

20         MR. KATZ:  Do you know how those numbers compare to

21  the figures in Falmouth and Barnstable County?

22         WARDEN SPAULDING:  I would reasonably say that they

23  are just as high as Falmouth, if not higher.

24         MR. KATZ:  If I suggested to you that the rate of

25  infection in Shirley is four times what it is in Falmouth,

1    would that surprise you?

2              WARDEN SPAULDING:  No, it would not surprise me.

3              MR. KATZ:  If I told you the rate of infection --

4              THE COURT:  He needs to testify based on his personal

5    knowledge.  He's answered this.  And I think, although it may

6    be useful to ask Ms. Bourke, if we ever get to her, why she put

7    it in her declaration.  Mr. LaMacchia has withdrawn that

8    statement from paragraph 26.  Am I correct?

9              MR. LaMACCHIA:  That's correct, Your Honor.

10             THE COURT:  Do you have anything else that's important

11   to ask him?  They're not relying on that.

12             MR. KATZ:  Okay.  Well, I mean --

13             THE COURT:  Although if -- here:  If that was a basis

14   of their decision, then you can explore it.  But --

15             MR. KATZ:  Well, I guess -- it's not now a basis of

16   the decision?

17             THE COURT:  Well, my understanding is, because he's

18   told me several times, that they never considered the case-

19   specific criteria, including where would Mr. Pena be safer

20   because he didn't meet the 50/25 test.

21             Correct, Mr. Spaulding?

22             WARDEN SPAULDING:  Yes, sir.

23             THE COURT:  Move on.

24             MR. KATZ:  I appreciate that, Judge.  The issue here,

25   though, is that I haven't heard the government to abandon that

1    argument.  That's one of the --

2              THE COURT:  Excuse me.  Excuse me.  Move on.

3              MR. KATZ:  Now, you said because of the 50/25 rule you

4    haven't evaluated how Mr. Pena would fair on the criteria

5    identified by the Attorney General; is that correct?

6              WARDEN SPAULDING:  That's correct.  If he didn't meet

7    the criteria of 50/25, he wouldn't -- I wouldn't have sent it

8    up.

9              MR. KATZ:  Can we do that now?  Do you have a copy of

10   the Attorney General's memo, the March 26 memo?

11             WARDEN SPAULDING:  Where would you like me to look?

12             MR. LaMACCHIA:  Judge, can I just interject, because,

13   you know, the determination of home confinement is not

14   reviewable.  I understand the circumstance --

15             THE COURT:  Well, to the extent that's an objection,

16   I'm going to overrule it, because I was going to ask the same

17   questions to decide the statutory issue, the compassionate

18   release issue.  And you've asked me to defer to the judgment of

19   the warden.  He's not previously made a judgment, but I'd like

20   to know what his judgment is.  It's not going to dictate mine,

21   but if -- you know, I think if this wasn't moving so fast, you

22   might welcome this.  It's relevant for some other purposes too.

23             MR. LaMACCHIA:  Okay.  That's fine.  Let's go through

24   it.  I just want to note that the criteria for compassionate

25   release are different from those of --

```
 1              THE COURT:  Right.  And as I will point out, as I
 2   tried to sort this out over lunch, it's utterly illogical for
 3   the Department of Justice or for the Attorney General, in my
 4   opinion, to tell the Bureau of Prisons to use new criteria for
 5   home confinement, and then they add other criteria inconsistent
 6   with his, in my view, and not to revise the instructions that
 7   the warden gets with regard to motions for compassionate
 8   release.  But the life of the law, as Oliver Wendell Holmes
 9   said, it's not logic, it's experience.  So here we are.  But
10   I'd be interested in this.  It's one of the questions I
11   intended to ask.
12              MR. LaMACCHIA:  Okay.
13              THE COURT:  So let me see if I can find my copies.
14              The April 3 memo.  Anyway, Mr. Katz, why don't you do
15   it?
16              MR. KATZ:  Sure.  Warden Spaulding, you have the March
17   26 memo in front of you?
18              WARDEN SPAULDING:  Yes.
19              MR. KATZ:  As I understand it, from the bottom of page
20   1 to about the middle of page 2, there are six bullet points?
21              WARDEN SPAULDING:  Yes, I see it.
22              MR. KATZ:  Okay.  I guess I would go through them one
23   by one.  How would you assess the age and vulnerability of
24   Mr. Pena to COVID-19 in accordance with CDC guidelines?
25              WARDEN SPAULDING:  He meets the age criteria.
```

1          MR. KATZ:  And that's based on the fact that as many

2     as six in ten people 65 and older become hospitalized, as many

3     as eight get admitted to the ICU, and as many as one in nine

4     die?

5          MR. LaMACCHIA:  Objection.  He's asking about the

6     criteria and then putting in statistics.  I'm not sure the

7     warden has knowledge of that.

8          THE COURT:  Well, yeah.  Why don't you ask it in a

9     more open-ended -- well, in a different way.

10          MR. KATZ:  Sure.

11          Do you agree that he satisfies that first criteria?

12          WARDEN SPAULDING:  Yes.

13          THE COURT:  No.  It's age and vulnerability.  He said

14     he satisfied -- I think he's making a distinction between

15     age -- are you making a distinction between age and

16     vulnerability?

17          WARDEN SPAULDING:  Sir, just the age, because I'm

18     looking at the CDC high risk conditions as well, in conjunction

19     with the Attorney General's memo, dated March 26, and so the

20     statement, or the sentence in there states the age and

21     vulnerability of the inmate with COVID-19.  So I'm saying that

22     he meets the criteria for age.

23          THE COURT:  And if it turned out he were severely

24     obese, would he meet the criteria for vulnerability?

25          WARDEN SPAULDING:  BMI of 40 or higher, yes.

1          MR. KATZ:  Is it your understanding in evaluating

2     inmates that both of those things need to be satisfied?

3          WARDEN SPAULDING:  Yes.  We would look at all of the

4     criteria based on the CDC guidelines.

5          MR. KATZ:  I'm sorry.  When you say age and

6     vulnerability, you're not saying that an inmate needs to both

7     be old and vulnerable.  He can be young and vulnerable, or he

8     could, in theory, be old and not vulnerable, one of those two?

9          THE COURT:  Do you understand that question?

10          WARDEN SPAULDING:  Yeah.  So I know you have younger

11     people that have lots of medical conditions, and that would

12     define them as being vulnerable.  And when you look at the

13     elder population, CDC is saying if you're over the age of 65,

14     you're considered a high risk.  And then with that could be

15     some additional risk factors to include obesity and some of the

16     other things listed in terms of chronic medical conditions.

17          MR. KATZ:  I don't need to belabor the point.

18          The second factor, the security level of the facility

19     holding the inmate.  The camp at FMC Devens, what security

20     level is that?

21          WARDEN SPAULDING:  Minimum security.

22          MR. KATZ:  The inmate's conduct in prison.  How would

23     you evaluate Mr. Pena's conduct in prison?

24          WARDEN SPAULDING:  Outstanding.

25          MR. KATZ:  And his score under PATTERN, how would you

1    evaluate that?

2          WARDEN SPAULDING:  A minimum.

3          MR. KATZ:  Can you explain what that means?

4          WARDEN SPAULDING:  So the recidivism rate of coming

5    back to prison, he scores at a minimum, which means that the

6    bureau's criteria views him as a low risk that he would

7    re-offend and come back to prison.

8          MR. KATZ:  That's the best score possible?

9          WARDEN SPAULDING:  Yes, it is.

10          MR. KATZ:  "Whether the inmate has demonstrated a

11    verifiable reentry plan that will prevent recidivism and

12    maximize public safety, including verification that the

13    conditions under which the inmate would be confined upon

14    release would present a lower risk of contracting COVID-19 than

15    the inmate would face in his or her BOP facility."

16          I believe you said you haven't conducted that analysis

17    yet?

18          WARDEN SPAULDING:  Well, we know that he was released

19    into Falmouth with his wife.  So I would say that he did

20    provide us an appropriate release plan.

21          MR. KATZ:  What information -- what other information

22    would you need to make the determination on that factor?

23          WARDEN SPAULDING:  Probation.  If they're at that

24    specific age, maybe employment, or Social Security benefits,

25    types of health insurance, if they have that, just things that

1    he is required to list and put in on paper to present to the

2    unit team that shows that he would be successful if he was

3    placed back into the community, whether that's on home

4    confinement, or any other way of getting home.

5         MR. KATZ:  Okay.  And the request that he made for

6    compassionate release, do you know whether it included that

7    information?

8         WARDEN SPAULDING:  Just the address.

9         MR. KATZ:  The request for compassionate release that

10   you have does not state that he's been on Social Security since

11   age 66 with Harvard Pilgrim and Medicare coverage?

12        WARDEN SPAULDING:  It says that he will reside with

13   his wife, daughter and grandchildren.  He's been on Social

14   Security since age 66 with Medicare coverage.  He says all the

15   doctors and medical providers are within the immediate area.

16        MR. KATZ:  To be clear, the form that I'm looking at,

17   and I want to be sure we're looking at the same form.  It

18   doesn't say he would live with his daughter and grandchildren.

19   On the form that I'm looking at, it says "daughter,

20   grandchildren, local."  Is that what you're seeing?

21        WARDEN SPAULDING:  Yes.  That's what I read, yes.  I'm

22   sorry.  Daughter, grandchildren, local, yes.

23        MR. KATZ:  So assuming those things were verified,

24   would he meet, I guess, the fifth bullet point?

25        WARDEN SPAULDING:  Well, we're talking about two

1    separate things here.  This is confinement and -- so what

2    bullet are we talking about?  Whether the inmate demonstrates a

3    variable release -- reentry plan?

4         MR. KATZ:  That whole fifth bullet point, correct.

5         WARDEN SPAULDING:  So that falls under home

6    confinement.

7         MR. KATZ:  I understand --

8         WARDEN SPAULDING:  Separate from the compassionate

9    release.

10        MR. KATZ:  Well, the information would be -- if the

11   information that's provided on the compassionate release form

12   were true, would that satisfy that fifth criteria for home

13   confinement?

14        WARDEN SPAULDING:  Yes.

15        MR. KATZ:  The last criteria:  "The inmate's crime of

16   conviction, and assessment of the danger posed by the inmate to

17   the community.  Some offenses, such as sex offenses, will

18   render an inmate ineligible for home detention.  Other serious

19   offenses should weigh more heavily against consideration for

20   home detention."  Would that criteria --

21        WARDEN SPAULDING:  He would meet that.  He does not

22   have a sex offense, and his -- he doesn't have a serious

23   offense that would weigh more heavily against consideration for

24   home detention.

25             MR. KATZ:  So would it be fair to say that, other than

1   potentially vulnerability under the first criteria, and

2   verification of facts under the fifth criteria, that Mr. Pena

3   meets all six criteria?

4        WARDEN SPAULDING:  He meets those criteria on the AG

5   memo, but does not meet the criteria that the bureau pushed

6   down to the wardens for the 50 percent or 18 months/25 percent.

7        MR. KATZ:  I understand that.  I'm saying if he were

8   considered, that's how you would evaluate those criteria?

9        WARDEN SPAULDING:  With the AG memo, yes.

10       THE COURT:  Let me ask you this:  So I assume that

11  Mr. Pena will reach the 25 percent within 18 months of the end

12  of his sentence in July.  I thought it was the end of June, but

13  I think his lawyer, perhaps you calculated it as sometime in

14  July.  And if you were still the warden, is it correct that you

15  would then look at all of these criteria, which are said to be

16  a non-exhaustive list of discretionary factors, and decide

17  whether to recommend him to your superiors for home

18  confinement?  Is that what --

19       WARDEN SPAULDING:  Yes, sir, he met the criteria.

20       THE COURT:  The 25 percent criteria?  So that sort

21  of -- is that what you're referring to?

22       WARDEN SPAULDING:  Yes, sir.

23       THE COURT:  All right.  And then based on the review

24  of those six stated factors that you just did, do you expect

25  that you would recommend his release to home confinement?

1        WARDEN SPAULDING:  I would recommend it to my
2   superiors, yes.
3        MR. KATZ:  Judge, just to keep you apprised, I have
4   three -- I'll tell you what they are -- three more areas of
5   questioning.
6        THE COURT:  I'm not quite finished yet.
7        MR. KATZ:  I apologize.
8        THE COURT:  I'm just making a note.
9        Then here's something I need to wrestle with, I've
10  been wrestling with:  So if you were still the warden at Devens
11  roughly two months from now, you would recommend Mr. Pena's
12  release, and earlier you said "knock on wood."  Right?
13       WARDEN SPAULDING:  In terms of COVID at the camp.
14       THE COURT:  Right.
15       Am I correct in understanding that you feel so far
16  you've been both fortunate and somewhat lucky, and you hope
17  that the good luck will continue?
18       WARDEN SPAULDING:  Yes, sir.  We started early,
19  aggressive, and there are things that you can't control in the
20  prison system.
21       THE COURT:  Yeah.  And you recognize that there's a
22  degree -- well, do you believe that there's a degree of risk
23  since you've got staff going out into the community and coming
24  back, that one of them, or more than one of them, may be
25  unsymptomatic, but bring the virus into the camp?

```
 1            WARDEN SPAULDING:  Yes, sir.

 2            THE COURT:  And I'll tell you that the statistics from

 3    the Massachusetts Department of Public Health yesterday showed

 4    that there had been 5,141 deaths from the virus, attributed to

 5    the virus, and 4,386 were people 70 years old or older.  And

 6    I'll also tell you that the statistic says that 98.5 percent

 7    had an underlying condition, which you don't believe Mr. Pena

 8    has.  But basically, you know, it looks like more than four out

 9    of five of the people who died were over 70 years old.

10    Mr. Pena I think is almost 71.

11            The question I have is if you would recommend his

12    release in July, is there a good reason why I shouldn't order

13    his release in May, and avert the risk that he'll get infected

14    in the next two months?

15            WARDEN SPAULDING:  That's a great question.  I can

16    tell you that we're talking about two months.  The criteria

17    that I'm using, the bureau has made a firm stance on this.  It

18    hasn't changed too much in terms of the 50 percent, and now we

19    have the new criteria of the 25 percent/18 months.  And so, I

20    would say, based on the AG's memo and the six factors -- the

21    six things we spoke about, I would be recommending him for home

22    confinement in July when he meets the Bureau's criteria.

23            THE COURT:  And I think -- thank you for saying it's a

24    great question.  It's an important one to me.  But I don't

25    think that's the one -- that's in some respects more for
```

1    Mr. LaMacchia.

2           But let me tell you something else.  Have you seen

3    Mr. Pena?

4           WARDEN SPAULDING:  Yes.

5           THE COURT:  How recently?

6           WARDEN SPAULDING:  It's been about -- it's been a few

7    weeks.  Now, do I have direct conversation with Mr. Pena?  No.

8    I've done my town halls out there.  I've walked my camp unit.

9    And if they have questions, I am absolutely approachable.  So I

10   know I have -- I could recognize him if I saw him on the unit

11   because he is an older gentleman.  So I know that -- you know,

12   I don't know if that answers your question, sir.

13          THE COURT:  I think, and the lawyers should correct me

14   if I'm wrong be -- I think I was told that there were eight

15   people 70 or older in the camp.  Are you aware of that

16   statistic?

17          WARDEN SPAULDING:  Yes, sir.

18          MR. LaMACCHIA:  That's correct.  It's in the

19   declaration from Amber Bourke at paragraph 23.

20          THE COURT:  Right.

21          MR. KATZ:  This was going to be one of my areas of

22   inquiry, so...

23          THE COURT:  And do you know if any of those eight have

24   applied for reductions in sentence?  Well, for home confinement

25   and/or reductions in sentence?

1          WARDEN SPAULDING:  So I have who's been approved.  I

2     know that because of age that is a criteria that every time we

3     have a change within the criteria, they're re-reviewed.  So I

4     can comfortably say that every inmate at that camp that meets

5     any one of these criterias is reviewed for home confinement,

6     and then re-reviewed.

7          THE COURT:  Yeah.  But I guess what I'm trying to get

8     at, and let me be more specific.  I wonder if any of those

9     seven others, I think, have applied for home confinement or

10    reduction in sentence and been denied because they, for home

11    confinement, didn't might the 50/25 criteria.  Do you know the

12    answer to that question?

13         WARDEN SPAULDING:  No, sir, I do not.

14         THE COURT:  Okay.  And you know the answer to a lot of

15    questions.  This is very helpful.  I appreciate it.

16         MR. KATZ:  Judge, since we're on that topic --

17         THE COURT:  Go ahead.

18         MR. KATZ:  I can inform the court, and I'm happy to

19    either inform you or pose it in the form of a question to the

20    warden.

21         THE COURT:  Why don't you put it as a question.

22         MR. KATZ:  Sure.  Well, let me ask for a little

23    guidance first.  I'm using names of other inmates.  I know who

24    the inmates are that are in the camp that are over 70.

25         THE COURT:  Are you going to talk about their health

```
 1    conditions?
 2              MR. KATZ:  No, I'm not going to talk about their
 3    health conditions.
 4              THE COURT:  Okay.  You can use their names.
 5              MR. KATZ:  Okay.
 6              Mr. Spaulding, are you familiar with an inmate named
 7    John DiMenna?
 8              WARDEN SPAULDING:  Yes.  Sorry.  Yes.
 9              MR. KATZ:  And Ms. Bourke's data in her declaration
10    was as of May 8; is that correct?
11              WARDEN SPAULDING:  Yes.
12              MR. KATZ:  Are you aware Mr. DiMenna was released
13    yesterday per an order of the court from the District of
14    Connecticut granting a motion for a compassionate release?
15              WARDEN SPAULDING:  Yes.
16              MR. KATZ:  So he was one of the eight inmates?
17              WARDEN SPAULDING:  Yes.
18              MR. KATZ:  And Mr. Pena's one of the eight inmates?
19              WARDEN SPAULDING:  Yes.
20              MR. KATZ:  So there are six others?
21              WARDEN SPAULDING:  Hold on.  Let me get -- hold on one
22    second.
23              MR. KATZ:  Sure.
24              WARDEN SPAULDING:  So I guess I need clarification.
25    So when you talk about -- there are two separate things we're
```

1 talking about, that Connecticut let him come home with a

2 reduction in sentence time served.  And so -- but when we talk

3 about home confinement, that's something separate.  So maybe if

4 you could re-ask that question so I can answer it correctly for

5 you.

6         MR. KATZ:  Sure.  I apologize.  I'll try to be more

7 clear.  According to Ms. Bourke's declaration, there are eight

8 inmates in the camp who are 70 or older as of May 8.

9         WARDEN SPAULDING:  As of May 8, yes.

10         MR. KATZ:  How many of those eight are still in the

11 camp?

12         WARDEN SPAULDING:  Well, I think there's still eight

13 of them there, unless we're counting the immediate release that

14 happened yesterday.  He's over the age.  So that would make it

15 seven.

16         MR. KATZ:  Okay.  So one inmate has been released, and

17 that was pursuant to a court order, not being placed on home

18 confinement by the Bureau of Prisons?

19         WARDEN SPAULDING:  That's correct.

20         MR. KATZ:  Now of these six other inmates, not

21 including Mr. Pena, not including the inmate who was released

22 yesterday, of the six others, are any of them currently slated

23 to be released to home confinement?

24         WARDEN SPAULDING:  I'm not sure at this time.  I'd

25 have to get my unit manager to run that roster to see what

1  those release dates are.

2          THE COURT:  Could you ask him to do that, please.

3          MR. KATZ:  Yeah.  Could you do it?

4          THE COURT:  You can speak to me, Mr. Katz, and I will

5  give him direction.

6          MR. KATZ:  I apologize, Your Honor.

7          Do you know whether any of those others are presently

8  in quarantine in anticipation --

9          WARDEN SPAULDING:  Two of them have dates.  One's for

10  June 28.  Oh, that's a regular release date.  I'm sorry.  Hold

11  on.  I know there's two.  If you're asking me if we're going to

12  quarantine them, the answer is yes.

13          THE COURT:  So I think he wants to know, have you

14  recommended any of the remaining six for home confinement or

15  reduction in sentence?

16          WARDEN SPAULDING:  No, sir.  Only if they met the

17  criteria, I would have recommended them for home confinement.

18  The fact that they're still here and they haven't been placed

19  on home confinement as of yet, and I can't speak to their dates

20  of when they'll be placed on home confinement, but if they met

21  the criteria, then they would have been sent up for

22  consideration for home confinement.  If they didn't meet the

23  criteria, then it wouldn't have been sent up.

24          MR. KATZ:  I apologize.  I'm just trying to get a

25  sense of the six other inmates, you're saying as of now no one

1    is in a position to be released to home -- or no one is

2    scheduled to be released to home confinement?

3           WARDEN SPAULDING:  You're talking about with the camp

4    inmates, right?  The six camp inmates?  I heard you say 600.

5    So the six camp inmates, I do not have that information in

6    front of me to be able to answer that question.  I can get it

7    from my AUSA there, Brian, can help me get you that answer, but

8    I don't have it in front of me right now.

9           MR. KATZ:  Just to be transparent, I'm trying to get a

10   sense of when Mr. Pena becomes eligible to be reviewed in July,

11   how many other inmates who are over 70 will be left in the

12   camp?  I'm happy to, you know -- I'm happy to move on.

13          Judge, the only other questions I have were about

14   testing and quarantine.  So I'll try and be as quick as I can.

15          THE COURT:  Here, let me -- I can help you because I

16   know it's important to me on this.

17          MR. KATZ:  Sure.

18          THE COURT:  He's already told me that they're not

19   testing the staff coming in.  Is it the policy if the Bureau of

20   Prisons decides to release an inmate to home confinement to

21   quarantine that inmate for 14 days at the institution?

22          WARDEN SPAULDING:  Yes, sir.

23          THE COURT:  And is quarantine in a special housing

24   unit?

25          WARDEN SPAULDING:  Yes, sir.

 1          THE COURT:  What is a special housing unit?

 2          WARDEN SPAULDING:  It's a restricted housing unit

 3   where I have staff that are there 24 hours a day that do 30-

 4   minute rounds and provide their food and any kind of medical

 5   issues that they might have.  But it's the safest place that I

 6   can place them to know that they will have limited interaction

 7   with other inmates and/or staff.

 8          THE COURT:  Is it what lay people might consider

 9   solitary confinement?

10          WARDEN SPAULDING:  Yes, sir.

11          THE COURT:  They're in a cell all by themselves?

12          WARDEN SPAULDING:  Well, there's a row of cells.  So

13   if you're saying it's -- they're completely isolated, they do

14   have conversations downrange quite frequently.

15          THE COURT:  All right.  Do they get to go out of the

16   cell during the day?

17          WARDEN SPAULDING:  Not when they're in quarantine

18   status.

19          THE COURT:  So 24-hour lockdown?

20          WARDEN SPAULDING:  Yes, sir.

21          THE COURT:  And you do have some limited number of

22   tests, correct?

23          WARDEN SPAULDING:  Yes, sir.

24          THE COURT:  So let's say a judge ordered the release

25   of an inmate but, like you, wanted to try to minimize the risk

1   that the inmate would infect anybody in the community, the

2   judge could order you to test the inmate.  How long does it

3   take you to get the results of a test?

4        WARDEN SPAULDING:  Our current rapid test machine, I

5   can get a result within 12 minutes with an 80 percent accuracy.

6   If they're positive, that's a hundred percent accuracy.  If

7   it's a negative, it can be -- I think it's as high as 80

8   percent accurate.  And that is what we're using in the Bureau

9   of Prisons, as well as the outside labs, Quest and LabCorp.

10       THE COURT:  Do you have any additional questions,

11  Mr. Katz?

12       MR. KATZ:  So about quarantine --

13       THE COURT:  Do you have anything important?

14       MR. KATZ:  Well --

15       THE COURT:  It's 3:30.

16       MR. KATZ:  I understand.  I'm concerned -- I'm very

17  concerned about the environment in quarantine.  You know, I'm

18  wondering whether or not people who are placed there are

19  suspected cases, whether these are negative pressure

20  environments, meaning, you know, the person's droplets don't

21  get shared with other people in the cell.  I mean, I have

22  concerns that even quarantine exposes Mr. Pena to a higher

23  degree of risk than he would have if he were at home.  So --

24       THE COURT:  All right.  My present inclination is if,

25  and underlining the "if," I order Mr. Pena released, I would

 1   order the Bureau of Prisons to test him.  If he tests

 2   positive -- in fact, it might be contingent -- if he tests

 3   positive, that's one thing.  If he tests negative, my present

 4   inclination would be to send him home.  But that's all if.

 5            Let's hear from Mr. LaMacchia.  We'll see where we

 6   are.

 7            MR. KATZ:  Thank you, Your Honor.

 8            MR. LaMACCHIA:  Thank you, Your Honor.  I will try and

 9   be brief.  I just have a few questions.

10            THE COURT:  Take whatever time you reasonably need.

11            MR. LaMACCHIA:  Okay.

12            So good afternoon, Warden.  This is Brian LaMacchia

13   from the U.S. Attorney's office.  How are you?

14            WARDEN SPAULDING:  Good, sir.

15            MR. LaMACCHIA:  So I want to just return to the

16   directive that we were talking about before from the BOP about

17   time served eligibility for home confinement.  Do you recall

18   that with the 18 months served and 25 percent or 50 percent?

19            WARDEN SPAULDING:  Yes, sir.

20            MR. LaMACCHIA:  Can you explain to us, you know, in

21   particular the court, what's your understanding of the purpose

22   of that directive.

23            WARDEN SPAULDING:  It's -- we currently are

24   prioritizing for consideration for inmates that have served 50

25   percent or more of their sentence or have 18 months or less

1    remaining on their sentence, and have served at least 25

2    percent of their sentence.  So I hope that answers the

3    question.

4           MR. LaMACCHIA:  Well, that's what I'm talking about.

5    My question was, can you explain to the court what your

6    understanding is of the reason for that requirement.

7           THE COURT:  If you have one.

8           WARDEN SPAULDING:  So we have many inmates in the

9    Bureau of Prisons, and throughout the course of this -- of the

10   AG memo and the change of the criteria throughout the last two

11   months going into the third month, we have lessened the

12   restrictions or the criteria to basically help prioritize the

13   resources, and not only in the Bureau of Prisons but also out

14   into the community that we serve.  So probation, first for

15   them, as well as the resources in the Bureau of Prisons, the

16   social workers that are involved, the unit team staff.  So 50

17   percent is a criteria that they use that they have determined

18   to meet the needs of serving an inmate's sentence.

19          MR. LaMACCHIA:  Is there any part of that requirement

20   that has to do with fairness or -- fairness of implementation

21   with respect to various inmates in the BOP facilities?

22          WARDEN SPAULDING:  I think there's a level of

23   fairness, but also, more importantly, a level of safety for the

24   community.  And most of the criteria that's been created is to

25   ensure that we don't release inmates with a history of violence

1    or terrorists or detainers or things of that nature we don't

2    release out in the communities.  So the fairness is 50 percent

3    of the sentence that was carried out by -- that was imposed by

4    the judge as considered fair in terms of the AG and the folks

5    that sent out the criteria.

6         MR. LaMACCHIA:  If an inmate does not meet that

7    criteria, the 50 percent or the 25 percent with 18 months, but

8    is released through the court and imposed compassionate

9    release, does that have any effect on you managing your

10   institution with respect to the inmates?

11        WARDEN SPAULDING:  It does.  It really -- other

12   inmates are seeing that as, you know, what did he -- and I say

13   "he," only because I'm a male prison.  So inmates look at how

14   other inmates are -- got their release, and they try to mimic

15   that type of relief paperwork.  It just creates quite a

16   burdensome situation, even though the majority of the inmates

17   wouldn't meet the criteria, but, nevertheless, staff have to

18   utilize additional resources and are pulled away from all of

19   their responsibilities to address those kind of new requests

20   that come across their desk.

21        MR. LaMACCHIA:  We also talked about the time served

22   requirement, the 50 percent served or 25 percent with 18

23   months, and whether that was not or was in the AG's March 26 or

24   April 3 memorandum.  So I just want wanted to ask you a

25   question about that.  In your view, is that time be served

1    requirement inconsistent with the AG's March 26 memo or April 3

2    memo?

3         WARDEN SPAULDING:  I don't think so.  I think the AG

4    put out some guidance and gave us a directive to try to release

5    as many inmates that meet -- that they think -- that he thinks

6    would be acceptable to reduce the inmate population and also to

7    get the high risk inmates that have -- that could be released,

8    and I think that, you know, the attorney -- well, the director

9    and the Bureau of Prisons developed a criteria to -- and then

10   changed the criteria for the last six or two months to be able

11   to work through the volume of inmates that are looking for home

12   confinement or -- well, home confinement.

13        MR. LaMACCHIA:  I just want to turn to another topic.

14   So we were talking a lot about social distancing and certain

15   guidance by the CDC and whether that was -- you know, safe or

16   not with respect to prisons.

17        Are you familiar with CDC guidance specific to

18   prisons?

19        WARDEN SPAULDING:  Yes.

20        MR. LaMACCHIA:  Okay.  Can you just explain to the

21   court what that is and how you've managed that at Devens?

22        WARDEN SPAULDING:  So the CDC has put out lots of

23   guidance on many topics to include nursing homes, assisted

24   living places, but also a correctional environment.  So they

25   understand, as all of us do, the complexity of housing a group

1   of individuals from all age groups, young adults to older

2   adults, with some that have comorbidities to include chronic

3   care issues and things of that nature.

4        Knowing that the Bureau of Prisons, as well as the

5   correctional environment, have to house these inmates to meet

6   the needs of the community and what's been sanctioned upon the

7   inmate.  So they gave us some guidance on best practices to try

8   to reduce the risk of spreading COVID-19.

9        So I got that guidance early on, in about the middle

10  of March or so, and we've been doing our due diligence to try

11  to adhere to that guidance.

12       MR. LaMACCHIA:  We talked a little before about the

13  camp, the camp versus those at the medical center.  Can you

14  tell me, is there any distinction in terms of health between

15  the inmates at the camp versus those at the medical center?

16       WARDEN SPAULDING:  So we have -- the medical center is

17  a federal medical center.  So we have the sickest inmates from

18  around the country that come to us, dialysis, organ

19  transplants, those kinds of chronic illnesses we manage

20  in-house.

21       The camp, on the other hand, is considered a work

22  cadre camp.  It can hold as many as 128.  That work cadre camp,

23  the inmates are placed there.  They have minor medical issues,

24  prediabetics, some -- maybe on one or two hypertensive meds or

25  something to that effect, something minor that doesn't require

1    quarterly or twice-a-year evaluation.  These guys are

2    relatively healthy, all age groups, and they do -- they work

3    out in and around FMC Devens.  We have some that work on the

4    base.  We have some that work in the powerhouse and outside

5    landscaping and food service within the camp.  So their

6    responsibilities, when they come to the work cadre at the camp

7    is to work.  They're there to work.

8         MR. LaMACCHIA:  So those people who are doing the

9    work, that includes Mr. Pena?

10        WARDEN SPAULDING:  Yes.

11        MR. LaMACCHIA:  Do you know what his jobs are at the

12   camp?

13        WARDEN SPAULDING:  Mr. Pena was responsible for basic

14   orderly-type responsibilities, sweeping, mopping.  I think we

15   even had him as a door handler at one time, which is to help

16   the spread of any virus.  During flu season, we do this every

17   year, where they open and close the doors so that staff or

18   inmates don't touch the doors.  So very minor job

19   responsibilities.

20        MR. LaMACCHIA:  Your Honor, I think that's all I have

21   for now.

22        THE COURT:  I think I've got a couple more, and maybe

23   you'll be done, Mr. Spaulding, today at least.

24        Could you tell me what your educational background is,

25   please?

 1              WARDEN SPAULDING:  I have a bachelor's in occupational
 2      therapy, and I have a master's in healthcare administration.
 3              THE COURT:  And you were in the Navy?
 4              WARDEN SPAULDING:  Yes, sir.
 5              THE COURT:  What did you do in the Navy?
 6              WARDEN SPAULDING:  I was a hospital corpsman at
 7      Bethesda Naval Hospital, now Walter Reed.
 8              THE COURT:  Okay.  In your opinion, is Mr. Pena an
 9      at-risk inmate?
10              WARDEN SPAULDING:  Based on age, sir.
11              THE COURT:  So, you would say yes, he is, because
12      based on his age.
13              WARDEN SPAULDING:  Just on his age, yes, sir.
14              THE COURT:  And I'm just making some notes.
15              Let me see.  I think most of my questions have been
16      answered.
17              I think you said that it's your understanding that
18      Mr. Pena now weighs about 243 pounds, something like that?
19              WARDEN SPAULDING:  When I was reviewing his Bureau
20      Electronic Medical Record, in March of 2020 he was 243 pounds.
21              THE COURT:  And can one of the lawyers tell me where
22      to find that?
23              WARDEN SPAULDING:  It's page 2 of the May 11 --
24              MR. LaMACCHIA:  Your Honor, I actually think it's in
25      more than one place, but one of the places it is is in the

1   fifth page of the exhibits to the Amber Bourke declaration.

2           THE COURT:  Okay.  Hold on a second.  And where on

3   that page?

4           MR. LaMACCHIA:  So after the cover page, five more

5   pages, and then you'll see it at the bottom, it has his vitals

6   for various things, blood pressure and weight, pulse.

7           THE COURT:  Right.  Here it is.

8           MR. LaMACCHIA:  Including weight.

9           THE COURT:  Yeah.  So on March 24 it says he weighed

10  243 pounds.

11          MR. LaMACCHIA:  And then as another point, Your Honor,

12  if you look on page 3, so two pages back, there's a note

13  towards the top in the middle of page where Mr. Pena reports

14  trying to lose weight and walking 18 laps three to four days a

15  week, as well as other workouts, which the warden mentioned.

16          THE COURT:  Mr. Spaulding, I gave you some

17  Massachusetts statistics yesterday.  The parties gave them to

18  me yesterday afternoon.  As of yesterday there were 5,141

19  deaths reportedly attributed to COVID-19, 4,386 were people

20  over 70.  Were you aware of those general -- you know, that

21  general ratio?

22          WARDEN SPAULDING:  Your Honor, I look at that about

23  every week to every other week, so I am always looking at those

24  numbers.

25          THE COURT:  How old are you?

 1          WARDEN SPAULDING:  Fifty-two.

 2          THE COURT:  I may not have asked you this.  Are you

 3   doing anything to trace the contacts that staff members have

 4   when they go out into the community?

 5          WARDEN SPAULDING:  Not when they're out into the

 6   community.  When we had the positive case of the staff member

 7   inside the institution, we did the same day -- we traced his

 8   whereabouts and where he worked and who he was in contact with,

 9   both staff and inmate.

10          THE COURT:  In your opinion, is there a risk that the

11   staff members are going out, interacting with people who are

12   infected, becoming infected themselves but are asymptomatic?

13          WARDEN SPAULDING:  Yes, sir, there's a risk.

14          THE COURT:  And if you had the resources, would you

15   try to address that risk through tracking?

16          WARDEN SPAULDING:  If I had the resources, I would

17   test staff.

18          THE COURT:  If you had the resources, what would you

19   do?

20          WARDEN SPAULDING:  I would test the staff.

21          THE COURT:  I think -- do my questions suggest any

22   further questions to counsel?

23          MR. LaMACCHIA:  Not from the government.

24          MR. KATZ:  Very, very briefly, Your Honor.

25          One was just to know whether or not, you know, in the

1    last few minutes, you've gotten any more information on the

2    other inmates at the camp who are over 70.

3              WARDEN SPAULDING:  Yes, I did.

4              MR. KATZ:  Can you tell us about that.  Are any of

5    them -- do you expect any of them to be placed on home

6    confinement between now and July?

7              WARDEN SPAULDING:  Two already have dates prior to

8    July.

9              MR. KATZ:  Two have dates prior to -- what are the

10   dates?

11             WARDEN SPAULDING:  Well, I don't have the dates.  I

12   just know they'll be getting home confinement prior to July,

13   and both 70 years old.

14             MR. KATZ:  They're both 70 years old, did you say?

15             THE COURT:  Yes, sir.

16             MR. KATZ:  And then the door handler at the main

17   building, is that going on currently?

18             WARDEN SPAULDING:  I believe it is.  I haven't

19   discontinued that.  Sometimes inmates get pulled away to do

20   other assignments.  So there might be a time that we don't have

21   a door handler, but the expectation is we have door handlers,

22   and Mr. Pena is on the schedule as a door handler.

23             MR. KATZ:  So when he's a door handler, he would come

24   into contact with staff coming into the facility, many of whom

25   are not wearing masks?

1           WARDEN SPAULDING:  He has his mask and he has gloves,

2     yes.

3           MR. KATZ:  And the same would be true for other

4     inmates in the camp?

5           WARDEN SPAULDING:  Yes.

6           THE COURT:  I don't think he answered your question,

7     though.  I thought you asked him whether the people coming in

8     were wearing masks.

9           WARDEN SPAULDING:  Some wear their masks on their way

10    in because they bought their mask, and then we provide them a

11    mask in the front screening site.  They pick up their mask

12    there.

13          MR. KATZ:  Thank you, Your Honor.  And then the last

14    question is, before we started today, do you ever any more

15    recent information on whether there's -- well, I don't mean --

16    I'm not trying to hide the ball.  I'm refreshing the BOP

17    website, and I'm seeing that it now says eight inmates have

18    tested positive at FMC Devens.

19          THE COURT:  How many?

20          MR. KATZ:  Eight inmates and two staff.  Earlier the

21    testimony was two, and two staff, which is the same as we heard

22    earlier.

23          I'm just wondering whether you have any information on

24    the six new positives?

25          WARDEN SPAULDING:  I've been with you since 11:45.  So

1    all I can tell you is we began our tracer when we had those

2    positive inmates in N1 and N4 that we talked about earlier, and

3    we continued to test those inmates that had, in my opinion,

4    were -- had exposure to those inmates, and so now we're testing

5    those inmates.

6         MR. KATZ:  Nothing further.

7         THE COURT:  All right.  Mr. Spaulding, thank you.

8    This has been very helpful.

9         I'll tell the lawyers, at the moment -- I've got a

10   couple of questions for Mr. Pena, and I don't at the moment

11   perceive a need to question Ms. Bourke.  I think, as far as I

12   can tell, everything I was interested in, the warden was able

13   to address.  Are you going to want to, Mr. Katz, question

14   Ms. Bourke?

15        MR. KATZ:  I don't think that's necessary, Your Honor.

16        THE COURT:  All right.  As I said, I'd like to ask

17   Mr. Pena a few questions.  Do you want to talk to him for a

18   minute briefly, or is that not necessary?

19        MR. KATZ:  I mean, I guess -- he's been sitting in the

20   proceedings for a couple of hours now.  So I guess I would like

21   to talk to him briefly.  The only other thing I would mention

22   is, you know, certainly we can address Mr. Pena's weight.  I

23   just wanted to point out.

24        THE COURT:  I don't want you to point anything out.  I

25   want you to ask him some questions.

1            MR. KATZ:  Fair enough.

2            THE COURT:  I want his answer.  And you can probably

3     anticipate the question, but I'm sure.

4            Go ahead, we'll put you in the breakout room.

5            MR. KATZ:  Thank you, Your Honor.

6            THE CLERK:  One moment.

7            (Discussion held off the record.)

8            MS. SCANNELL:  Your Honor, this is Stephanie Scannell

9     with the BOP again.  If it's possible, if you don't need Warden

10    Spaulding anymore, could I ask that he be released?

11           THE COURT:  Yes, I'll release him unless he wants to

12    hear Mr. Pena, but I'll leave that up to him.

13           WARDEN SPAULDING:  No, sir, I'm good.

14           THE COURT:  All right.  When are you going to be

15    transferred?  When do you start your new assignment?

16           WARDEN SPAULDING:  Well, I start in June, but now what

17    you heard with the -- some of the cases that we've had, I'm

18    probably going to stick around until we get a handle on this,

19    and I anticipate the new warden will be here at the end of

20    July.  So I will be involved with some of the day-to-day

21    operations until her arrival.

22           THE COURT:  Okay.  Does the Bureau of Prisons still

23    give an award in the name of Norman Carlson, do you know?

24           WARDEN SPAULDING:  Yes, sir.

25           THE COURT:  They do?

```
 1              WARDEN SPAULDING:  Yes, sir.
 2              THE COURT:  I used to work with Mr. Carlson when I was
 3     an assistant to the Attorney General.  I'm glad they still
 4     honor him.  Maybe you'll get it some day.
 5              WARDEN SPAULDING:  Maybe with your recommendation.
 6              THE COURT:  I make judicial decisions -- I can't --
 7     we'll see.
 8              WARDEN SPAULDING:  Okay, sir.
 9              THE COURT:  And I'm not sure it would help.  All
10     right.
11              WARDEN SPAULDING:  Thanks for the time and allowing me
12     the opportunity to do this.  I will be here all week if you
13     have any other additional questions.
14              THE COURT:  Yeah.  We'll see where this goes.
15              WARDEN SPAULDING:  Yes, sir.
16              THE COURT:  Thank you.
17              MS. SCANNELL:  Thank you, Your Honor.
18              (Mr. Katz and Mr. Pena in breakout room.)
19              THE COURT:  Is Mr. Katz back?
20              MR. KATZ:  I'm back.
21              THE CLERK:  I'm just waiting for Mr. Pena.  He should
22     be back on now.  He is back on.
23              THE COURT:  All right.  Mr. Pena, are you there?
24              THE DEFENDANT:  Yes, Your Honor.
25              THE COURT:  Do you solemnly swear that the testimony
```

```
 1   that you're about to give shall be the truth, the whole truth
 2   and nothing but the truth?
 3              THE DEFENDANT:  Yes.
 4                      ROBERT M. PENA, sworn
 5              THE COURT:  Do you understand that means, among other
 6   things, you can be prosecuted for committing perjury if you
 7   make a knowingly false material statement?
 8              THE DEFENDANT:  Yes, Your Honor.
 9              THE COURT:  In about -- on about -- well, on April 21,
10   2020, did you file a declaration in support of your request for
11   reduction of sentence?
12              THE DEFENDANT:  Yes.
13              THE COURT:  And did you declare under the penalties of
14   perjury that the following is true:  -- is that what the
15   declaration -- here, I'll tell you.  Do you remember that the
16   declaration started, "I, Robert Pena, declare under the penalty
17   of perjury that the following is true to the best of my
18   knowledge"?
19              THE DEFENDANT:  I don't remember, but I don't -- I
20   don't have the document, but I would say yes.  I don't --
21              THE COURT:  I have the document.  I just read it to
22   you.
23              Do you remember that you signed it under the penalties
24   of perjury?
25              THE DEFENDANT:  Yes.  I don't -- I think I agreed to a
```

1    document, but I don't remember sending it back.  I was

2    responsible for it, yes.

3                THE COURT:  Do you remember signing the document at

4    some point?

5                THE DEFENDANT:  Yes.  Okay.  Yes.

6                THE COURT:  And did you send it to your lawyer?

7                THE DEFENDANT:  Yes.

8                THE COURT:  And did you know he was going to file it

9    with me?

10               THE DEFENDANT:  Yes.

11               THE COURT:  And do you remember that paragraph 2B

12   said, "I am obese.  I am six feet two inches tall and weigh 297

13   pounds when I arrived at FMC Devens"?

14               THE DEFENDANT:  Yes.

15               THE COURT:  Do you remember writing that or signing a

16   declaration that said that?

17               THE DEFENDANT:  Signing it, yes.

18               THE COURT:  And then the next sentence says, "When I

19   was last weighed, I was 307 pounds"?

20               THE DEFENDANT:  Yes.

21               THE COURT:  Why did you say when you were last weighed

22   you weighed 307 pounds?

23               THE DEFENDANT:  I remember being last weighed maybe

24   about a couple weeks after I came in.  I was putting weight on,

25   and I -- the scale is not too accurate here, so I was on the

1    scale, and it looked like I put on some weight, more than what

2    I weighed when I came here.

3              THE COURT:  Was that the last time you were weighed

4    before April 21?

5              THE DEFENDANT:  I weighed myself with Mr. Larkin

6    about -- at lunchtime.

7              THE COURT:  Today?

8              THE DEFENDANT:  Yes.

9              THE COURT:  Well, I was asking you a different

10   question.  We'll get to that.  So between the time you say you

11   put on weight a couple weeks after arriving and April 21, were

12   you ever weighed again?

13             THE DEFENDANT:  They did a physical on me.  So I would

14   assume I was weighed then, yes.

15             THE COURT:  When did they do the second physical?

16             THE DEFENDANT:  I don't remember when, but I know it

17   was probably about three months after being here.

18             THE COURT:  And how much did you weigh then?

19             THE DEFENDANT:  I don't ever remember being down to

20   243 pounds.  That would be a wonderful thing, but I don't

21   remember being 243.  I've been, you know, trying to get my

22   weight down.  But I don't believe I've gotten down that far.

23             THE COURT:  When you were weighed after three months,

24   how much did you weigh?

25             THE DEFENDANT:  I don't remember, I'm being honest

1    with you, Your Honor, I don't remember how much I weighed at

2    that point.

3              THE COURT:  Was it more or less than 307 pounds?

4              THE DEFENDANT:  Less than 307 pounds, I'm sure.

5              THE COURT:  Then why did you tell me, "On April 21,

6    when I was last weighed, I was 307 pounds"?

7              THE DEFENDANT:  I thought the time when I weighed 307,

8    I weighed myself.  I didn't know there was a record of that,

9    unless I said that to somebody.  I don't remember -- I mean, my

10   weight fluctuates in a month by 20 -- it can fluctuates by 20

11   to 25 pounds in one month, you know, if I'm trying to lose

12   weight or gain -- no, I'm not trying to gain weight.  If I'm

13   trying to lose weight, my weight can fluctuate because of my

14   size.

15             So if I did, I apologize, I made a mistake, but I

16   don't -- the scale here, the one we just got on just now, I

17   mean, I got on that, and I hadn't been on that scale for a

18   while, weighed myself in a while.

19             THE COURT:  What did you say you weighed at lunchtime?

20             THE DEFENDANT:  Mr. Larkin, he's sitting here, he

21   weighed himself and I weighed myself.  I think he said 260 or

22   something like that.

23             THE COURT:  How much did you weigh?

24             THE DEFENDANT:  About 260 pounds.

25             THE COURT:  Did you see a doctor at the camp on or

1    about March 24?

2            THE DEFENDANT:  I went in for medication -- I go in

3    there from time to time for medication for my hip, pain -- you

4    know, Tylenol.

5            THE COURT:  And do they weigh you each time you go for

6    that?

7            THE DEFENDANT:  No.  In fact, they never weigh me,

8    that I can remember.  I have to put into the computer if I've

9    run out, but they generally alert me that I'm going to be

10   running out based on the amount of the pills in the bottle, and

11   they ask me if I want it again.  I always say yes.

12           THE COURT:  Have you had right-shoulder pain since

13   you've been at Devens?

14           THE DEFENDANT:  Yes.

15           THE COURT:  And do you plan to have shoulder surgery

16   after you get released?

17           THE DEFENDANT:  Yes.  I actually needed the shoulder

18   surgery before I went in.  The doctor said I needed a reverse

19   shoulder replacement, which is taking bones out, but I didn't

20   ask you about it before because you allowed me to get my hip

21   replacement.  So I figured that was not going to happen, so I

22   just came in with the shoulder the way it is.

23           THE COURT:  Were you trying to lose weight in part by

24   walking 18 laps three to four days a week?

25           THE DEFENDANT:  Well, when I first came in, I tried to

1   walk.  I couldn't walk even three laps.  My hip got sore, and

2   it wasn't that far after the surgery.  So --

3          THE COURT:  In March of this year, two months ago, did

4   you tell the medical provider that you were trying to lose

5   weight, you were walking eighteen laps three to four days a

6   week, as well as other workouts?  Did you say that?

7          THE DEFENDANT:  I don't remember saying that.  I tell

8   the inmates here -- they've seen me out there trying to walk.

9   So that's kind of common knowledge that I'm out there walking.

10  There's a bunch of guys out there walking.  I don't remember

11  talking to a doctor about it, though.

12         THE COURT:  Was there a time when you were walking 18

13  laps three to four days a week?

14         THE DEFENDANT:  I've done it about probably fifteen

15  times.  Most of the time -- I start out at three laps, and I

16  worked my way up.

17         THE COURT:  And did you do other workouts?

18         THE DEFENDANT:  If it's raining, there's a shed here

19  that you can go in.  There's some bicycles in there, but that's

20  all I can do.  I can't lift weights.  I can't do pushups.  I

21  can't do pullups.  I can't do anything with that shoulder.  And

22  I cannot run.  All I can do is walk.  And it's not a quarter

23  mile track.  There's more than four laps to a mile.

24         THE COURT:  Do you remember what you were convicted

25  for?

1          THE DEFENDANT:  Fraud.  Conspiracy to commit fraud.

2          THE COURT:  Lying to the government?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Do my questions suggest any further

5     questions to counsel?

6          MR. LaMACCHIA:  None from the government, Your Honor.

7          THE COURT:  Mr. Katz?

8          MR. KATZ:  None, Your Honor.

9          THE COURT:  It's now 4:06.  I'd like to give you an

10    opportunity to make some brief, essentially, closing arguments,

11    but I'm going to take a break in meaningful measure for the

12    heroic stenographer, who's working a long time under

13    challenging conditions.  So why don't we resume at about 4:20.

14    Okay.  Mr. Katz, it's your motion, I'll give you a chance to

15    argue it, and then the government can respond.  Okay?

16          MR. KATZ:  Okay.  Thank you.

17          THE COURT:  Court is in recess.

18          MR. LaMACCHIA:  Thank you.

19    (A recess was taken.)

20          THE COURT:  Okay.  It appears we have Mr. Katz,

21    Mr. LaMacchia and the stenographer.  So Mr. Katz, it's your

22    motion.  You're seeking an indicative ruling.  The case is in

23    the First Circuit.  So I would have to indicate either there's

24    a substantial question, or that I intend to rule in your favor,

25    and ask that they remand the case to me, correct?

1         MR. KATZ:  That's correct, Your Honor.

2         Can we just make sure Mr. Pena's present?

3         THE COURT:  Oh, sure.  Mr. Pena, are you on?

4         THE DEFENDANT:  Yes, Your Honor.

5         THE COURT:  All right.  This is argument.  If the

6    prison needs him back, they can have him, but if they can

7    accommodate this, that would be helpful.

8         Hold on a second.  There's a file I was just looking

9    for.  Well, Mr. Katz, the issue -- just one moment.  So the

10   question is under 3582(c)(1)(A), I believe.  Essentially the

11   question is whether there exists in the defendant's case an

12   extraordinary and compelling reason, other than those

13   identified earlier, that justifies release.  I know that that

14   provision says, "As determined by the director of the Bureau of

15   Prisons."  Hold on a second.  I think I just read you the

16   guideline.  Yeah, I just read you the guideline.

17        All right.  Why don't you go ahead.

18        MR. KATZ:  All right.  Your Honor, very briefly I just

19   wanted to address the issue with the statement about Mr. Pena's

20   weight in the declaration.  First, I do want to apologize to

21   the court, and apologize for not raising it with you at the

22   start of the hearing.  I don't think that Mr. Pena had any

23   intent to deceive the court.  I say that for a couple of

24   reasons.  Number one, if you look through the medical records,

25   there are two other weigh-ins from the medical records in the

1    fall, when he weighed 280 and 295 pounds.

2            THE COURT:  What page are those?

3            MR. KATZ:  It is on -- for me it's page 44 of the 96-

4    page attachment.  And it's not -- you know, they're not

5    numbered 1 to 44 -- you know, 1 to 96.

6            THE COURT:  I'll find it.

7            MR. KATZ:  It lists three weigh-ins that they have

8    records of them, two from fall of 2019 and one from the March

9    2020.  He was that weight --

10           THE COURT:  What are the three weights?

11           MR. KATZ:  October 30 he was 290 pounds.  November 15

12   he was 295 pounds.  And then March 24 of this year, 243 pounds.

13           THE COURT:  Okay.

14           MR. KATZ:  But the other thing I was going to say is,

15   I mean, as I told you -- as I told you last time, I've always

16   taken the position that Mr. Pena's age alone is sufficient

17   reason.  And in talking through his health with him, I mean, I

18   really asked him matter of factually, "What do you weigh?"

19   This was not something emphasized to him.  He had no motivation

20   to try to deceive the court.  I don't recall talking

21   specifically about BMI.  I mean, this was a short conversation

22   going through, you know, the criteria that the CDC lists.

23           THE COURT:  Look, this isn't evidence.  Why don't you

24   base your argument on evidence.

25           MR. KATZ:  Fair enough.

1          The last point I was going to make on it, it's

2    obviously known to us that the government has these records.  I

3    don't think Mr. Pena's foolish enough to, you know,

4    intentionally try to deceive the court when the records are

5    available.  But I'll leave that --

6          THE COURT:  He worked hard to intentionally deceive

7    Ginnie Mae and the records were available.  Go ahead.

8          MR. KATZ:  I understand.  That's all I wanted to say

9    about that point.

10         THE COURT:  Not every judge would give you about eight

11   hours of hearings on this.  Go ahead.

12         MR. KATZ:  And I appreciate that, Your Honor.

13         So, I mean, my argument is identical to where we were

14   last week.  It's about the risk of infection to Mr. Pena, and

15   if anything, I think what the evidence from the warden revealed

16   today is that it corroborates the remainder of what was in

17   Mr. Pena's declaration about the conditions at FMC Devens, the

18   camp there, and the risk that he faces there.  If anything, he

19   chose that the risk is more than that based on, you know, not

20   only the lack of testing, but the points of contact for the

21   staff, workers at FMC Devens who do leave the institution, come

22   back into the community, congregate together before they're

23   assessed, not tested, and that there's essentially no testing

24   going on.  Obviously no one takes pleasure in the fact that

25   we've seen new cases of infection since last week.

1          THE COURT:  How many are there now?

2          MR. KATZ:  As of this afternoon, there's eight

3   inmates, two staff.  Obviously we don't have information about

4   where those inmates are.

5          The reality is --

6          THE COURT:  You should put this in an affidavit that

7   you can file tomorrow morning.

8          MR. KATZ:  Sure.

9          I mean, the reality is, and I think the warden was

10  very candid during his testimony, and it's obvious that, you

11  know, he is doing his best.  But the reality is is that this is

12  a disease that, despite our best efforts, we're not able to

13  contain right now.  And the fact that it took FMC Devens until,

14  you know, May 13 to start having an increase in cases, I mean,

15  that's great news.  I'm not sure whether that's luck or whether

16  that's because of those great measures or some combination, but

17  the risk of infection is there, and it's increasing.

18          As far as the risk of severe illness or death to

19  Mr. Pena, I don't need to quote you the CDC statistics on age

20  again.  They are what they are.  I would suggest that, to the

21  extent Mr. Pena -- and I don't know that we need to litigate

22  specifically where on the BMI scale Mr. Pena falls, under any

23  definition he's still considered obese.  I also don't know

24  that, you know, it's sort of a binary you either have it or you

25  don't at BMI 40.  Presumably there's some sort of sliding scale

1    about how obese you are and how much it increases risk.  The

2    difficulty is we don't know the specifics.  We probably aren't

3    going to know those statistics a month from now, a year from

4    now.  The bottom line is that we know based on age alone and

5    perhaps more that Mr. Pena faces an elevated risk.

6           I addressed last week the 3553 factors.  I'd be happy

7    to go through them again, but the one I want to talk about is

8    unwarranted disparity, because I know the court stressed that

9    one last week.  Last week you were worried about the

10   unjustified disparity if you granted Mr. Pena's motion.

11          Now a week later, I would suggest that the denial of

12   Mr. Pena's motion is actually going to result in an unwarranted

13   disparity.  We know that a lot of other older inmates from FMC

14   Devens have been placed on home confinement.  We know that some

15   of the other ones will be soon.  We know based on the warden's

16   testimony that, in all likelihood, two months from now Mr. Pena

17   is likely to be one of those inmates.

18          With this disease, two months is a long time.  If we

19   all think back to where we were on March 13.  We had just begun

20   to social distance.  The courts, the schools had just started

21   to close.  That was a long time ago.  To force Mr. Pena to wait

22   two more months and risk an infection that will likely result

23   in severe consequences for him doesn't make sense.

24          The government's opposition has been principally based

25   on either deference to the warden or the notion that he's safer

1    at home.  The warden -- in terms of the warden, there's nothing

2    to defer to.  The warden told us that in considering

3    compassionate release, coronavirus is not a consideration.  The

4    fact that, you know, inmates like Mr. Pena are asking for --

5    you know, for BOP to file it, and then being forced to wait 30

6    days when there's literally a zero percent chance of BOP filing

7    on that basis does not make sense.  But be that as it may, the

8    warden did not consider compassionate release because

9    coronavirus is not a consideration, and we know he didn't

10   consider him for home confinement because of the 50/25 rule

11   that Mr. Pena will meet in two months.  So there's nothing to

12   defer to in terms of the warden's determination.

13          Then as far as whether or not he's safer at home, I

14   mean, I've made the argument before.  If Your Honor has

15   questions about it, I'm happy to talk about it again.  To me

16   it's a matter of common sense.  I don't think the number of

17   infections in Falmouth or in Barnstable County are relevant.  I

18   don't think the -- you know, we would say that to the 170 towns

19   that have higher infection rates than Falmouth, that the

20   residents in those towns would all be safer at FMC Devens.  So

21   unless the court has further questions, we rest on the papers

22   and ask you to grant Mr. Pena's motion.

23          THE COURT:  I think that's okay for the moment anyway.

24          MR. LaMACCHIA:  Thank you, Your Honor.  I'm not

25   entirely sure I agree with Mr. Pena's counsel's

1    characterizations of the warden's process.  I think looking at

2    it more generally, not just at FMC Devens but at the BOP

3    generally, there is without question a process for addressing

4    the pandemic and the inmates in the various prisons.  There's

5    no question about that.

6            And Mr. Pena is but one inmate in that process.  You

7    know, I think that there is the AG guidance.  There is both the

8    two memos.  There's BOP guidance.  They're following CDC

9    guidance.

10           THE COURT:  Yeah, but to me the Bureau of Prisons's

11   policies are inconsistent with the Attorney General's

12   memoranda.  The Attorney General, in the April 3 memo says "and

13   now that I've exercised my authority under the CARES Act, your

14   review should include all at-risk inmates, not only those who

15   were previously eligible for transfer."  So this is home

16   confinement.  And it should be guided by the factors in the

17   March 26 memo.

18           The Bureau of Prisons has said, Well, if you haven't

19   served 50 percent of your sentence or 25 percent of your

20   sentence, and are within 18 months of your release date, we're

21   not going to consider you on the merits.  I'm not the Attorney

22   General, but if I was, I would consider that utterly

23   inconsistent.  There are at-risk inmates who are not being

24   individually assessed for release.  And some of them may get

25   very sick.  Some of them may die.

1          It's also, to me, illogical that there has been no

2    direction with regard to reductions in sentence motions, the

3    type of motion I have before me, because it seems to me

4    logically all the considerations the Attorney General

5    thoughtfully laid out with regard to the Bureau of Prisons

6    deciding whether to reduce a sentence to home confinement,

7    actually applied more to a reduction in sentencing motions,

8    because you put your finger on this, and I alluded to it last

9    week.  You know, maybe the Bureau of Prisons would say if we

10   let somebody out too soon, the sentencing judge will be

11   offended.  He intended Mr. Pena serve 32 months.

12          But with regard to a reduction in sentencing motions,

13   you know, if the warden looked at this -- and Warden Spaulding

14   impressed me as a candid, thoughtful capable person.  So if he

15   were unconstrained by regulation 5050.50, which has not been

16   modified to respond to the pandemic and, in fact, in my view

17   wasn't properly modified to respond to the First Step Act

18   because it doesn't have the final, you know, extraordinary and

19   compelling circumstances provision.  You know, if he were sort

20   of a free agent and just told me he regards Mr. Pena as high

21   risk -- at risk -- not high risk, at risk, and he went through

22   the factors, and he said if this is the situation two months

23   from now, and I'm here, I expect I'll recommend him for

24   release.

25          So I don't understand why the Bureau of Prisons's

 1    guidance is the way it is, but the motion is now made by

 2    Mr. Pena, and so I have the discretion to consider all the

 3    factors.

 4              MR. LaMACCHIA:  I understand Your Honor's concern.  I

 5    would say that, you know, reading the Attorney General's March

 6    26 memo, it seems to suggest that there is a plan to implement

 7    the reduction in prison in response to the pandemic through

 8    home confinement as opposed to compassionate release, because

 9    the memo mentions home confinement.  So that was a -- that was

10    a thought process that appears to have been made by the

11    Attorney General himself.

12              You know, I think when you read that memo, the March

13    26 memo, it does have particular factors, but it says right

14    there before listing the factors it says, "The following

15    non-exhaustive list of discretionary factors."

16              I think because the Attorney General is making a

17    determination to address this through home confinement, I think

18    that suggests that he understands the BOP already has

19    discretion.  That's an authority committed to the BOP to

20    address how it manages the inmate population.

21              THE COURT:  I think when he says "discretionary

22    factors," he's saying, well, sure, that they have discretion,

23    and there may be other factors in a particular case.  You know,

24    these are not the whole universe of relevant factors

25    necessarily.

1          MR. LaMACCHIA:  So I take Your Honor's point that,

2     okay, well, why aren't these factors being considered, but I'm

3     not sure that these factors in and of themselves the Attorney

4     General himself would say that there aren't -- that the BOP

5     can't implement this directive to reduce the prison sentence in

6     a way that they believe is fair and orderly.

7          THE COURT:  Yeah, that's -- you know, there are two

8     things.  I have a case to decide, and that's my primary

9     function, but, you know, when you have a case, some cases, the

10    branches are in colloquy with each other.  You know, and the

11    Attorney General -- I don't know if -- he's got a lot on his

12    mind.  I don't know if he knows about the inconsistency.  Maybe

13    he knows about it and he doesn't care.  Maybe he thinks the

14    rules that the Bureau of Prisons implemented are good, but not

15    for Mr. Manafort, apparently.  I don't say that gratuitously.

16    We're going to go through the 3553(a) factors.  I have to say

17    what's going to promote -- what's going to promote respect for

18    the law and avoid unjustified disparity.  And I don't have the

19    Manafort case.  I don't know all the details.

20         MR. LaMACCHIA:  Right.  And I think Your Honor makes a

21    good point there that, you know, if you or I were the Attorney

22    General or the BOP, we would look at these and probably make

23    different decisions, but that's not where we are.  This is the

24    decisions that have been made by people in those positions and

25    how it's being implemented.  I think the larger point and what

1    Your Honor has to consider with respect to Mr. Pena's

2    compassionate release motion is this point:  That if you kind

3    of what I think -- and I can explain why Mr. Pena's motion on

4    extraordinary and compelling reasons is kind of weak.  If

5    you're kind of shoe-horning those motions into compassionate

6    release, you're undermining that process.

7                THE COURT:  What process?

8                MR. LaMACCHIA:  Well, the process that the BOP and the

9    AG have implemented.

10               THE COURT:  But here's -- I'm sorry.  Keep going.

11               MR. LaMACCHIA:  I'm just saying, you know, yes, you

12    may disagree with that process, and I take your points.  I

13    think they're worth considering.  But I think at the same time

14    if through compassionate release you're kind of going past that

15    process and in effect letting Mr. Pena jump the line, like he's

16    doing here with this motion, instead of waiting the two months

17    to go on home confinement, you're essentially creating a race

18    to the courthouse where people can go and do these motions, and

19    then you're going to create the disparity that I think Your

20    Honor was concerned about.

21               THE COURT:  Well, read my decision in DeMasi.  At that

22    time -- it goes through the history of this.  The Bureau of

23    Prisons has long been widely regarded, including by the

24    Attorney General, and Deputy Attorney General in the last

25    administration is being too restrictive in permitting

1     compassionate release.  They weren't filing motions.  And the

2     sentencing -- the Department of Justice Inspector General found

3     that.  The sentencing commission found that.  The Congress

4     found it, and enacted the First Step Act that opened the gate.

5     And now I've learned, and, you know, you taught me a lot,

6     including today.  I said last week you were both doing a very

7     good job.  You're continuing to do a very good job.  That

8     regulation, 5050.50, it's -- you know, it says unless you've

9     served how long?  You know, the Bureau of Prisons -- he would

10    have to serve until, what, October 2021 for the Bureau of

11    Prisons to consider on the merits filing a motion.  And they

12    haven't considered the merits.  So until today there was

13    nothing for me to defer to.  And I told you last week if there

14    was a thoughtful good faith process, I'd be inclined to give

15    that some weight.  But I don't think there's a process that

16    deserves deference, and I essentially have an advisory opinion

17    from the warden when -- you know, if -- and I commend the

18    Bureau of Prisons for going at least as far as it has going

19    down to 25 percent in certain circumstances.  But he says if we

20    were in July, I would recommend that he be released.  So it

21    can't be -- and then the question is considering the 3553(a)

22    factors, should he be released now?  That's my current frame of

23    mind, and I haven't decided the matter.

24         MR. LaMACCHIA:  I understand where Your Honor is

25    coming from.  I think I see the interaction between

1    compassionate release, as you're talking about, and then the

2    warden's decision.  I've seen Mr. Pena kind of falling in

3    between those in some respects.  Because yes, I think if he

4    waited in line, he probably would get recommended for release

5    according to the warden and maybe he would get released.  I

6    really don't know what the circumstances are at that time, but

7    it's certainly possible.

8         But at the same time I think if you're looking at him

9    squarely on compassionate release, his motion is kind of thin,

10   you know.  I mean, I think the fact that he had to trump up his

11   weight to make, you know, one of those severe factors, I think

12   exemplifies that.  That's exactly why, because just age alone

13   is -- granted, it is a CDC factor, but I think when you look at

14   that data we pointed out in our last response, that there is

15   such a high correlation between these underlying conditions and

16   severe infection or death from COVID.  And I think that it

17   doesn't really seem to me what you would normally think of

18   either in the sentencing guidelines or otherwise what is an

19   extraordinary --

20        THE COURT:  So let me see if I can rearticulate your

21   argument.  The warden said that he considers Mr. Pena to be an

22   at-risk inmate by virtue of his age alone at risk, but in the

23   lexicon of the Bureau of Prisons not vulnerable, because he

24   doesn't have -- and in the CDC framework, he doesn't have a

25   diagnosed other condition that makes him at higher risk than

1    somebody else 71 years -- 70 or 71 years old.  That's part of

2    your argument.  Is that right?

3         MR. LaMACCHIA:  Correct.

4         THE COURT:  And you know, because it's something I

5    singled out in my order on Monday, the statistics about age,

6    particularly in Massachusetts, which seems to be more up to

7    date than the CDC statistics, concern me.  You know, like 80

8    percent of the people who die from this are 70 or older.  And

9    that concerns me.  I intended to give Mr. Pena a serious

10   sentence but not a death sentence.

11        You know, it seems likely that he's going to get out

12   in two months, and then there's also -- the argument is, we

13   heard it, that so far the camp has been lucky, but people come

14   in and out.  If the infection gets in the camp, there's not

15   going to be that much they can do about it.  And as a 70-year-

16   old man, he's going to be at risk, and would it be sufficient

17   to let him spend an extra couple months at home to try to

18   reduce that risk?  I think that's the issue, at the moment it

19   comes down to, to me.  There's also the question whether he can

20   be trusted if he goes home.

21        MR. LaMACCHIA:  I mean, that goes to the 3553(a)

22   factors that Your Honor has to consider.

23        THE COURT:  Yes.

24        MR. LaMACCHIA:  You know, I think that what was

25   apparent today was that Mr. Pena lied his way into prison and

1    he's trying to lie his way out of prison with that affidavit.

2            But, you know, I think -- I understand where Your

3    Honor is coming from, and, you know, I think the government

4    would recommend that you just let BOP do its process, and then

5    in two months he'll likely be released.  I understand Your

6    Honor may want to do that sooner, because you're saying, oh,

7    it's just two months.  I understand that.  I think that

8    regardless of what Your Honor does, I think you should -- and I

9    think we put this in our last response as well.  And this goes

10   to the thing I actually started, which seems quite a long time

11   ago today, about Ginnie Mae.

12           THE COURT:  Yeah, tell me.

13           MR. LaMACCHIA:  So I wanted to make you aware of this.

14   So I conferred about Ginnie Mae, Paul St. Laurent in

15   particular.  He was the individual who worked very closely with

16   Mr. Pena.  So I think he's probably the best person to speak

17   with.  And he just said to me that he wasn't too concerned with

18   Mr. Pena staying in prison.  From his perspective, he believed

19   that staying -- the fact that he was caught, prosecuted and put

20   in jail was significant to him.  But at the same time he

21   believed that it was very important and very significant to

22   Ginnie Mae that they get repaid as much as possible.  That's

23   why in my response I made that clear that he, you know, I

24   think -- there should be a plan for him to make repayments to

25   Ginnie Mae.  I think in this unprecedented economic downturn if

1   there's anyone who could use some extra money to deal with the

2   crisis, it's Ginnie Mae, but unfortunately they're going to be

3   short 2.5 million.

4         THE COURT:  Hold on just a second.  I'm looking at the

5   presentence report.

6         Who owns a house in Falmouth?

7         MR. LaMACCHIA:  I don't know the answer to that off

8   the top of my head, Your Honor.  I thought it was Mr. Pena, but

9   I'm not in a position to represent anything on that.

10        THE COURT:  I'm going to ask Ms. Loret to get me the

11   financial statement that was filed in connection with the

12   presentence report, and I'll have to look at the judgment.

13        Well, one of the conditions of supervised release is

14   that he pay the balance of any fine or restitution according to

15   a court order repayment schedule, and he must provide probation

16   access to any requested financial information, which may be

17   shared with the financial litigation unit.

18        If I order his release, you can make a request to me

19   to ask probation to get your office that information.

20        MR. LaMACCHIA:  Okay.  I guess I had in mind something

21   more than Mr. Pena just sitting at home and not doing anything

22   to repay.

23        THE COURT:  Well, I don't issue orders I don't intend

24   to enforce.  There's an order of a forfeiture for a money

25   judgment, 2,500,000.  The U.S. Attorney forfeiture section

```
 1    knows how to deal with these things.  But let's look at the
 2    three 3553(a) factors which I need to consider.  Nature and
 3    circumstances of the offense and history and characteristics of
 4    the defendant, the need for the sentence to reflect the
 5    seriousness of the offense, and he has served only eight
 6    months, which ordinarily would not be enough, but I do think
 7    the pandemic is extraordinary.  That's not the end of the
 8    inquiry.
 9              MR. KATZ:  It's about seven months, Your Honor, just
10    to be clear.
11              THE COURT:  Thank you.
12              MR. KATZ:  A little under seven months.
13              THE COURT:  Right.  What, if any, are the implications
14    of Mr. Manafort being released in connection with the idea of
15    promoting respect for the law and avoid unjustified
16    disparities?
17              MR. KATZ:  I'd be happy to answer, Judge.
18              THE COURT:  Well, let me put it to the government
19    first.
20              MR. KATZ:  All right.
21              MR. LaMACCHIA:  I'm not prepared to answer that, Your
22    Honor, because I don't know the facts and circumstances.  I
23    mean, I know generally of Paul Manafort's crimes.  I don't know
24    the specifics or the circumstances of his release.
25              THE COURT:  I just glanced at one article.  It says he
```

```
 1   was 71 years old.  He's got 40 something months, I think, to
 2   serve, but he has had a heart attack, I think --
 3           MR. LaMACCHIA:  Yeah.
 4           THE COURT:  -- in custody.  Is there more you'd like
 5   to say, Mr. LaMacchia?
 6           MR. LaMACCHIA:  You know, only that the court should
 7   consider Mr. Pena's efforts to commit this crime and, you know,
 8   it doesn't seem like -- I understand that there's the pandemic
 9   and obviously we don't want any harm to come to Mr. Pena as a
10   result of that pandemic.  I think --
11           THE COURT:  I'm having trouble hearing you.  The
12   stenographer may be too.
13           MR. LaMACCHIA:  What I'm saying is there's a lot of
14   effort that went into the crime, and I think the court should
15   consider that.  Obviously we don't want anything to happen to
16   him with respect to the pandemic.  That's not the kind of
17   sentence we're asking for.  I don't want the court to give
18   short shrift to the crime itself.
19           THE COURT:  Okay.  Is there more you wanted to say,
20   Mr. Katz?
21           MR. KATZ:  Just very briefly, Your Honor.  The
22   government talked about the 98.4 percent, I think, that had
23   underlying conditions.  I looked very hard last night to try to
24   find what qualifies as an underlying condition under that
25   criteria.  I could not find anything.  So, I mean, for all I
```

1    know, obesity counts and obesity may not be a BMI of 40.

2    Again, there's no -- at least in the Massachusetts reporting

3    statistics, I was unable to find what counts as a underlying

4    condition.  I'm just suggesting it very well may be that

5    Mr. Pena would be one of those 98.4 percent.

6          As far as Paul Manafort, I'm also unfamiliar with the

7    case.  What I can say is, based on what the warden told us

8    today, a person who had served the amount of time that Paul

9    Manafort served would not be considered unless there was

10   something coming down from the central office.  I think

11   Mr. Spaulding's testimony was very clear that he doesn't

12   recommend someone going up with less -- that doesn't meet the

13   50/25 rule.  It's only if it comes from up high.  So we don't

14   know about the other people that have received that treatment.

15   We know there are other people that have received that

16   treatment.

17         As far as the sentence, to be clear, Mr. Pena is still

18   going to be serving a sentence.  He's not -- I mean, I don't

19   want to -- I mean, I want to be fair.  You know, certainly home

20   confinement is different than being in a prison setting.  At

21   the same time, home confinement, and we're talking about a

22   six-month, six-and-a-half or almost seven-month committed

23   sentence plus whatever period -- you know, period of home

24   confinement, would be the 25 months or whatever.  That's still

25   a very serious sentence.  As far as whether or not he could be

1    trusted at home, probation has ways to make sure -- to trust

2    but verify.

3            As far as repaying Ginnie Mae, I mean, no one's

4    disagreeing with that.  As Your Honor said, there is a

5    restitution judgment.  There are ways for that to be enforced,

6    and those things can all be put into place.  None of those

7    things should stand in the way of Mr. Pena being able to serve

8    on home confinement.

9            THE COURT:  All right.  It's almost 5:00.  I'm going

10   to take this matter under advisement.  I'm not available to

11   work on this at all tomorrow.  I'm tentatively scheduling this

12   for 11:30 on Friday, the 15th.  If I'm ready, I'll give you a

13   decision orally.  If I'm not ready, it will have to be

14   rescheduled, but I've got a heavy calendar here.  So I'll try

15   to reach a decision, which I haven't reached yet, and organize

16   my thoughts sufficiently to give it to you, because I do

17   recognize there's some urgency to this.

18           I direct you, again, to order the transcript of this

19   decision on an expedited basis, and I know there's something I

20   just directed you, Mr. Katz, to file an affidavit on tomorrow

21   morning.

22           MR. KATZ:  Yeah, it ws the number of infections at FMC

23   Devens?

24           THE COURT:  Yes.

25           If either of you want to supplement the record -- and

1    you don't have to -- by 11:00 tomorrow morning.

2              MR. LaMACCHIA:  Very good, Your Honor.

3              MR. KATZ:  Thank you, Your Honor.

4              THE COURT:  Again, I mean, this has taken a long time

5    but, A, Mr. Pena is important, as every human being is, and, B,

6    his case is in the context of recurring issues that are

7    important to the public, to the government and to the prisoners

8    and those work in the prison camp.  So I think the adversary

9    system is working at a high level.  I think the warden was

10   knowledgeable and, in my view, candid, and I will develop a

11   decision as soon as I can.  Okay?

12             Anything further in this matter for today, other than

13   to thank the stenographer.

14             Court is in recess.  Except I'll ask my staff to stay

15   on, please.

16             THE CLERK:  Yes, Your Honor.

17   (Proceedings adjourned at 5:00 p.m.)

18

19

20

21

22

23

24

25

1                C E R T I F I C A T E

2

3

4    UNITED STATES DISTRICT COURT )

5    DISTRICT OF MASSACHUSETTS     )

6

7

8              I certify that the foregoing is a correct transcript

9    from the record of proceedings taken May 13, 2020 in the

10   above-entitled matter to the best of my skill and ability.

11

12

13

14

15   /s/ Kathleen Mullen Silva                    5/14/20

16   Kathleen Mullen Silva, RPR, CRR              Date
     Official Court Reporter
17   .

18

19

20

21

22

23

24

25